UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHIGAN DEPARTMENT OF
ENVIRONMENTAL QUALITY,

     Plaintiff,                       No.

v.                                   HON.

WOLVERINE WORLD WIDE, INC.,     MAG.

     Defendant.
_____

Polly A. Synk (P63473)
Brian J. Negele (P41846)
Assistant Attorneys General
Attorneys for Plaintiff
Environment, Natural Resources, and
Agriculture Division
P.O. Box 30755
Lansing, MI 48909
(517) 373-7540
synkp@michigan.gov
negeleb@michigan.gov

_____

John V. Byl (P35701)
Warner Norcross & Judd LLP
Attorney for Defendant
111 Lyon Street NW, Suite 900
Grand Rapids, MI 49503
(616) 752-2149
jbyl@wnj.com
_____/

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Michigan Department of Environmental Quality (MDEQ), by the authority of the Michigan Attorney General and through the undersigned counsel, for its Complaint against Defendant Wolverine World Wide, Inc. (Wolverine), states as follows:

## INTRODUCTION

1.  This is a civil action for declaratory and injunctive relief, and costs and fees, under the citizen suit provision of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901, *et seq*., specifically Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B), and Part 201, Environmental Remediation, of the Michigan Natural Resources and Environmental Protection Act (NREPA) (Part 201), Mich. Comp. Laws § 324.20101 *et seq*., and Part 31, Water Resources Protection, of the NREPA (Part 31), Mich. Comp. Laws § 324.3101 *et seq*., specifically Mich. Comp. Laws § 324.20137 and Mich. Comp. Laws § 324.3109.

2.  RCRA Section 3006, 42 U.S.C. § 6926, allows the Administrator of the U.S. Environmental Protection Agency (U.S. EPA) to authorize a state to administer its own hazardous waste program in lieu of the federal program when the Administrator deems the state program to be equivalent to and consistent with the federal program.

3.  On October 30, 1986, the State of Michigan was granted final authorization by the U.S. EPA Administrator, pursuant to Section 3006(b) of RCRA, 42 U.S.C. § 6926(b), to administer a hazardous waste management program in Michigan in lieu of the federal RCRA program.  40 C.F.R. §§ 272.1150-1151.  This

authorization is periodically updated to maintain authorization.  In November of 2000, U.S. EPA and MDEQ entered into a Memorandum of Understanding agreeing that the MDEQ could use Part 201 cleanup criteria and processes to implement RCRA corrective action, so long as they were not less stringent than RCRA.

4.     As detailed below, MDEQ alleges that Wolverine has contributed and continues to contribute to the past and present handling, storage, treatment, transportation, and/or disposal of solid waste at properties owned by Wolverine, and also at properties owned by others, in such a manner that resulted in releases of per- and polyfluoroalkyl substances (PFAS) at levels that resulted in detections that exceed applicable Michigan cleanup criteria for perfluorooctanoic acid (PFOA) and perfluorooctane sulfonate (PFOS), and which may present an imminent and substantial endangerment to human health and the environment.

5.     MDEQ seeks declaratory and injunctive relief establishing that Wolverine's historic manufacturing processes and waste management practices present an imminent and substantial endangerment to human health and the environment, and directing Wolverine to: investigate and assess the location and extent of releases or threatened releases of PFAS into the environment; develop and implement plans for the continued sampling and analysis of impacts to drinking water wells from PFAS released or disposed of by Wolverine; and provide alternate drinking water supplies to users of drinking water wells impacted by PFAS for which Wolverine is responsible.

6.     MDEQ seeks further injunctive relief requiring Wolverine to: provide long-term, reliable drinking water supplies to users of drinking water wells to address unacceptable risks posed by a release or threat of release of PFAS attributable to Wolverine; to require Wolverine to perform response activities required under the NREPA to abate any endangerment to human health and the environment from exposure to PFAS at locations where they have come to be located; and for the payment of the State's past and future response activity costs and costs of surveillance and enforcement.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over the RCRA claims set forth in this complaint under Section 7002(a) of RCRA, 42 U.S.C. § 6972(a); the federal Declaratory Judgment Act, 28 U.S.C. § 2201; and 28 U.S.C. § 1331 (federal question).

8.     This Court also has supplemental jurisdiction over the NREPA claims set forth in this complaint under 28 U.S.C. § 1367, as they are substantially related to the RCRA claims and form part of the same case or controversy.

