UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

MICHIGAN DEPARTMENT OF
ENVIRONMENTAL QUALITY,

      Plaintiff,

v.

WOLVERINE WORLD WIDE, INC.,

      Defendant.

And

PLAINFIELD CHARTER TOWNSHIP and
ALGOMA TOWNSHIP

      Intervening Plaintiffs,

v.

WOLVERINE WORLD WIDE, INC.,

      Defendant
_____/

Case No. 1:18-cv-00039

Hon. Janet T. Neff

**DEFENDANT WOLVERINE WORLD WIDE INC.'S
ANSWER, JURY DEMAND, AND AFFIRMATIVE DEFENSES
TO PLAINTIFF'S COMPLAINT**

Polly A. Synk (P63473)
Brian J. Negele (P41846)
Assistant Attorneys General
Environment, Natural Resources, and
Agriculture Division
P.O. Box 30755
Lansing, MI 48909
(517) 373-7540
synkp@michigan.gov
negeleb@michigan.gov
*Attorneys for Plaintiff Michigan Department*
*of Environmental Quality*

John V. Byl (P35701)
James Moskal (P41885)
Scott Watson (P70185))
Warner Norcross + Judd LLP
111 Lyon Street NW, Suite 900
Grand Rapids, MI 49503
(616) 752-2149
jbyl@wnj.com
jmoskal@wnj.com
swatson@wnj.com
*Attorneys for Defendant Wolverine World*
*Wide, Inc.*

Douglas W. Van Essen (P33169)
Silver & Van Essen, P.C.
300 Ottawa Avenue, NW, Suite 620
Grand Rapids, MI 49503
(616) 988-5600
dwv@silvervanessen.com
*Attorneys for Intervening Plaintiffs Plainfield*
*Charter Township and Algoma Township*

Wolverine World Wide, Inc. ("Wolverine"), submits the following Answer and Affirmative Defenses to Plaintiff's Complaint:

## INTRODUCTION

1.      This is a civil action for declaratory and injunctive relief, and costs and fees, under the citizen suit provision of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901, *et seq*., specifically Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B), and Part 201, Environmental Remediation, of the Michigan Natural Resources and Environmental Protection Act (NREPA) (Part 201), Mich. Comp. Laws § 324.20101 *et seq*., and Part 31, Water Resources Protection, of the NREPA (Part 31), Mich. Comp. Laws § 324.3101 *et seq.*, specifically Mich. Comp. Laws § 324.20137 and Mich. Comp. Laws § 324.3109.

**ANSWER:  Wolverine admits that Plaintiff has alleged these claims, but Wolverine denies that Plaintiff is entitled to any relief from Wolverine and further denies any allegations of liability, harm, or damages, as well as any further allegations in this paragraph, as untrue.**

2.      RCRA Section 3006, 42 U.S.C. § 6926, allows the Administrator of the U.S. Environmental Protection Agency (U.S. EPA) to authorize a state to administer its own hazardous waste program in lieu of the federal program when the Administrator deems the state program to be equivalent to and consistent with the federal program.

**ANSWER: This paragraph states legal conclusions to which no answer is required.**

3.      On October 30, 1986, the State of Michigan was granted final authorization by the U.S. EPA Administrator, pursuant to Section 3006(b) of RCRA, 42 U.S.C. § 6926(b), to

administer a hazardous waste management program in Michigan in lieu of the federal RCRA program. 40 C.F.R. §§ 272.1150-1151. This authorization is periodically updated to maintain authorization. In November of 2000, U.S. EPA and MDEQ entered into a Memorandum of Understanding agreeing that the MDEQ could use Part 201 cleanup criteria and processes to implement RCRA corrective action, so long as they were not less stringent than RCRA.

**ANSWER: This paragraph states legal conclusions to which no answer is required.  To the extent these allegations seek to summarize written documents, those documents speak for themselves and any allegations inconsistent with these documents are denied as untrue.  The remaining allegations are denied as untrue, as stated.**

4.      As detailed below, MDEQ alleges that Wolverine has contributed and continues to contribute to the past and present handling, storage, treatment, transportation, and/or disposal of solid waste at properties owned by Wolverine, and also at properties owned by others, in such a manner that resulted in releases of per- and polyfluoroalkyl substances (PFAS) at levels that resulted in detections that exceed applicable Michigan cleanup criteria for perfluorooctanoic acid (PFOA) and perfluorooctane sulfonate (PFOS), and which may present an imminent and substantial endangerment to human health and the environment.

