UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

MICHIGAN DEPARTMENT OF                    Case No. 1:18-cv-00039
ENVIRONMENTAL QUALITY,
                                          Hon. Janet T. Neff
      Plaintiff,

v.

WOLVERINE WORLD WIDE, INC.,

      Defendant.

And

PLAINFIELD CHARTER TOWNSHIP and
ALGOMA TOWNSHIP

      Intervening Plaintiffs,

v.

WOLVERINE WORLD WIDE, INC.,

      Defendant
_____/

**DEFENDANT WOLVERINE WORLD WIDE INC.'S
ANSWER, JURY DEMAND, AND AFFIRMATIVE DEFENSES
TO INTERVENING PLAINTIFFS' COMPLAINT**

Polly A. Synk (P63473)
Brian J. Negele (P41846)
Assistant Attorneys General
Environment, Natural Resources, and
Agriculture Division
P.O. Box 30755
Lansing, MI 48909
(517) 373-7540
synkp@michigan.gov
negeleb@michigan.gov
*Attorneys for Plaintiff Michigan Department of Environmental Quality*

John V. Byl (P35701)
James Moskal (P41885)
Scott M. Watson (P70185)
Warner Norcross + Judd LLP
111 Lyon Street NW, Suite 900
Grand Rapids, MI 49503
(616) 752-2149
jbyl@wnj.com
jmoskal@wnj.com
swatson@wnj.com
*Attorneys for Defendant Wolverine World Wide, Inc.*

Douglas W. Van Essen (P33169)
Silver & Van Essen, P.C.
300 Ottawa Avenue, NW, Suite 620
Grand Rapids, MI 49503
(616) 988-5600
dwv@silvervanessen.com
*Attorneys for Intervening Plaintiffs Plainfield Charter Township and Algoma Township*

Wolverine World Wide, Inc. (Wolverine), submits the following Answer and Affirmative Defenses to Intervening Plaintiffs' Complaint:

1.     On January 10, 2018, the Plaintiff, the Michigan Department of Environmental Quality ("MDEQ") filed this civil action for declaratory and injunctive relief, and costs and fees, under the citizen suit provision of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901, et seq., specifically Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B), and Part 201, Environmental Remediation, of the Michigan Natural Resources and Environmental Protection Act (NREPA) (Part 201), M.C.L. § 324.20101 et seq., and Part 31, Water Resources Protection, of the NREPA (Part 31), M.C.L. § 324.3101 et seq., specifically M.C.L. § 324.20137 and M.C.L. § 324.3109.

**ANSWER: Wolverine admits that MDEQ has alleged these claims, but Wolverine denies that MDEQ and Intervening Plaintiffs are entitled to any relief from Wolverine and further denies any allegations of liability, harm, or damages, as well as any further allegations in this paragraph, as untrue.**

2.     The MDEQ alleges that Wolverine has contributed and continues to contribute to the past and present handling, storage, treatment, transportation, and/or disposal of solid waste at properties owned by Wolverine, and also at properties owned by others, in such a manner that resulted in releases of per- and polyfluoroalkyl substances (PFAS) at levels exceeding applicable Michigan cleanup criteria for perfluorooctanoic acid (PFOA) and perfluorooctane sulfonate (PFOS)(collectively or individually "PFCs"), and which may present an imminent and substantial endangerment to human health and the environment.

**ANSWER: Wolverine admits that MDEQ has alleged this claim, but Wolverine denies that MDEQ and Intervening Plaintiffs are entitled to any relief from Wolverine**

**and further denies any allegations of liability, harm, or damages, as well as any further allegations in this paragraph, as untrue.**

3.      The MDEQ seeks declaratory and injunctive relief establishing that Wolverine's historic manufacturing processes and waste management practices present an imminent and substantial endangerment to human health and the environment; directing Wolverine to: investigate and assess the location and extent of releases or threatened releases of PFCs into the environment; develop and implement plans for the continued sampling and analysis of impacts to drinking water wells from PFAS released or disposed of by Wolverine; and "provide alternate drinking water supplies to users of drinking water wells impacted by PFCs for which Wolverine is responsible, including, "connection to municipal drinking water supplies."