9.     Venue is proper in this Court under section 7002(a) of RCRA, 42 U.S.C. § 6972(a), because the Wolverine headquarters and the facilities affected by PFAS attributable to Wolverine are located within the Western District of Michigan and the alleged endangerment occurred and continues to occur within the Western District of Michigan.

**PLAINTIFF**

10.     MDEQ is a department of the State of Michigan, and is responsible for the overall management and protection of the environmental safety and health of Michigan citizens and residents.

**DEFENDANT**

11.     Wolverine is a Delaware Corporation with its principal place of business located in Rockford, Michigan.

12.     Pursuant to 42 U.S.C. § 6903(15) and Mich. Comp. Laws § 324.301(h), Wolverine is a "person" subject to the provisions of RCRA, 42 U.S.C. §§ 6903(15), 6972, and the NREPA, Mich. Comp. Laws § 324.20137.

**COMMON ALLEGATIONS**

13.     The Rockford Tannery is a site located at 123 North Main Street, Rockford, Michigan.  At all times relevant to this litigation, Wolverine has owned the Rockford Tannery.

14.     Wolverine utilized the Rockford Tannery from 1908 to 2009 to process hides and leathers for use in shoes, boots, and other consumer leather goods.  The Tannery building was demolished in 2010.

15.     Buried hides and leathers have been identified at and in the vicinity of the Rockford Tannery.

16.     Wolverine disposed of wastes from tannery operations at and near the "House Street Disposal Site," a property located at 1855 House Street, Belmont, Michigan.

17.     The House Street Disposal Site was licensed under Act 87 of the Public Acts of 1965 (Act 87) for the disposal of solid waste in 1966.  Records from the early 1960s reference Wolverine's placement of tannery wastes on the site prior to 1966.

18.     Wolverine disposed of waste at and near the House Street Disposal Site from the mid-1950s through 1970.  Wolverine has submitted a plan to MDEQ for investigation of the House Street Disposal Site.

19.     On information and belief, Wolverine also disposed of tannery wastes in locations other than the Rockford Tannery and the House Street Disposal Site during a similar period from the mid-1950s through the 1970s.

20.     On information and belief, tannery wastes from Wolverine's Rockford Tannery contained PFAS from waterproofing operations.

21.     Wolverine's manufacturing processes and associated waste management and disposal activities caused the release of per- and polyfluoroalkyl substances (PFAS) into the environment, including but not limited to perfluorooctanoic acid (PFOA) and perfluorooctane sulfonate (PFOS).

22.     The PFAS released by Wolverine have migrated into the environment, including, but not limited to, surface water, soils, and groundwater, at the Rockford Tannery, the House Street Disposal Site, and other areas where Wolverine disposed

of tannery wastes, including in groundwater discharging to the Rogue River adjacent to the Former Rockford Tannery.

## INVESTIGATION AND CHARACTERIZATION ACTIVITIES

23.     Wolverine performed sampling in 2017 for PFAS both on the Rockford Tannery property and in the adjacent Rogue River.  Results indicated that PFAS are present in the groundwater onsite, as well as in groundwater discharging to the Rogue River.

24.     Wolverine collected surface water samples from the Rogue River downgradient from the former Rockford Tannery in 2017 and detected PFAS in the samples.

25.     PFAS were also detected in the groundwater discharging to surface water adjacent to the former Rockford Tannery and in surface water both upstream and downstream of the Rockford Dam.  Results of the sampling demonstrated that groundwater on the Rockford Tannery site exceed Part 201 groundwater-surface water interface criteria for both PFOA and PFOS.

26.     Sampling results in groundwater and residential wells indicate that the PFAS have also migrated from the original locations where disposal activities took place.

27.      Wolverine has been engaged in the investigation, characterization, and/or remediation of these PFAS since their discovery in 2017, and has complied with several requests from MDEQ to conduct investigations, sampling, and action to provide alternate water supplies at locations suspected or confirmed to have

impacts to drinking water sources. Wolverine conducted PFAS sampling at locations depicted on Exhibit A and described as House Street, Wolven/Jewell, and Rogue River. MDEQ conducted PFAS sampling at the location depicted on Exhibit A and described as North Childsdale/10 Mile.