**ANSWER:  Wolverine admits that Plaintiff has alleged this claim, but Wolverine denies that Plaintiff is entitled to any relief from Wolverine and further denies any allegations of liability, harm, or damages, as well as any further allegations in this paragraph, as untrue.**

5.      MDEQ seeks declaratory and injunctive relief establishing that Wolverine's historic manufacturing processes and waste management practices present an imminent and substantial endangerment to human health and the environment, and directing Wolverine to:

investigate and assess the location and extent of releases or threatened releases of PFAS into the environment; develop and implement plans for the continued sampling and analysis of impacts to drinking water wells from PFAS released or disposed of by Wolverine; and provide alternate drinking water supplies to users of drinking water wells impacted by PFAS for which Wolverine is responsible.

**ANSWER: Wolverine admits that Plaintiff seeks this relief, but Wolverine denies that Plaintiff is entitled to any relief from Wolverine and further denies any allegations of liability, harm, or damages, as well as any further allegations in this paragraph, as untrue.**

6.      MDEQ seeks further injunctive relief requiring Wolverine to: provide long-term, reliable drinking water supplies to users of drinking water wells to address unacceptable risks posed by a release or threat of release of PFAS attributable to Wolverine; to require Wolverine to perform response activities required under the NREPA to abate any endangerment to human health and the environment from exposure to PFAS at locations where they have come to be located; and for the payment of the State's past and future response activity costs and costs of surveillance and enforcement.

**ANSWER: Wolverine admits that Plaintiff seeks this relief, but Wolverine denies that Plaintiff is entitled to any relief from Wolverine and further denies any allegations of liability, harm, or damages, as well as any further allegations in this paragraph, as untrue.**

## JURISDICTION AND VENUE

7.　　This Court has jurisdiction over the RCRA claims set forth in this complaint under Section 7002(a) of RCRA, 42 U.S.C. § 6972(a); the federal Declaratory Judgment Act, 28 U.S.C. § 2201; and 28 U.S.C. § 1331 (federal question).

**ANSWER: Admitted.**

8.　　This Court also has supplemental jurisdiction over the NREPA claims set forth in this complaint under 28 U.S.C. § 1367, as they are substantially related to the RCRA claims and form part of the same case or controversy.

**ANSWER: Admitted.**

9.　　Venue is proper in this Court under section 7002(a) of RCRA, 42 U.S.C. § 6972(a), because the Wolverine headquarters and the facilities affected by PFAS attributable to Wolverine are located within the Western District of Michigan and the alleged endangerment occurred and continues to occur within the Western District of Michigan.

**ANSWER: Admitted that venue is proper in this Court and that Wolverine's headquarters are located in the Western District of Michigan; denied as untrue, as stated, for remaining allegations.**

### PLAINTIFF

10.　　MDEQ is a department of the State of Michigan, and is responsible for the overall management and protection of the environmental safety and health of Michigan citizens and residents.

**ANSWER: Admitted.**

**DEFENDANT**

11.     Wolverine is a Delaware Corporation with its principal place of business located in Rockford, Michigan.

**ANSWER: Admitted.**

12.     Pursuant to 42 U.S.C. § 6903(15) and Mich. Comp. Laws § 324.301(h), Wolverine is a "person" subject to the provisions of RCRA, 42 U.S.C. §§ 6903(15), 6972, and the NREPA, Mich. Comp. Laws § 324.20137.

**ANSWER: This paragraph states legal conclusions to which no answer is required.**

**COMMON ALLEGATIONS**

13.     The Rockford Tannery is a site located at 123 North Main Street, Rockford, Michigan. At all times relevant to this litigation, Wolverine has owned the Rockford Tannery.

**ANSWER: Admitted that Wolverine owns the site located at 123 North Main Street, and that a tannery operated at this site from approximately 1908 to 2009. Wolverine denies the remaining allegations in this paragraph as untrue.**

14.     Wolverine utilized the Rockford Tannery from 1908 to 2009 to process hides and leathers for use in shoes, boots, and other consumer leather goods. The Tannery building was demolished in 2010.

**ANSWER: Admitted.**

15.     Buried hides and leathers have been identified at and in the vicinity of the Rockford Tannery.

**ANSWER: Admitted.**

5

16.     Wolverine disposed of wastes from tannery operations at and near the "House Street Disposal Site," a property located at 1855 House Street, Belmont, Michigan.

**ANSWER: Denied as untrue, as stated.**

17.     The House Street Disposal Site was licensed under Act 87 of the Public Acts of 1965 (Act 87) for the disposal of solid waste in 1966. Records from the early 1960s reference Wolverine's placement of tannery wastes on the site prior to 1966.