**ANSWER: Wolverine admits that MDEQ seeks this relief, but Wolverine denies that MDEQ and Intervening Plaintiffs are entitled to any relief from Wolverine and further denies any allegations of liability, harm, or damages, as well as any further allegations in this paragraph, as untrue.**

4.      F.R.Civ.P. 24(a)(2) provides that upon a "timely motion" the Federal Court must permit anyone to intervene who "claims an interest relating to the transaction that is the subject of the action and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interests, unless existing parties adequately represent that interest."

**ANSWER: This states a legal conclusion to which no answer is required.**

5.      Plainfield operates a municipal water system ("MWS") within Plainfield and Algoma, which includes areas that the MDEQ alleges have had groundwater adversely affected

by Wolverine's alleged actions. Plainfield is the only municipal entity with a MWS that can provide the relief that the MDEQ seeks in this action.

**ANSWER**: **Wolverine admits that Plainfield operates a municipal water system, but denies the remaining allegations as untrue.**

6.     With all due respect to the MDEQ and Wolverine, neither adequately represents Plainfield's or Algoma's interest in an extension of the MWS that the MDEQ seeks from this Court of Wolverine in this action for reasons which include but are not limited to the following:

a.     Neither has the legal authority to build or operate a MWS in the affected area.

b.     Neither has the legal authority to compel Plainfield or Algoma to extend the MWS into the affected area.

c.     Neither has requested that Plainfield or Algoma extend the MWS to the affected area.

d.     Neither has the engineering expertise to extend the MWS to the affected area.

e.     Neither has financing in place to extend the MWS to the affected area.

f.     Neither knows if the MWS can be extended to the affected area.

g.     Neither knows the pressure districts that exist in the various MWS loops and implement extensions;

h.     Neither knows the status of easements nor has the easements necessary to implement extensions;

i. Neither understands the MWS's plant capacities or changes that are necessary to provide MWS to residents adversely affected by the contamination.

j. Neither knows how long it would take to extend MWS to the affected area; and

k. Neither has to live daily, continuously, or indefinitely with the consequences of extending the MWS to the affected area or the consequences of not extending the MWS to the affected area.

**ANSWER**: **Wolverine lacks knowledge or information sufficient to form a belief about the truth of these allegations with respect to MDEQ. Wolverine denies the allegations with respect to Wolverine as untrue, as stated.**

7. Plainfield and Algoma believe that the MWS can be extended to most of the affected area. Indeed, Plainfield and Algoma fully believe that the MWS, where it can be technically feasible to be extended, is the **only viable long-term remedy** for the potable water health threat posed by the alleged contamination for reasons that include the following:

a. No other alternative will provide a remedy that is free from regular individual property monitoring and regular filter-changing for generations, if not forever;

b. No other alternative will provide a remedy that is free from property value threatening deed restrictions;

c. No other alternative will protect homes from the vagaries and uncertainties of plume location, depth and strength, and filter strength and operation;

d. No other alternative will be monitored and operated by licensed, regulated operators on a continuous basis;

e.  No other alternative provides a stable, clean water source that is regularly tested and that is continually regulated by employee engineers of Plainfield and the State of Michigan as well and outside consulting engineers hired by Plainfield and the State of Michigan through standardized regulatory and oversight systems that would not be unique to the area;

f.  No other alternative will avoid constant monitoring of properties currently outside the current definition of the plumes or below regulatory action level to ensure that they do not in the future become so adversely affected as to require remedial action either from plume migration or from lowered regulatory levels;

g.  No other alternative minimizes the health threats posed by the uncertainties of the situation; and

h.  No other alternative will be subject to the regular checks and balances of being supervised through the elected, political process by officials who are *solely* elected by, serve and are accountable to the Plainfield and Algoma residents affected by this water crisis.

**ANSWER**: **Wolverine lacks knowledge or information sufficient to form a belief about the truth of these allegations with respect to Plainfield and Algoma. Wolverine denies any further allegations as untrue, as stated.**

## JURISDICTION AND VENUE

8.  This Court has federal question jurisdiction over the RCRA claims set forth in the Complaint and this Intervening Complaint under Section 7002(a) of RCRA, 42 U.S.C. § 6972(a); the federal Declaratory Judgment Act, 28 U.S.C. § 2201; and 28 U.S.C. § 1331.

**ANSWER: Admitted.**

9.     This Court also has supplemental jurisdiction over the common law nuisance claims set forth in this complaint under 28 U.S.C. § 1367, as they are substantially related to the RCRA claims and form part of the same case or controversy.