28. As of January 8, 2018, Wolverine has sampled 640 residential drinking water wells for PFAS due to concerns over the possible migration of PFAS from the House Street Disposal Site. Of these, 30 residential drinking water wells have tested above the Part 201 generic residential drinking water cleanup criteria of 70 parts per trillion (combined) established for two PFAS: PFOA and PFOS. In addition, groundwater at and emanating from the House Street Disposal Site exceeds Part 201 groundwater-surface water interface criteria for PFOS.

29. On information and belief, Wolverine has offered bottled water to all residents whose wells it has sampled for PFAS. In addition, as of January 8, 2018, Wolverine has installed 90 point-of-use filtration systems and 410 point-of-entry filtration systems based on PFAS sampling results. Wolverine has also begun a remedial investigation of the House Street Disposal Site groundwater plume to define the horizontal and vertical extent of PFAS contamination as well as potential PFAS impacts to surface waters.

30. As of January 8, 2018, Wolverine has sampled 549 residential wells for PFAS in association with locations in Kent County, other than the Rockford Tannery and the House Street Disposal Site, where Wolverine tannery wastes may have been disposed and released PFAS into the environment. Of these, 48

residential drinking water wells have tested above the Part 201 generic residential drinking water cleanup criteria for PFOA and PFOS.

31.     As is further outlined below, while Wolverine has been engaged in the investigation, characterization, and/or remediation of PFAS-related contamination and wastes since their discovery in 2017, on information and belief, these Part 201 PFAS hazardous substances, contaminants and wastes continue to be present in the soil, surface water, and groundwater at the Rockford Tannery, the House Street Disposal Site, and other disposal sites still being identified, and in groundwater discharging to the Rogue River adjacent to the Rockford Tannery at unsafe levels.

## CLAIMS FOR RELIEF

### COUNT I: RCRA – IMMINENT AND SUBSTANTIAL ENDANGERMENT

32.     MDEQ realleges and incorporates by reference paragraphs 1 through 31.

33.     Section 7002(a)(l)(B) of RCRA, 42 U.S.C. § 6972(a)(l)(B), under which MDEQ brings this claim, is RCRA's citizen enforcement provision.  Section 7002(a)(l)(B) authorizes "any person" to seek redress in federal court for risks posed to public health and the environment by "hazardous wastes" and "solid wastes."  A Section 7002(a)(l)(B) claim alleges endangerment to health or environment rather than a statutory violation.

34.     A "State" is included within the definition of "person" under RCRA. 42 U.S.C. § 6903(15).

35.     Any person may bring a lawsuit under RCRA § 7002(a)(1)(B) when: (a) a "solid or hazardous waste"; (b) "may present an imminent and substantial endangerment to health or the environment"; and (c) the defendant falls within one of the categories of entities that Congress declared liable for taking abatement action or such other action as a court determines may be necessary.

36.     The persons declared liable by Congress for abatement of endangerments under RCRA § 7002(a)(l)(B) are entities that contributed to "past or present handling, storage, treatment, transportation, or disposal" of the "solid wastes" at issue.

37.     Under Section 1004(27) of RCRA, 42 U.S.C. § 6903(27), "solid waste" is "discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities."

38.     For purposes of RCRA § 7002(a)(l)(B) citizen suits, substances qualify as "solid wastes" when the above statutory definition as set forth in RCRA § 1004 (27) is met.

39.     The tannery wastes containing and leaching PFAS contaminants, including PFOA and PFOS, into the environment are solid wastes because they constitute discarded materials resulting from Wolverine's industrial and commercial operations.

40. According to the U.S. EPA, human exposure to PFOA and PFOS may result in adverse health effects to humans such as developmental, thyroid, liver, and immune system effects.

41. Wolverine has caused or contributed to a condition that presents or may present an imminent and substantial endangerment to health or the environment because Wolverine released "solid wastes" into the environment.

42. Wolverine has caused or contributed to a condition that may present an imminent and substantial endangerment to health or the environment because Wolverine: (a) owned the Rockford Tannery and the House Street Disposal Site at the time that the release of the "solid wastes" from these sites occurred and yet failed to prevent that release of the "solid wastes"; or (b) failed to investigate and abate the "solid waste" contamination once the release of the "solid wastes" occurred at the Rockford Tannery, the House Street Disposal Site, and other areas where Wolverine disposed of tannery wastes.