**ANSWER: Wolverine admits that the House Street Disposal Site was licensed under Act 87 of the Public Acts of 1965 (Act 87).  Wolverine further admits placing certain tannery waste at the House Street Disposal Site for certain times prior to 1966. Wolverine denies as untrue the remaining allegations in this paragraph.**

18.     Wolverine disposed of waste at and near the House Street Disposal Site from the mid-1950s through 1970. Wolverine has submitted a plan to MDEQ for investigation of the House Street Disposal Site.

**ANSWER: Wolverine admits that it submitted a work plan to MDEQ for investigation of the House Street Disposal Site.  To the extent these allegations seek to summarize written documents, those documents speak for themselves and these allegations are denied as untrue to the extent they are inconsistent therewith; denied as untrue, as stated, to the remaining allegations here.**

19.     On information and belief, Wolverine also disposed of tannery wastes in locations other than the Rockford Tannery and the House Street Disposal Site during a similar period from the mid-1950s through the 1970s.

**ANSWER: Denied as untrue, as stated.**

20.     On information and belief, tannery wastes from Wolverine's Rockford Tannery contained PFAS from waterproofing operations.

**ANSWER: Denied as untrue, as stated.**

21.     Wolverine's manufacturing processes and associated waste management and disposal activities caused the release of per- and polyfluoroalkyl substances (PFAS) into the environment, including but not limited to perfluorooctanoic acid (PFOA) and perfluorooctane sulfonate (PFOS).

**ANSWER: Denied as untrue, as stated.**

22.     The PFAS released by Wolverine have migrated into the environment, including, but not limited to, surface water, soils, and groundwater, at the Rockford Tannery, the House Street Disposal Site, and other areas where Wolverine disposed of tannery wastes, including in groundwater discharging to the Rogue River adjacent to the Former Rockford Tannery.

**ANSWER: Denied as untrue, as stated.**

## INVESTIGATION AND CHARACTERIZATION ACTIVITIES

23.     Wolverine performed sampling in 2017 for PFAS both on the Rockford Tannery property and in the adjacent Rogue River. Results indicated that PFAS are present in the groundwater onsite, as well as in groundwater discharging to the Rogue River.

**ANSWER: To the extent these allegations seek to summarize written documents, those documents speak for themselves and these allegations are denied as untrue to the extent they are inconsistent therewith; denied as untrue, as stated, to the remaining allegations.**

24.     Wolverine collected surface water samples from the Rogue River downgradient from the former Rockford Tannery in 2017 and detected PFAS in the samples.

**ANSWER: Denied as untrue, as stated.**

25.     PFAS were also detected in the groundwater discharging to surface water adjacent to the former Rockford Tannery and in surface water both upstream and downstream of the Rockford Dam. Results of the sampling demonstrated that groundwater on the Rockford Tannery site exceed Part 201 groundwater-surface water interface criteria for both PFOA and PFOS.

**ANSWER: To the extent these allegations seek to summarize written documents, those documents speak for themselves and these allegations are denied as untrue to the extent they are inconsistent therewith; denied as untrue, as stated, to the remaining allegations.**

26.     Sampling results in groundwater and residential wells indicate that the PFAS have also migrated from the original locations where disposal activities took place.

**ANSWER: To the extent these allegations seek to summarize written documents, those documents speak for themselves and these allegations are denied as untrue to the extent they are inconsistent therewith; denied as untrue, as stated, to the remaining allegations.**

27.     Wolverine has been engaged in the investigation, characterization, and/or remediation of these PFAS since their discovery in 2017, and has complied with several requests from MDEQ to conduct investigations, sampling, and action to provide alternate water supplies at locations suspected or confirmed to have impacts to drinking water sources. Wolverine conducted PFAS sampling at locations depicted on Exhibit A and described as House Street, Wolven/Jewell, and Rogue River. MDEQ conducted PFAS sampling at the location depicted on Exhibit A and described as North Childsdale/10 Mile.

**ANSWER: Wolverine admits that it has engaged in the investigation, characterization, and/or remediation of certain PFAS compounds since their discovery in groundwater in 2017, and has complied with several requests from MDEQ to conduct investigations, sampling, and action to provide alternate water supplies at certain locations. Wolverine admits that it conducted sampling for certain PFAS compounds at certain locations depicted on Exhibit A. Wolverine lacks knowledge or information sufficient to form a belief about the truth of the allegation regarding the actions of the MDEQ. Wolverine denies as untrue any further allegations in this paragraph.**

28.     As of January 8, 2018, Wolverine has sampled 640 residential drinking water wells for PFAS due to concerns over the possible migration of PFAS from the House Street Disposal Site. Of these, 30 residential drinking water wells have tested above the Part 201 generic residential drinking water cleanup criteria of 70 parts per trillion (combined) established for two PFAS: PFOA and PFOS. In addition, groundwater at and emanating from the House Street Disposal Site exceeds Part 201 groundwater-surface water interface criteria for PFOS.