**ANSWER: Admitted.**

10.     Venue is proper in this Court under section 7002(a) of RCRA, 42 U.S.C. § 6972(a), because the Wolverine headquarters and the facilities affected by PFAS attributable to Wolverine are located within the Western District of Michigan and the alleged endangerment occurred and continues to occur within the Western District of Michigan.

**ANSWER: Admitted that venue is proper in this Court and that Wolverine's headquarters are located in the Western District of Michigan; denied as untrue, as stated, for remaining allegations.**

## PARTIES

11.     MDEQ is a department of the State of Michigan, and is responsible for the overall management and protection of the environmental safety and health of Michigan citizens and residents. A "State" is included within the definition of "person" under RCRA. 42 U.S.C. § 6903(15).

**ANSWER: Wolverine admits that MDEQ is a department of the State of Michigan, and is responsible for the overall management and protection of the environmental safety and health of Michigan citizens and residents.  The remaining allegations state a legal conclusion to which no answer is required.**

12.     Wolverine is a Delaware Corporation with its principal place of business located in Rockford, Michigan.  Pursuant to 42 U.S.C. § 6903(15) and Mich. Comp. Laws § 324.301(h), Wolverine is a "person" subject to the provisions of RCRA, 42 U.S.C. §§ 6903(15), 6972

**ANSWER: Admitted.**

13.     Plainfield and Algoma are Michigan "townships" located in Kent County, Michigan and the Western District of Michigan.  Their geographical boundaries encompass contaminated areas as asserted by the MDEQ in this action.  They are "municipalities" as intended by Congress within the definition of "person" under RCRA. 42 U.S.C. § 6903(15), and may, therefore, bring a citizen suit thereunder.  They are the only municipalities authorized under Michigan law to operate a MWS within their geographical boundaries.  See M.C.L. § 41.411.

**ANSWER: This states a legal conclusion to which no answer is required; Wolverine lacks knowledge or information sufficient to form a belief as to the truth of remaining allegations.**

## COMMON ALLEGATIONS

14.     The Rockford Tannery is a site located at 123 North Main Street, Rockford, Michigan. At all times relevant to this litigation, Wolverine has owned the Rockford Tannery.

**ANSWER: Admitted that Wolverine owns the site located at 123 North Main Street, and that a tannery operated at this site from approximately 1908 to 2009. Wolverine denies the remaining allegations in this paragraph as untrue.**

15.     Wolverine utilized the Rockford Tannery from 1908 to 2009 to process hides and leathers for use in shoes, boots, and other consumer leather goods. The Tannery building was demolished in 2010.

**ANSWER: Admitted.**

16.     Buried hides and leathers have been identified at and in the vicinity of the Rockford Tannery.

**ANSWER: Admitted.**

17.     Wolverine disposed of wastes from tannery operations at and near the "House Street Disposal Site," a property located at 1855 House Street, Belmont, Michigan, which is located within Plainfield.

**ANSWER: Denied as untrue, as stated.**

18.     The House Street Disposal Site was licensed under Act 87 of the Public Acts of 1965 (Act 87) for the disposal of solid waste in 1966. Records from the early 1960s reference Wolverine's placement of tannery wastes on the site prior to 1966.

**ANSWER: Wolverine admits that the House Street Disposal Site was licensed under Act 87 of the Public Acts of 1965 (Act 87). Wolverine further admits placing certain tannery waste at the House Street Disposal Site for certain times prior to 1966. Wolverine denies as untrue the remaining allegations in this paragraph.**

19.     Wolverine disposed of waste at and near the House Street Disposal Site from the mid-1950s through 1970. Wolverine has submitted a plan to MDEQ for investigation of the House Street Disposal Site.

**ANSWER: Wolverine admits that it submitted a work plan to MDEQ for investigation of the House Street Disposal Site. To the extent these allegations seek to summarize written documents, those documents speak for themselves and these allegations are denied as untrue to the extent they are inconsistent therewith; denied as untrue, as stated, to the remaining allegations here.**

20.     On information and belief, Wolverine also disposed of tannery wastes in locations other than the Rockford Tannery and the House Street Disposal Site during a similar period from the mid-1950s through the 1970s.  Most, if not all, of these sites are located in Plainfield and Algoma.

**ANSWER: Denied as untrue, as stated.**

21.     On information and belief, tannery wastes from Wolverine's Rockford Tannery contained PFAS from waterproofing operations.