43. MDEQ is entitled to relief under RCRA § 7002(a), 42 U.S.C. § 6972(a), requiring Wolverine to take such action as may be necessary to abate the imminent and substantial endangerment to public health and the environment based on the disposal of "solid wastes" that present an imminent and substantial endangerment to public health and the environment.

## COUNT II: LIABILITY UNDER PART 201 OF THE NREPA

44.     MDEQ realleges and incorporates by reference paragraphs 1 through 43.

45.     The purpose of Part 201 of the NREPA is to provide for appropriate response activities to eliminate unacceptable risks to public health, safety, or welfare, or to the environment from environmental contamination at facilities within the State of Michigan.  Mich. Comp. Laws § 324.20102(c).

46.     Part 201 of the NREPA authorizes the Attorney General, on behalf of the State, to commence a civil action seeking, inter alia, "[t]emporary or permanent injunctive relief necessary to protect the public health, safety, or welfare, or the environment from the release or threat of release," and a "declaratory judgment on liability for future response activity costs and damages."  Mich. Comp. Laws § 324.20137(1).

47.     The PFAS known as PFOA (perfluorooctanoic acid) and PFOS (perfluorooctane sulfonate) are "hazardous substances" under Section 20101(1)(x) of Part 201 of the NREPA, Mich. Comp. Laws § 324.20101(1)(x), based upon MDEQ's establishment of residential drinking water cleanup criteria for PFOA and PFOS under Mich. Admin. Code r. 299.6(12), effective January 10, 2018.

48.     The leaking, emitting, discharging, escaping, leaching, dumping and disposal of hazardous substances constitute a "release" or "threat of release" as those terms are defined in Section 20101(1)(pp) and 20101(1)(ccc) of the NREPA, Mich. Comp. Laws § 324.20101(1)(pp) and Mich. Comp. Laws § 324.20101(1)(ccc).

49.     MDEQ has established cleanup criteria for PFOA and PFOS for exposure pathways including groundwater-surface water interface, and groundwater as a source of drinking water. Mich. Comp. Laws § 324.20120e(1)(a), Mich. Admin. Code r. 299.6(12).

50.     The detections of PFOA and PFOS in groundwater at and near areas where Wolverine manufactured or disposed of tannery wastes exceed the concentrations that satisfy the criteria under Part 201 and those areas are "facilities" as defined in Section 20101(1)(s) of Part 201 of the NREPA, Mich. Comp. Laws § 324.20101(1)(s).

51.     Samples taken in groundwater discharging to surface water near the Rockford Tannery exceed the generic groundwater-surface water interface cleanup criteria for PFOA and PFOS.

52.     NREPA Section 20126(1), MCL 324.20126(1), provides in part:

(1) Notwithstanding any other provision or rule of law and except as provided in subsections (2), (3), (4), and (5) and section 20128, the following persons are liable under this part:

> (a) The owner or operator of a facility if the owner or operator is responsible for an activity causing a release or threat of release.

> (b) The owner or operator of a facility at the time of disposal of a hazardous substance if the owner or operator is responsible for an activity causing a release or threat of release.

***

(d) person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of a hazardous substance owned or possessed by the person, by any other person, at a facility owned or operated by another person and containing the hazardous substance.

53. Wolverine is an owner and operator of a facility responsible for an activity causing a release or threat of release and is liable under Mich. Comp. Laws §§ 324.20126(1)(a) and (b).

54. Wolverine arranged for disposal of tannery wastes that contained PFAS at facilities owned by others, and is liable under Mich. Comp. Laws § 324.20126(1)(d).

55. Section 20126a of the NREPA, Mich. Comp. Laws § 324.20126a, provides in part:

(1) Except as provided in section 20126(2), a person who is liable under section 20126 is jointly and severally liable for all of the following:

(a) All costs of response activity lawfully incurred by the state relating to the selection and implementation of response activity under this part.

***

(3) The amounts recoverable in an action shall include interest. This interest shall accrue from the date payment is demanded in writing, or the date of expenditure or damage, whichever is later. The rate of interest on the outstanding unpaid balance of the accounts recoverable under this section shall be the same rate as specified in section 6013(8) of the revised judicature act of 1961, Act No. 236 of the Public Acts of 1961, being section 600.613 of the Michigan Compiled Laws.

***

    (6) If the department determines that there may be an imminent and substantial endangerment to the public health, safety, or welfare, or to the environment because of an actual or threatened release from a facility, the attorney general may bring an action against any person who is liable under section 20126 or any other appropriate person to secure the relief that may be necessary to abate the danger or threat. The court has jurisdiction to grant such relief as the public interest and the equities of the case may require.