**ANSWER: Wolverine has sampled in excess of 640 residential drinking water wells for certain PFAS and admits that in excess of 30 residential drinking water wells have tested above 70 parts per trillion (combined) for PFOA/PFOS. Wolverine denies as untrue any further allegations in this paragraph.**

29.     On information and belief, Wolverine has offered bottled water to all residents whose wells it has sampled for PFAS. In addition, as of January 8, 2018, Wolverine has installed 90 point-of-use filtration systems and 410 point-of-entry filtration systems based on PFAS sampling results. Wolverine has also begun a remedial investigation of the House Street Disposal

Site groundwater plume to define the horizontal and vertical extent of PFAS contamination as well as potential PFAS impacts to surface waters.

> **ANSWER: Wolverine admits that it has offered bottled water to residents whose wells it has sampled for certain PFAS compounds and that it has installed at least 90 point-of-use filtration systems and 410 point-of-entry filtration systems.  Wolverine further admits that it has undertaken response activities, including an investigation of the House Street Disposal Site.  Wolverine denies as untrue any further allegations in this paragraph.**

30.     As of January 8, 2018, Wolverine has sampled 549 residential wells for PFAS in association with locations in Kent County, other than the Rockford Tannery and the House Street Disposal Site, where Wolverine tannery wastes may have been disposed and released PFAS into the environment. Of these, 48 residential drinking water wells have tested above the Part 201 generic residential drinking water cleanup criteria for PFOA and PFOS.

> **ANSWER: Wolverine has sampled in excess of 549 residential drinking water wells for certain PFAS chemicals and admits that in excess of  48 residential drinking water wells have tested above 70 parts per trillion (combined) for PFOA/PFOS. Wolverine denies as untrue any further allegations in this paragraph.**

31.     As is further outlined below, while Wolverine has been engaged in the investigation, characterization, and/or remediation of PFAS-related contamination and wastes since their discovery in 2017, on information and belief, these Part 201 PFAS hazardous substances, contaminants and wastes continue to be present in the soil, surface water, and groundwater at the Rockford Tannery, the House Street Disposal Site, and other disposal sites

still being identified, and in groundwater discharging to the Rogue River adjacent to the Rockford Tannery at unsafe levels.

**ANSWER: Wolverine admits that it has undertaken response activity, including investigation, characterization, and/or remediation of groundwater containing certain PFAS since their discovery in groundwater in 2017.  Wolverine denies as untrue, as stated, any further allegations in this paragraph.**

## CLAIMS FOR RELIEF

**COUNT I: RCRA – IMMINENT AND SUBSTANTIAL ENDANGERMENT**

32.    MDEQ realleges and incorporates by reference paragraphs 1 through 31.

**ANSWER: Wolverine incorporates its previous responses.**

33.    Section 7002(a)(l)(B) of RCRA, 42 U.S.C. § 6972(a)(l)(B), under which MDEQ brings this claim, is RCRA's citizen enforcement provision. Section 7002(a)(l)(B) authorizes "any person" to seek redress in federal court for risks posed to public health and the environment by "hazardous wastes" and "solid wastes." A Section 7002(a)(l)(B) claim alleges endangerment to health or environment rather than a statutory violation.

**ANSWER: This is a legal conclusion to which no response is required.**

34.    A "State" is included within the definition of "person" under RCRA. 42 U.S.C. § 6903(15).

**ANSWER: This is a legal conclusion to which no response is required.**

35.    Any person may bring a lawsuit under RCRA § 7002(a)(1)(B) when: (a) a "solid or hazardous waste"; (b) "may present an imminent and substantial endangerment to health or the environment"; and (c) the defendant falls within one of the categories of entities that

Congress declared liable for taking abatement action or such other action as a court determines may be necessary.

**ANSWER: This is a legal conclusion to which no response is required.**

36.    The persons declared liable by Congress for abatement of endangerments under RCRA § 7002(a)(l)(B) are entities that contributed to "past or present handling, storage, treatment, transportation, or disposal" of the "solid wastes" at issue.

**ANSWER: Denied as untrue, as stated.**

37.    Under Section 1004(27) of RCRA, 42 U.S.C. § 6903(27), "solid waste" is "discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities."

**ANSWER: This is a legal conclusion to which no response is required.**

38.    For purposes of RCRA § 7002(a)(l)(B) citizen suits, substances qualify as "solid wastes" when the above statutory definition as set forth in RCRA § 1004 (27) is met.

**ANSWER: This is a legal conclusion to which no response is required.**

39.    The tannery wastes containing and leaching PFAS contaminants, including PFOA and PFOS, into the environment are solid wastes because they constitute discarded materials resulting from Wolverine's industrial and commercial operations.