**ANSWER: Denied as untrue, as stated.**

22.     Wolverine's manufacturing processes and associated waste management and disposal activities caused the release of PFC's including per-and polyfluoroalkyl substances (PFAS) into the environment, including but not limited to perfluorooctanoic acid (PFOA) and perfluorooctane sulfonate (PFOS).

**ANSWER: Denied as untrue, as stated.**

23.     The PFC's released by Wolverine have migrated into the environment, including, but not limited to, surface water, soils, and groundwater, at the Rockford Tannery, the House Street Disposal Site, and other areas where Wolverine disposed of tannery wastes, including in groundwater discharging to the Rogue River adjacent to the former Rockford Tannery and into plumes moving South into Plainfield and North into Algoma.

**ANSWER: Denied as untrue, as stated.**

## INVESTIGATION AND CHARACTERIZATION ACTIVITIES

24.     Wolverine performed sampling in 2017 for PFCs both on the Rockford Tannery property and in the adjacent Rogue River. Results indicated that PFCs are present in the groundwater onsite, as well as in groundwater discharging to the Rogue River.

**ANSWER: To the extent these allegations seek to summarize written documents, those documents speak for themselves and these allegations are denied as untrue to the extent they are inconsistent therewith; denied as untrue, as stated, to the remaining allegations here.**

25.     Wolverine collected surface water samples from the Rogue River downgradient from the former Rockford Tannery in 2017 and detected PFAS in the samples.

**ANSWER: Denied as untrue, as stated.**

26.     PFCs were also detected in the groundwater discharging to surface water adjacent to the former Rockford Tannery and in surface water both upstream and downstream of the Rockford Dam. Results of the sampling demonstrated that groundwater on the Rockford Tannery site exceed Part 201 groundwater-surface water interface criteria for both PFOA and PFOS, Part 201 being Michigan's state law governing drinking water standards, among other things.

**ANSWER: To the extent these allegations seek to summarize written documents, those documents speak for themselves and these allegations are denied as untrue to the extent they are inconsistent therewith; denied as untrue, as stated, to the remaining allegations here.**

27.     Sampling results in groundwater and residential wells indicate that the PFAS have also migrated from the original locations where disposal activities took place.

**ANSWER: To the extent these allegations seek to summarize written documents, those documents speak for themselves and these allegations are denied as untrue to the extent they are inconsistent therewith; denied as untrue, as stated, to the remaining allegations.**

28. Wolverine has been engaged in the investigation, characterization, and/or remediation of these PFAS since their discovery in 2017, and has complied with several requests from MDEQ to conduct investigations, sampling, and action to provide alternate water supplies at locations suspected or confirmed to have impacts to drinking water sources. Wolverine conducted PFC sampling at locations including but not limited to described as House Street, Wolven/Jewell, Wellington Ridge, and Rogue River. MDEQ conducted PFC sampling at the location depicted on Exhibit A attached to the MDEQ's complaint and described as North Childsdale/10 Mile. These areas are located within Plainfield and Algoma.

**ANSWER: Wolverine admits that it has engaged in the investigation, characterization, and/or remediation of certain PFAS compounds since their discovery in groundwater in 2017, and has complied with several requests from MDEQ to conduct investigations, sampling, and action to provide alternate water supplies at certain locations. Wolverine admits that it conducted sampling for certain PFAS compounds at certain locations depicted on Exhibit A. Wolverine lacks knowledge or information sufficient to form a belief about the truth of the allegation regarding the actions of the MDEQ. Wolverine denies as untrue any further allegations in this paragraph.**

29. As of January 8, 2018, Wolverine has sampled 640 residential drinking water wells for PFAS due to concerns over the possible migration of PFAS from the House Street Disposal Site. Of these, 30 residential drinking water wells have tested above the Part 201 generic residential drinking water cleanup criteria of 70 parts per trillion (combined) established for two PFAS: PFOA and PFOS. In addition, groundwater at and emanating from the House Street Disposal Site exceeds Part 201 groundwater-surface water interface criteria for PFOS.

**ANSWER: Wolverine has sampled in excess of 640 residential drinking water wells for certain PFAS and admits that in excess of 30 residential drinking water wells have tested above 70 parts per trillion (combined) for PFOA/PFOS. Wolverine denies as untrue any further allegations in this paragraph.**

30.     On information and belief, Wolverine has offered bottled water to all residents whose wells it has sampled for PFCs. In addition, as of January 8, 2018, Wolverine has installed 90 point-of-use filtration systems and 410 point-of-entry filtration systems based on PFC sampling results. Wolverine has also begun a remedial investigation of the House Street Disposal Site groundwater plume to define the horizontal and vertical extent of PFC contamination as well as potential PFC impacts to surface waters.