56.    As a result of releases and threatened releases of hazardous substances for which Wolverine is responsible, the State has incurred and is continuing to incur response activity costs, including investigation, monitoring, and enforcement costs, at the Facility. NREPA Section 20137(1), Mich. Comp. Laws § 324.20137(1), provides in part as follows:

    Subject to subsections (2) and (3), in addition to other relief authorized by law, the attorney general may, on behalf of the state, commence a civil action seeking 1 or more of the following:

    (a) Temporary or permanent injunctive relief necessary to protect the public health, safety, or welfare, or the environment from the release or threat of release.

    (b) Recovery of state response activity costs pursuant to Section 20126a.

***

    (d) A declaratory judgment on liability for future response costs and damages.

    (e) A civil fine of not more than $10,000.00 for each day of noncompliance without sufficient cause with a written request of the department pursuant to section 20114(1)(h). A fine imposed under this subdivision shall be based on the seriousness of the violation and any good faith efforts of the person to comply with this part.

15

(f) A civil fine of not more than $1,000.00 for each day of violation of this part. A fine imposed under this subdivision shall be based upon the seriousness of the violation and any good faith efforts of the person to comply with this part.

\*\*\*

(k) Any other relief necessary for the enforcement of this part.

57. Under NREPA Sections 20126a and 20137(1), Mich. Comp. Laws § 324.20126a and Mich. Comp. Laws § 324.20137(1), MDEQ seeks declaratory relief that Wolverine is responsible for performing all further response activities necessary to protect the public health, safety, or welfare or the environment from the release or threat and release of hazardous substances, and is liable for the State's past and future response activity costs and costs of surveillance and performance related to its investigation and implementation of other response activities, including, but not limited, to costs related to providing an alternative water supply, costs related to health assessments or health-effect studies carried out under the supervision, or with the approval of, the Michigan Department of Health and Human Services related to response activities, interest, and oversight of any future response activities that Wolverine may perform.

58. Under Section 20114(1) of Part 201 of the NREPA, Mich. Comp. Laws § 324.20114(1), as the liable owner or operator of property known to be a facility, Wolverine has an affirmative obligation, with or without notice or demand from MDEQ, to determine the nature and extent of Wolverine's releases of PFAS and to

diligently pursue response activities necessary to achieve the cleanup criteria specified in Part 201 and its implementing rules.

59.     Based on information gathered to date, the State has determined that unacceptable exposures to PFAS currently exist to drinking water well users and, therefore, replacement of such PFAS-affected drinking water wells with public or private water supplies may be necessary to protect public health, safety, or welfare.

60.     Wolverine is obligated to demonstrate to the State's satisfaction that Wolverine's PFAS analysis and proposal for provision of alternate water supplies mitigates current and future unacceptable risks to human health.

61.     MDEQ further seeks statutory penalties, civil fines, and any other relief available under Section 20137(1), Mich. Comp. Laws § 324.20137(1).

62.     MDEQ is entitled to relief under Section 20137 of Part 201 of the NREPA, Mich. Comp. Laws § 324.20137, requiring Wolverine to take such action as may be necessary to protect the public health, safety, or welfare, or the environment.

### COUNT III: VIOLATIONS OF PART 31 OF THE NREPA AND COMMON LAW NUISANCE

63.     MDEQ realleges and incorporates by reference paragraphs 1 through 62.

64.     Section 3115(1) of Part 31 of the NREPA, Mich. Comp. Laws § 324.3115(1), provides that the Attorney General may commence a civil action for

appropriate relief, including a permanent or temporary injunction, for violations of Part 31 of the NREPA or its implementing rules.

65. Section 3109(1) of Part 31 of the NREPA, Mich. Comp. Laws § 324.3109(1), prohibits the direct or indirect discharge of any substance into the waters of the State that is or may become injurious to: (a) "the public health, safety, or welfare"; (b) "domestic, commercial, industrial, agricultural, recreational, or other uses that are being made or may be made of such waters"; (c) "the value or utility of riparian lands"; (d) "livestock, wild animals, birds, fish, aquatic life, or plants or to their growth, or propagation"; and (e) "the value of fish and game."