**ANSWER: Denied as untrue, as stated.**

40.    According to the U.S. EPA, human exposure to PFOA and PFOS may result in adverse health effects to humans such as developmental, thyroid, liver, and immune system effects.

**ANSWER: Wolverine lacks knowledge or information sufficient to form a belief as to the truth of this allegation.**

41.     Wolverine has caused or contributed to a condition that presents or may present an imminent and substantial endangerment to health or the environment because Wolverine released "solid wastes" into the environment.

**ANSWER: Denied as untrue, as stated.**

42.     Wolverine has caused or contributed to a condition that may present an imminent and substantial endangerment to health or the environment because Wolverine: (a) owned the Rockford Tannery and the House Street Disposal Site at the time that the release of the "solid wastes" from these sites occurred and yet failed to prevent that release of the "solid wastes"; or (b) failed to investigate and abate the "solid waste" contamination once the release of the "solid wastes" occurred at the Rockford Tannery, the House Street Disposal Site, and other areas where Wolverine disposed of tannery wastes.

**ANSWER: Denied as untrue, as stated.**

43.     MDEQ is entitled to relief under RCRA § 7002(a), 42 U.S.C. § 6972(a), requiring Wolverine to take such action as may be necessary to abate the imminent and substantial endangerment to public health and the environment based on the disposal of "solid wastes" that present an imminent and substantial endangerment to public health and the environment.

**ANSWER: Denied as untrue, as stated.**

**COUNT II: LIABILITY UNDER PART 201 OF THE NREPA**

44.     MDEQ realleges and incorporates by reference paragraphs 1 through 43.

**ANSWER: Wolverine incorporates its previous responses.**

45.     The purpose of Part 201 of the NREPA is to provide for appropriate response activities to eliminate unacceptable risks to public health, safety, or welfare, or to the environment from environmental contamination at facilities within the State of Michigan.  Mich. Comp. Laws § 324.20102(c).

**ANSWER: This states a legal conclusion to which no response is required.**

46.     Part 201 of the NREPA authorizes the Attorney General, on behalf of the State, to commence a civil action seeking, inter alia, "[t]emporary or permanent injunctive relief necessary to protect the public health, safety, or welfare, or the environment from the release or threat of release," and a "declaratory judgment on liability for future response activity costs and damages." Mich. Comp. Laws § 324.20137(1).

**ANSWER: This states a legal conclusion to which no response is required.**

47.     The PFAS known as PFOA (perfluorooctanoic acid) and PFOS (perfluorooctane sulfonate) are "hazardous substances" under Section 20101(1)(x) of Part 201 of the NREPA, Mich. Comp. Laws § 324.20101(1)(x), based upon MDEQ's establishment of residential drinking water cleanup criteria for PFOA and PFOS under Mich. Admin. Code r. 299.6(12), effective January 10, 2018.

**ANSWER: This states a legal conclusion to which no response is required; denied as untrue, as stated, for remaining allegations.**

48.     The leaking, emitting, discharging, escaping, leaching, dumping and disposal of hazardous substances constitute a "release" or "threat of release" as those terms are defined in Section 20101(1)(pp) and 20101(1)(ccc) of the NREPA, Mich. Comp. Laws § 324.20101(1)(pp) and Mich. Comp. Laws § 324.20101(1)(ccc).

**ANSWER: This states a legal conclusion to which no response is required.**

49.     MDEQ has established cleanup criteria for PFOA and PFOS for exposure pathways including groundwater-surface water interface, and groundwater as a source of drinking water. Mich. Comp. Laws § 324.20120e(1)(a), Mich. Admin. Code r. 299.6(12).

**ANSWER: This states a legal conclusion to which no response is required; denied as untrue, as stated, for remaining allegations.**

50.     The detections of PFOA and PFOS in groundwater at and near areas where Wolverine manufactured or disposed of tannery wastes exceed the concentrations that satisfy the criteria under Part 201 and those areas are "facilities" as defined in Section 20101(1)(s) of Part 201 of the NREPA, Mich. Comp. Laws § 324.20101(1)(s).

**ANSWER: This states a legal conclusion to which no response is required; denied as untrue, as stated, for remaining allegations.**

51.     Samples taken in groundwater discharging to surface water near the Rockford Tannery exceed the generic groundwater-surface water interface cleanup criteria for PFOA and PFOS.

**ANSWER: Denied as untrue, as stated.**

52.     NREPA Section 20126(1), MCL 324.20126(1), provides in part:

(1) Notwithstanding any other provision or rule of law and except as provided in subsections (2), (3), (4), and (5) and section 20128, the following persons are liable under this part:

      (a)  The owner or operator of a facility if the owner or operator is responsible for an activity causing a release or threat of release.