**ANSWER: Wolverine admits that it has offered bottled water to residents whose wells it has sampled for certain PFAS compounds and that it has installed at least 90 point-of-use filtration systems and 410 point-of-entry filtration systems. Wolverine further admits that it has undertaken response activities, including an investigation of the House Street Disposal Site. Wolverine denies as untrue any further allegations in this paragraph.**

31.     As of January 8, 2018, Wolverine has sampled 549 residential wells for PFCs in association with locations in Kent County, other than the Rockford Tannery and the House Street Disposal Site, where Wolverine tannery wastes may have been disposed and released PFCs into the environment. Of these, 48 residential drinking water wells have tested above the Part 201 generic residential drinking water cleanup criteria for PFOA and PFOS.

**ANSWER: Wolverine has sampled in excess of 549 residential drinking water wells for certain PFAS chemicals and admits that in excess of 48 residential drinking**

**water wells have tested above 70 parts per trillion (combined) for PFOA/PFOS. Wolverine denies as untrue any further allegations in this paragraph.**

32.    As is further outlined below, while Wolverine has been engaged in the investigation, characterization, and/or remediation of PFC-related contamination and wastes since their discovery in 2017, on information and belief, these Part 201 PFC hazardous substances, contaminants and wastes continue to be present in the soil, surface water, and groundwater at the Rockford Tannery, the House Street Disposal Site, and other disposal sites still being identified, and in groundwater discharging to the Rogue River adjacent to the Rockford Tannery at unsafe levels and in plumes across large sections of Plainfield and Algoma.

**ANSWER: Wolverine admits that it has undertaken response activity, including investigation, characterization, and/or remediation of groundwater containing certain PFAS since their discovery in groundwater in 2017. Wolverine denies as untrue, as stated, any further allegations in this paragraph.**

33.    Wolverine has also been involved in extensive discussions with Plainfield regarding the extension of MWS to affected areas and Plainfield has incurred and will incur expenses and damages in providing such clean MWS to the affected areas, although, on information and belief, Wolverine does not believe it can contractually commit to Plainfield until the present lawsuit is resolved and that any such commitment must be consistent with and/or a part of any decree approved or issued by this Court in this case.

**ANSWER: Denied as untrue, as stated.**

## CLAIMS FOR RELIEF

## COUNT I: RCRA – IMMINENT AND SUBSTANTIAL ENDANGERMENT

34. Plainfield and Algoma reallege and incorporate by reference paragraphs 1 through 33 of this Intervening Plaintiffs' Complaint as if fully set forth herein.

**ANSWER: Wolverine incorporates its previous responses.**

35. Section 7002(a)(l)(B) of RCRA, 42 U.S.C. § 6972(a)(l)(B), under which Plainfield and Algoma bring this claim, is RCRA's citizen enforcement provision. Section 7002(a)(l)(B) authorizes "any person" which includes Plainfield and Algoma, to seek redress in federal court for risks posed to public health and the environment by "hazardous wastes" and "solid wastes." A Section 7002(a)(l)(B) claim alleges endangerment to health or environment rather than a statutory violation.

**ANSWER: This states a legal conclusion to which no response is required.**

36. Any person may bring a lawsuit under RCRA § 7002(a)(1)(B) when: (a) a "solid or hazardous waste"; (b) "may present an imminent and substantial endangerment to health or the environment"; and (c) the defendant falls within one of the categories of entities that Congress declared liable for taking abatement action or such other action as a court determines may be necessary.

**ANSWER: This states a legal conclusion to which no response is required.**

37. The persons declared liable by Congress for abatement of endangerments under RCRA § 7002(a)(l)(B) are entities that contributed to "past or present handling, storage, treatment, transportation, or disposal" of the "solid wastes" at issue.

**ANSWER: Denied as untrue, as stated.**

38. For purposes of RCRA § 7002(a)(l)(B) citizen suits, substances qualify as "solid wastes" when the above statutory definition as set forth in RCRA § 1004 (27) is met.