66. Section 3112(1) of Part 31 of the NREPA, Mich. Comp. Laws § 324.3112(1), prohibits the discharge of any waste or waste effluent into the waters of the State (groundwater or surface water), without a permit.

67. Wolverine's manufacturing operations and waste disposal practices have resulted in the unpermitted discharges into surface water and groundwater of PFAS that are or may become injurious to public health, fish, plants, aquatic life, and other designated uses of the waters of the state and, therefore, these practices are in violation of Part 3109 of the NREPA.

68. A violation of Section 3109 of Part 31 is prima facie evidence of the existence of a public nuisance and, pursuant to Mich. Comp. Laws § 324.3109(7), the Attorney General is authorized to bring a judicial action in a court of competent jurisdiction to abate the nuisance.

69.     MDEQ is entitled to relief under Section 3115 of Part 31 of the NREPA, Mich. Comp. Laws § 324.3115, requiring Wolverine to take such action as may be necessary to abate the injurious PFAS discharged to the groundwater and surface waters of the State by Wolverine.

70.     MDEQ has incurred, and continues to incur, costs of surveillance and enforcement resulting from the violations of Part 31.

71.     Section 3115(2) provides that the Attorney General may commence a civil action on behalf of MDEQ to recover the costs of surveillance and enforcement incurred by the State as a result of the violation.

## RELIEF REQUESTED

WHEREFORE, MDEQ respectfully requests that the Court enter judgment awarding the following relief:

A.     Declare and adjudge that Wolverine's past and/or present generation, handling, storage, treatment, transportation, and/or disposal of solid wastes presents, or may present, an imminent and substantial endangerment to human health and to the environment under RCRA Section 7002(a)(1)(B);

B.     Declare that Wolverine is an owner or operator of a facility responsible for an activity causing a release or threat of release of a Part 201 hazardous substance, and that Wolverine arranged for the disposal of a Part 201 hazardous substance at a facility owned or operated by another person, and that such actions require Wolverine to conduct response activities under Part 201 to address the

exceedances of criteria and unacceptable risks to public health and the environment;

C.      Order Wolverine to prepare and submit for approval to MDEQ, and to U.S. EPA for review and comment, all necessary reports or plans, and to perform all further response activities necessary to protect the public health, safety, and welfare or the environment from a release or threat of a release of PFAS at any facilities resulting from Wolverine's releases or threatened releases in compliance with Part 201;

D.      Order Wolverine to implement a program of ongoing public outreach and information-sharing efforts to provide effective communication to the public and local units of government regarding the status and progress of response activities related to Wolverine's releases of PFAS into the environment.

E.      Order Wolverine to institute protective measures to prevent endangerment to human health and the environment including, but not limited to: (a) sampling for PFAS in drinking water using U.S. EPA-approved Method 537 version 1.1, as written, including any modifications allowed therein, or any subsequent U.S. EPA-approved method; (b) connection to municipal drinking water supplies; and (c) provision and maintenance of drinking water treatment systems, including regular sampling;

F.      Order Wolverine to continue and complete the investigation and characterization of the PFAS released into the environment from Wolverine's manufacturing processes and disposal practices, including potential releases via air

deposition, and analyze the impact of such releases to drinking water wells, surface waters, and stream biota, subject to the approval of the State;

G.     Declare that the unpermitted discharges of PFAS into surface water and groundwater are violations of Part 31 of the NREPA;

H.     Order Wolverine to abate the public nuisance caused by its discharge of injurious substances into the groundwater and surface waters of the State;

I.     Require Wolverine to pay the State's past and future response activity costs and past and future costs of surveillance and enforcement incurred by the State in connection with the releases of Part 201 hazardous substances into the environment from Wolverine tannery wastes, including enforcement costs and attorney fees; and

J.     Such other relief as the Court deems just and proper.

Respectfully submitted,

Bill Schuette
Attorney General

*/s/ Polly A. Synk*
Polly A. Synk (P63473)
Brian J. Negele (P41846)
Assistant Attorneys General
Attorneys for Plaintiff
Environment, Natural Resources, and
Agriculture Division
P.O. Box 30755
Lansing, MI 48909
(517) 373-7540
synkp@michigan.gov
negeleb@michigan.gov

Dated:  January 10, 2018
LF:  Wolverine World Wide, Inc. (MDEQ)/AG# 2018-0205144-A/Complaint 2018-01-10 [USDC-WD]