      (b)  The owner or operator of a facility at the time of disposal of a hazardous substance if the owner or operator is responsible for an activity causing a release or threat of release.

*  *  *

15

(d) person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of a hazardous substance owned or possessed by the person, by any other person, at a facility owned or operated by another person and containing the hazardous substance.

**ANSWER: This states a legal conclusion to which no response is required.**

53.     Wolverine is an owner and operator of a facility responsible for an activity causing a release or threat of release and is liable under Mich. Comp. Laws §§ 324.20126(1)(a) and (b).

**ANSWER: This states a legal conclusion to which no response is required; denied as untrue, as stated, for remaining allegations.**

54.     Wolverine arranged for disposal of tannery wastes that contained PFAS at facilities owned by others, and is liable under Mich. Comp. Laws § 324.20126(1)(d).

**ANSWER: This states a legal conclusion to which no response is required; denied as untrue, as stated, for remaining allegations.**

55.     Section 20126a of the NREPA, Mich. Comp. Laws § 324.20126a, provides in part:

(1) Except as provided in section 20126(2), a person who is liable under section 20126 is jointly and severally liable for all of the following:

(a) All costs of response activity lawfully incurred by the state relating to the selection and implementation of response activity under this part.

* * *

(3) The amounts recoverable in an action shall include interest. This interest shall accrue from the date payment is demanded in writing, or the date of expenditure or damage, whichever is later. The rate of interest on the outstanding unpaid balance of the accounts recoverable under this section shall be the same rate as specified in section 6013(8) of the revised judicature act of 1961, Act No. 236

of the Public Acts of 1961, being section 600.613 of the Michigan
Compiled Laws.

\* \* \*

(6) If the department determines that there may be an imminent and
substantial endangerment to the public health, safety, or welfare, or
to the environment because of an actual or threatened release from a
facility, the attorney general may bring an action against any person
who is liable under section 20126 or any other appropriate person to
secure the relief that may be necessary to abate the danger or threat.
The court has jurisdiction to grant such relief as the public interest
and the equities of the case may require.

**ANSWER: This states a legal conclusion to which no response is required.**

56.     As a result of releases and threatened releases of hazardous substances for which

Wolverine is responsible, the State has incurred and is continuing to incur response activity

costs, including investigation, monitoring, and enforcement costs, at the Facility. NREPA

Section 20137(1), Mich. Comp. Laws § 324.20137(1), provides in part as follows:

Subject to subsections (2) and (3), in addition to other relief authorized by
law, the attorney general may, on behalf of the state, commence a civil
action seeking 1 or more of the following:

(a)     Temporary or permanent injunctive relief necessary to
protect the public health, safety, or welfare, or the environment from the
release or threat of release.

(b)     Recovery of state response activity costs pursuant to Section
20126a.

\* \* \*

(d)     A declaratory judgment on liability for future response costs
and damages.
(e)     A civil fine of not more than $10,000.00 for each day of
noncompliance without sufficient cause with a written request of the
department pursuant to section
20114(1)(h). A fine imposed under this subdivision shall be based on
the seriousness of the violation and any good faith efforts of the person
to comply with this part.

(f) A civil fine of not more than $1,000.00 for each day of violation of
this part. A fine imposed under this
subdivision shall be based upon the seriousness of the violation and any
good faith efforts of the person to comply with this part.

* * *

(k) Any other relief necessary for the enforcement of this part.

**ANSWER: Denied as untrue, as stated.**

57.     Under NREPA Sections 20126a and 20137(1), Mich. Comp. Laws § 324.20126a

and Mich. Comp. Laws § 324.20137(1), MDEQ seeks declaratory relief that Wolverine is

responsible for performing all further response activities necessary to protect the public health,

safety, or welfare or the environment from the release or threat and release of hazardous

substances, and is liable for the State's past and future response activity costs and costs of

surveillance and performance related to its investigation and implementation of other response

activities, including, but not limited, to costs related to providing an alternative water supply,

costs related to health assessments or health-effect studies carried out under the supervision, or

with the approval of, the Michigan Department of Health and Human Services related to

response activities, interest, and oversight of any future response activities that Wolverine may

perform.

**ANSWER: Wolverine admits that Plaintiff seeks this relief, but Wolverine denies**

**that Plaintiff is entitled to any relief from Wolverine and further denies any allegations**

**of liability, harm, or damages, as well as any further allegations in this paragraph, as**

**untrue.**

58.     Under Section 20114(1) of Part 201 of the NREPA, Mich. Comp. Laws §

324.20114(1), as the liable owner or operator of property known to be a facility, Wolverine has an

affirmative obligation, with or without notice or demand from MDEQ, to determine the nature

18

and extent of Wolverine's releases of PFAS and to diligently pursue response activities necessary to achieve the cleanup criteria specified in Part 201 and its implementing rules.