**ANSWER: This states a legal conclusion to which no response is required.**

39. The tannery wastes containing and leaching PFAS contaminants, including PFOA and PFOS, into the environment are solid wastes because they constitute discarded materials resulting from Wolverine's industrial and commercial operations.

**ANSWER: Denied as untrue, as stated.**

40. According to the U.S. EPA, human exposure to PFOA and PFOS and other PFCs may result in adverse health effects to humans such as developmental, thyroid, liver, and immune system effects.

**ANSWER: Denied as untrue, as stated.**

41. Wolverine has caused or contributed to a condition that presents or may present an imminent and substantial endangerment to health or the environment because Wolverine released "solid wastes" into the environment.

**ANSWER: Denied as untrue, as stated.**

42. Wolverine has caused or contributed to a condition that may present an imminent and substantial endangerment to health or the environment because Wolverine: (a) owned the Rockford Tannery and the House Street Disposal Site at the time that the release of the "solid wastes" from these sites occurred and yet failed to prevent that release of the "solid wastes"; or (b) failed to investigate and abate the "solid waste" contamination once the release of the "solid wastes" occurred at the Rockford Tannery, the House Street Disposal Site, and other areas where Wolverine disposed of tannery wastes.

**ANSWER: Denied as untrue, as stated.**

43.     Under Section 1004(27) of RCRA, 42 U.S.C. § 6903(27), "solid waste" is discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities."

**ANSWER: This states a legal conclusion to which no response is required.**

44.     Plainfield and Algoma are entitled to relief under RCRA § 7002(a), 42 U.S.C. § 6972(a), requiring Wolverine to take such action as may be necessary to abate the imminent and substantial endangerment to public health and the environment based on the disposal of "solid wastes" that present an imminent and substantial endangerment to public health and the environment and to provide damages proximately caused to Plainfield and Algoma to provide clean MWS as a remedy necessitated by such releases as described above and below in this Complaint.

**ANSWER: Denied as untrue, as stated.**

### COUNT II:  VIOLATIONS OF COMMON LAW NUISANCE

45.     Plainfield and Algoma reallege and incorporate by reference paragraphs 1 through 44 of this Intervening Plaintiffs' Complaint as if fully set forth herein.

**ANSWER: Wolverine incorporates its previous responses.**

46.     Plainfield and Algoma have a private and public right to be free from interference in the planning and delivery of safe drinking water to their residents and to be free of the damages previously described above.

**ANSWER: This states a legal conclusion to which no response is required.**

47.     Wolverine has unreasonably and significantly interfered with Plainfield and Algoma's private and public rights as stated above by contaminating the well drinking water, as described above, of many of their residents in the areas described above within Plainfield

and Algoma, thereby forcing Plainfield and Algoma to plan for, engineer and deliver Plainfield's clean MWS to those residents to protect their health and safety, peace, property, comfort and/or convenience.

**ANSWER: Denied as untrue, as stated.**

48. Wolverine knew, or should have known, that its unreasonable and significant interference would produce a permanent or long-lasting infringement on Plainfield and Algoma's rights as stated above and force it to incur the costs and damages described above.

**ANSWER: Denied as untrue, as stated.**

49. Wolverine's actions in contaminating the well water and discharging PFAS and related hazardous compounds into the groundwater as alleged above have created a public and private nuisance entitling Plainfield and Algoma to recover their costs in the planning, designing, engineering, construction, financing, implementation and operation of MWS improvements and extensions into and for their residents in the affected areas, including but not limited to new filtering in Plainfield's water treatment plant in order to provide clean, water free of PFAS or related compounds in order to meet the health and safety needs of their residents unduly exposed to such compounds by the nuisance caused by Wolverine.

**ANSWER: Denied as untrue, as stated.**

50. The nuisance caused by Wolverine, as described above, is the direct and proximate cause of Plainfield's and Algoma's MWS costs and damages as described above.

**ANSWER: Denied as untrue, as stated.**

WHEREFORE, Wolverine requests that the Court dismiss Intervening Plaintiffs' Complaint with prejudice, that the Court deny all relief requested by Intervening Plaintiffs, that

the Court enter judgment in favor of Wolverine against Intervening Plaintiffs, and that the Court grant Wolverine all other relief to which it is entitled.