**ANSWER: This states a legal conclusion to which no response is required; denied as untrue, as stated, for remaining allegations.**

59.     Based on information gathered to date, the State has determined that unacceptable exposures to PFAS currently exist to drinking water well users and, therefore, replacement of such PFAS-affected drinking water wells with public or private water supplies may be necessary to protect public health, safety, or welfare.

**ANSWER: Wolverine lacks sufficient information to form a belief as to the truth of the determinations of the State referenced here. Denied as untrue, as stated, for remaining allegations.**

60.     Wolverine is obligated to demonstrate to the State's satisfaction that Wolverine's PFAS analysis and proposal for provision of alternate water supplies mitigates current and future unacceptable risks to human health.

**ANSWER: Denied as untrue, as stated.**

61.     MDEQ further seeks statutory penalties, civil fines, and any other relief available under Section 20137(1), Mich. Comp. Laws § 324.20137(1).

**ANSWER: Wolverine admits that Plaintiff seeks this relief, but Wolverine denies that Plaintiff is entitled to any relief from Wolverine and further denies any allegations of liability, harm, or damages, as well as any further allegations in this paragraph, as untrue.**

62.     MDEQ is entitled to relief under Section 20137 of Part 201 of the NREPA, Mich. Comp. Laws § 324.20137, requiring Wolverine to take such action as may be necessary to protect the public health, safety, or welfare, or the environment.

**ANSWER: Denied as untrue, as stated.**

## COUNT III: VIOLATIONS OF PART 31 OF THE NREPA AND COMMON LAW NUISANCE

63.     MDEQ realleges and incorporates by reference paragraphs 1 through 62.

**ANSWER: Wolverine incorporates its previous responses.**

64.     Section 3115(1) of Part 31 of the NREPA, Mich. Comp. Laws § 324.3115(1), provides that the Attorney General may commence a civil action for appropriate relief, including a permanent or temporary injunction, for violations of Part 31 of the NREPA or its implementing rules.

**ANSWER: This states a legal conclusion to which no answer is required.**

65.     Section 3109(1) of Part 31 of the NREPA, Mich. Comp. Laws § 324.3109(1), prohibits the direct or indirect discharge of any substance into the waters of the State that is or may become injurious to: (a) "the public health, safety, or welfare"; (b) "domestic, commercial, industrial, agricultural, recreational, or other uses that are being made or may be made of such waters"; (c) "the value or utility of riparian lands"; (d) "livestock, wild animals, birds, fish, aquatic life, or plants or to their growth, or propagation"; and (e) "the value of fish and game."

**ANSWER: This states a legal conclusion to which no response is required.**

66.     Section 3112(1) of Part 31 of the NREPA, Mich. Comp. Laws § 324.3112(1), prohibits the discharge of any waste or waste effluent into the waters of the State (groundwater or surface water), without a permit.

**ANSWER: This states a legal conclusion to which no response is required.**

67.     Wolverine's manufacturing operations and waste disposal practices have resulted in the unpermitted discharges into surface water and groundwater of PFAS that are or may become injurious to public health, fish, plants, aquatic life, and other designated uses of the waters of the state and, therefore, these practices are in violation of Part 3109 of the NREPA.

**ANSWER: Denied as untrue, as stated.**

68.     A violation of Section 3109 of Part 31 is prima facie evidence of the existence of a public nuisance and, pursuant to Mich. Comp. Laws § 324.3109(7), the Attorney General is authorized to bring a judicial action in a court of competent jurisdiction to abate the nuisance.

**ANSWER: Denied as untrue, as stated.**

69.     MDEQ is entitled to relief under Section 3115 of Part 31 of the NREPA, Mich. Comp. Laws § 324.3115, requiring Wolverine to take such action as may be necessary to abate the injurious PFAS discharged to the groundwater and surface waters of the State by Wolverine.

**ANSWER: Denied as untrue, as stated.**

70.     MDEQ has incurred, and continues to incur, costs of surveillance and enforcement resulting from the violations of Part 31.

**ANSWER: Wolverine lacks knowledge or information sufficient to form a belief as to the truth of these allegations.**

71.     Section 3115(2) provides that the Attorney General may commence a civil action on behalf of MDEQ to recover the costs of surveillance and enforcement incurred by the State as a result of the violation.