## AFFIRMATIVE AND OTHER DEFENSES

Wolverine asserts that Intervening Plaintiffs' claims are barred, in whole or in part, by the following affirmative or other defenses. By setting forth these defenses, Wolverine does not assume the burden of proving any fact, issue, or element of a cause of action where such burden properly belongs to Intervening Plaintiffs. Moreover, nothing stated herein is intended or shall be construed as an acknowledgment that any particular issue or subject matter is relevant to Intervening Plaintiffs' allegations. Wolverine reserves the right to plead any and all additional defenses that may become evident or appreciated after investigation and discovery in this matter.

1.      Intervening Plaintiffs' claims are barred by the applicable statute of limitations, statute of repose, laches, or any combination thereof.

2.      Wolverine is not the proximate cause of the complained-of harm.  Intervening Plaintiffs' harm, if any, was caused, at least in part, by intervening or supervening negligence, or other acts or omissions of persons over whom Wolverine had no control or any duty to control.  In the event that Intervening Plaintiffs are found to have sustained any injury, their recovery against Wolverine, if any, must be reduced by the proportionate harm and damages caused by the acts and omissions of other parties, including Intervening Plaintiffs.

3.      Intervening Plaintiffs are not entitled to recover from Wolverine more than Wolverine's fair, equitable, and proportionate share of the relief sought by Intervening Plaintiffs.

4.      Intervening Plaintiffs have not incurred response costs authorized for recovery under applicable law.

5.      Intervening Plaintiffs' claims are barred to the extent that they seek to recover costs and expenses other than response activity costs, as that term is defined under Part 201.

6.      Intervening Plaintiffs' claims are barred by their failure to comply with the prerequisites to recoverability of costs.

7.      Intervening Plaintiffs lack standing because they have not suffered compensable harm fairly traceable to Wolverine's actions.

8.      Intervening Plaintiffs' recovery from Wolverine is barred by the inapplicability of the collateral source rule.

9.      Intervening Plaintiffs' claims are barred by mandatory joinder, claim preclusion, issue preclusion, the entire controversy doctrine, or some combination thereof.

10.     The damages sought by Intervening Plaintiffs are wholly speculative, conjectural, unreasonable and excessive.

11.     Intervening Plaintiffs' claims are barred, in whole or in part, by the statutory defenses to liability set forth in RCRA.

12.     The Complaint is constitutionally impermissible to the extent that it seeks to impose retroactive liability.

13.     Intervening Plaintiffs' claims are barred because at all relevant times Wolverine complied with all applicable environmental laws and industry standards, and otherwise conducted itself reasonably, prudently, in good faith, and with due care for the rights, safety and property of others.  In all its actions, if any with relation to House Street, the Tannery, and Wolven/Jewell, Wolverine exercised due care with respect to the hazardous substances concerned, taking into consideration the characteristics of such hazardous substances, in light of

all the facts and circumstances, and took precautions against the foreseeable acts or omissions of any third parties and the consequences that could foreseeably result from such acts or omissions.

14.     Intervening Plaintiffs may not recover response activity costs to the extent that any releases were authorized by permit or other law.

15.     Intervening Plaintiffs' claims are barred in whole or in part by the doctrines of waiver, estoppel, unclean hands, *in pari delicto*, assumption of risk, acquiescence, or some combination thereof.

16.     Intervening Plaintiffs' claims are not ripe for adjudication because Intervening Plaintiffs have not paid more than their fair share of liability.

17.     The relief sought by Intervening Plaintiffs would result in unjust enrichment.

18.     Intervening Plaintiffs have failed to mitigate their damages, if any.

19.     The harm at issue in this matter is capable of apportionment.  To the extent that Wolverine is held liable, its liability is divisible and excludes any harm that may be apportioned to other parties under applicable law.  If Wolverine is held liable it is liable only for its several share of liability.

20.     To the extent that Wolverine is held liable, the response activity costs that it has incurred and will incur exceed its share of liability.

21.     Wolverine's share of liability, if any, is *de minimis*, *de micromis*, or both.

WHEREFORE, Wolverine hereby demands a reply to its answer and requests that Intervening Plaintiffs' Complaint be dismissed and that the Court grant all other appropriate relief.

## **JURY DEMAND**

1.      Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Wolverine hereby demands a trial by jury of all issues properly triable thereby.

Dated: December 18, 2018

/s/ Scott M. Watson
John V. Byl (P35701)
James Moskal (P41885)
Scott M. Watson (P70185)
Warner Norcross + Judd LLP
111 Lyon, N.W., Ste. 900
Grand Rapids, MI 49503
(616) 752-2000