**ANSWER: This states a legal conclusion to which no response is required.**

WHEREFORE, Wolverine requests that the Court dismiss Plaintiff's Complaint with prejudice, that the Court deny all relief requested by Plaintiff, that the Court enter judgment in

favor of Wolverine against Plaintiff, and that the Court grant Wolverine all other relief to which it is entitled.

## <u>AFFIRMATIVE AND OTHER DEFENSES</u>

Wolverine asserts that Plaintiff's claims are barred, in whole or in part, by the following affirmative or other defenses. By setting forth these defenses, Wolverine does not assume the burden of proving any fact, issue, or element of a cause of action where such burden properly belongs to Plaintiff. Moreover, nothing stated herein is intended or shall be construed as an acknowledgment that any particular issue or subject matter is relevant to Plaintiff's allegations. Wolverine reserves the right to plead any and all additional defenses that may become evident or appreciated after investigation and discovery in this matter.

1.      Plaintiff's claims are barred by the applicable statute of limitations, statute of repose, laches, or any combination thereof.

2.      Wolverine is not the proximate cause of the complained-of harm.  Plaintiff's harm, if any, was caused, at least in part, by intervening or supervening negligence, or other acts or omissions of persons over whom Wolverine had no control or any duty to control.  In the event that Plaintiff is found to have sustained any injury, its recovery against Wolverine, if any, must be reduced by the proportionate harm and damages caused by the acts and omissions of other parties, including Plaintiff.

3.      Plaintiff is not entitled to recover from Wolverine more than Wolverine's fair, equitable, and proportionate share of the relief sought by Plaintiff.

4.      Plaintiff has not incurred response costs authorized for recovery under applicable law.

5.      Plaintiff's claims are barred to the extent that it seeks to recover costs and expenses other than response activity costs, as that term is defined under Part 201.

6.      Plaintiff's claims are barred by its failure to comply with the prerequisites to recoverability of costs.

7.      Plaintiff lacks standing because it has not suffered compensable harm fairly traceable to Wolverine's actions.

8.      Plaintiff's recovery from Wolverine is barred by the inapplicability of the collateral source rule.

9.      Plaintiff's claims are barred by mandatory joinder, claim preclusion, issue preclusion, the entire controversy doctrine, or some combination thereof.

10.     The damages sought by Plaintiff are wholly speculative, conjectural, unreasonable and excessive.

11.     Plaintiff's claims are barred, in whole or in part, by the statutory defenses to liability set forth in Part 201, RCRA, and Part 31.

12.     The Complaint is constitutionally impermissible to the extent that it seeks to impose retroactive liability.

13.     Plaintiff's claims are barred because at all relevant times Wolverine complied with all applicable environmental laws and industry standards, and otherwise conducted itself reasonably, prudently, in good faith, and with due care for the rights, safety and property of others.  In all its actions, if any, with relation to House Street, the Tannery, and Wolven/Jewell, Wolverine exercised due care with respect to any hazardous substances concerned, taking into consideration the characteristics of such hazardous substances, in light of all the facts and circumstances, and took precautions against the foreseeable acts or omissions of any third parties and the consequences that could foreseeably result from such acts or omissions.

14.     Plaintiff may not recover response activity costs to the extent that any releases were authorized by permit or other law.

15.     Plaintiff's claims are barred in whole or in part by the doctrines of waiver, estoppel, unclean hands, *in pari delicto*, assumption of risk, acquiescence, or some combination thereof.

16.     Plaintiff's claims are not ripe for adjudication because Plaintiff has not paid more than its fair share of liability.

17.     The relief sought by Plaintiff would result in unjust enrichment.

18.     Plaintiff has failed to mitigate its damages, if any.

19.     The harm at issue in this matter is capable of apportionment.  To the extent that Wolverine is held liable, its liability is divisible and excludes any harm that may be apportioned to other parties under applicable law.  If Wolverine is held liable it is liable only for its several share of liability.

20.     To the extent that Wolverine is held liable, the response activity costs that it has incurred and will incur exceed its share of liability.

21.     Wolverine's share of liability, if any, is *de minimis*, *de micromis*, or both.


WHEREFORE, Wolverine hereby demands a reply to its answer and requests that Plaintiff's Complaint be dismissed and that the Court grant all other appropriate relief.

## JURY DEMAND

1.     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Wolverine hereby demands a trial by jury of all issues properly triable thereby.

Dated: December 18, 2018                    /s/ Scott M. Watson
                                            John V. Byl (P35701)
                                            James Moskal (P41885)
                                            Scott M. Watson (P70185)
                                            WARNER NORCROSS & JUDD LLP
                                            111 Lyon, N.W., Ste. 900
                                            Grand Rapids, MI 49503
                                            (616) 752-2000