## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

MICHIGAN DEPARTMENT OF
ENVIRONMENTAL QUALITY,

             Plaintiff,

   vs.

WOLVERINE WORLD WIDE, INC.,

             Defendant.

_____

PLAINFIELD CHARTER TOWNSHIP;
ALGOMA TOWNSHIP,

             Intervening Plaintiffs,

   vs.

WOLVERINE WORLD WIDE, INC.,

             Defendant.

_____

WOLVERINE WORLD WIDE, INC.,

             Third–Party Plaintiff,

   vs.

3M COMPANY,

             Third–Party Defendant.

_____

CASE NO. 1:18–CV–00039–JTN–ESC

Hon. Janet T. Neff

## WOLVERINE WORLD WIDE, INC.'S THIRD–PARTY COMPLAINT
## AND DEMAND FOR JURY TRIAL

John Byl (P35701)
James Moskal (P41885)
Scott M. Watson (P70185)
WARNER NORCROSS + JUDD LLP
111 Lyon, N.W., Ste. 900
Grand Rapids, MI 49503
(616) 752-2000
jbyl@wnj.com
jmoskal@wnj.com
swatson@wnj.com

Attorneys for Third-Party Plaintiff Wolverine
World Wide, Inc.

Polly A. Synk (P63473)
Brian J. Negele (P41846)
Danielle Allison-Yokom (P70950)
Assistant Attorneys General
P.O. Box 30755
Lansing, MI 48909
(517) 373-7540
synkp@michigan.gov
negeleb@michigan.gov
allisonyokomd@michigan.gov

Attorneys for Plaintiff Michigan Department
of Environmental Quality

Douglas W. Van Essen (P33169)
Silver & Van Essen, P.C.
300 Ottawa Avenue, NW, Suite 620
Grand Rapids, MI 49503
(616) 988-5600
dwv@silvervanessen.com

Attorneys for Intervening Plaintiffs Plainfield
Charter Township and Algoma Township

Third–Party Plaintiff Wolverine World Wide, Inc. ("Wolverine") for its complaint against Third–Party Defendant 3M Company ("3M") alleges as follows:

## INTRODUCTION

1.      3M is one of the largest chemical companies in the world, with annual revenues of $31 billion, an employee base of over 91,000 (including more than 8,000 scientists and researchers), and research facilities that dwarf those of most universities, major corporations and even some countries.  It markets itself to customers based on its touted scientific expertise.  Its trademarked slogan is: "3M.  Science.  Applied to Life.™"  3M boasts that "after more than 100 years, we know how to rock science."

2.      In the 1940s, 3M began developing a group of organic fluorine chemical products, sometimes referred to as "PFAS" compounds.  Two types of PFAS chemicals include PFOA and PFOS.  These compounds were sold for a variety of household, commercial, and industrial uses, and when applied to a surface, they make that surface water– and stain–repellant.

3.      From the 1940s onward, 3M has been the world leader in understanding and using these chemicals, but it has kept secret much of what it has learned and found, for competitive and other reasons.

4.      3M formulated numerous products using these PFAS chemicals, including Scotchgard™, which could be used to treat leather so as to make it water– and stain–repellant. 3M started selling Scotchgard™ in 1958.  In marketing Scotchgard™, 3M assured its customers that Scotchgard™ was thoroughly tested, and that it was safe and appropriate for such uses.

5.      On information and belief, in the mid–1950s, 3M began actively fostering a market amongst potential customers, including Wolverine, a Michigan–based shoe manufacturer of well–known brands, including Hush Puppies®, and convinced it to use Scotchgard™ to treat

the leather used in its shoes.  For the next 40+ years (starting in 1958), 3M sold Scotchgard™ to Wolverine.  During that more than 40 year period, 3M regularly assured Wolverine and its other customers that Scotchgard™ was safe, effective, and appropriate for such uses.

6.      In 1999, 3M began advising its customers that it would be phasing out Scotchgard™.  In communicating this decision, 3M assured its customers, including Wolverine, that Scotchgard™ remained safe and did not pose a risk to human health or the environment. Rather, 3M claimed, it was discontinuing Scotchgard™ solely because of its persistence in the environment, even though it did not pose an environmental risk.  To this day, 3M publicly maintains that none of its products containing PFAS, including Scotchgard™, poses an environmental or human health risk.

7.      Unbeknownst to Wolverine, one of 3M's primary reasons for phasing out its old Scotchgard™ formula was because a 3M scientist had written to the United States Environmental Protection Agency ("EPA") stating that he felt PFAS chemicals in Scotchgard™ posed environmental risks that 3M was hiding and ignoring.  3M withheld this information from Wolverine, however, instead assuring it that there were no environmental risks from the Scotchgard™ product that 3M had sold to Wolverine, and that Wolverine had used, for over 40 years.  Recently, however, as a result of a November 2017 court filing by the State of Minnesota against 3M, it has come to light that 3M hid relevant test data and information about the PFAS compounds in its Scotchgard™ product for decades.

8.      As early as the 1940s–1960s, 3M was aware of the very properties of Scotchgard™ that made it a risk to the environment, as alleged by the Michigan Department of Environmental Quality ("MDEQ").  Based on its research into the PFAS chemicals in Scotchgard™ and studies 3M conducted on its own waste disposal sites in Minnesota, 3M knew

PFAS was persistent, stable, mobile, and a potential environmental risk.  Yet it kept this information secret.  For example, the State of Minnesota described in its above–referenced filing how 3M instructed its scientists to destroy notes of meetings discussing the risks of PFAS.  The State of Minnesota also discovered secret arrangements between 3M and scientists who agreed to present themselves to the press as independent arbiters of PFAS research—when in fact they were being paid by 3M and briefed by 3M's medical department.  3M eventually settled with the State of Minnesota for $850 million to resolve claims that 3M had polluted Minnesota's water supply.

9.     On January 9, 2018, the MDEQ issued its first drinking water criterion for PFOA and PFOS, two of the PFAS compounds in Scotchgard™, setting that criterion at no more than 70 parts per trillion (ppt).  The next day, the MDEQ filed a lawsuit against Wolverine.  In its suit, the MDEQ alleges that Wolverine's disposal of Scotchgard™ and/or wastes containing Scotchgard™ residuals have contaminated the drinking water in and around sites where Wolverine used Scotchgard™ in its tanning process or sites Wolverine used to dispose of the resulting tannery wastes.  The MDEQ alleges that the primary source of contamination is an unoccupied parcel of land located at 1855 House Street, Belmont, Michigan ("House Street"), which Wolverine has not used as a disposal site since 1970.  At the time Wolverine was disposing of waste potentially containing Scotchgard™—and certainly, as of 1958 to 1970 when Wolverine was using House Street—Wolverine had no knowledge that Scotchgard™ posed any of the environmental risks now alleged by the MDEQ.  Wolverine did not know there was PFAS near its property at levels above 70 ppt until at the earliest, June 2017 when the MDEQ disclosed that the Belmont Armory had tested the drinking water adjacent to Wolverine's property.  And

there was no legal obligation to cleanup until the MDEQ established a drinking–water cleanup criterion of 70 ppt for PFOA and PFOS on January 9, 2018.

10.     As a result of 3M's actions and omissions, Wolverine is now faced with damage to its own property, three class actions, hundreds of individual lawsuits alleging bodily injury and property damage, and two governmental actions (including a Unilateral Administrative Order or "UAO" by the EPA) seeking extensive investigation and remediation.  While Wolverine does not agree with each of the MDEQ's allegations against Wolverine, it is now stuck defending a "product"—which was ultimately a waste—that was developed by 3M, researched by 3M, and marketed by 3M, and from which 3M made hundreds of millions of dollars annually, in part by actively concealing information regarding potential environmental risks known only to 3M.

11.     Wolverine has done its part to investigate, mitigate and remediate the environmental damage alleged by the State in its complaint and by the EPA in its UAO, including by implementing an extensive water sampling program, providing bottled water as a precaution, and providing and monitoring home filtration systems to hundreds of residents in Kent County, Michigan.  Wolverine has requested that 3M participate in these actions to address the potential environmental risks, but 3M has unreasonably refused to do so.  As the experts that studied PFAS for decades and failed to warn customers of the environmental risks associated with PFAS compounds in Scotchgard™, 3M should be held responsible.  Accordingly, Wolverine is filing this action to compel 3M to honor its obligations to Wolverine and this community.

## PARTIES

### A.   Third–Party Plaintiff Wolverine

12.     Third–Party Plaintiff Wolverine is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Rockford, Michigan. It started as a family–run business in 1883, and it has been designing and manufacturing shoes since 1903.

### B.   Third–Party Defendant 3M

13.     Third–Party Defendant 3M is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in St. Paul, Minnesota. 3M is a massive conglomerate with over 91,000 employees and extensive expertise in the chemical sciences. It is in the business of using that expertise to design, manufacture, and sell household, commercial and industrial products. According to 3M, it manufactures over 60,000 products, and its revenues for 2017 exceeded $31 billion.

14.     On its website, 3M describes itself as a "global powerhouse" and a "constant name on the Fortune 500 list." It touts its research and development ("R&D") capabilities, with 8,100 scientists and researchers worldwide, labs in over 36 countries, over 112,000 patents and $1.7 billion in annual expenditures for R&D alone.

15.     Pursuant to Rule 14 of the Federal Rules of Civil Procedure, 3M is a third party who is liable to Wolverine for all or part of the claims of the MDEQ, Plainfield Charter Township and Algoma Township (jointly, "the Townships" and together with the MDEQ, "Plaintiffs"), including but not limited to, for damage to Wolverine's properties and resulting remediation and response costs.

## JURISDICTION

16.     Pursuant to 28 U.S.C. § 1331, this Court has federal question jurisdiction over Wolverine's federal law claims.  In addition, this Court has supplemental jurisdiction over Wolverine's state law claims under 28 U.S.C. § 1367(a), because these claims are closely related to, and form part of the same case and controversy as, the federal law claims asserted by Wolverine and Plaintiffs.

17.     Venue is proper in the Western District of Michigan pursuant to 28 U.S.C. § 1391(b)(2) in that the properties in question are situated in this District and a substantial portion of the events giving rise to the claims occurred in this District.  Venue is also proper in this District pursuant to 42 U.S.C. § 6972(a) and 42 U.S.C. § 9613(b) because the alleged environmental damage occurred in this District.

## BACKGROUND

### A.     3M Engages in Early Research and Mass Production of PFAS

18.     Poly– and perfluoroalkyl substances ("PFAS") are a subgroup of organic–fluorine compounds.  There are many different types of PFAS, each of which has unique properties.  The two PFAS primarily at issue in this case are perfluorooctanoic acid or "PFOA" and perfluorooctane sulfonate or "PFOS."

19.     Initially, PFAS compounds were produced in very small amounts as part of a government–funded project.  In the late 1940s, Dr. Joseph Simons, a scientist at Pennsylvania State University, developed a means for producing PFAS on a commercial scale.  This process is known as the Simons Cell Electrofluorination (or "Simons ECF") process.  Dr. Simons patented his ECF process in 1948.

20.     Recognizing the commercial potential of Dr. Simons' ECF process, 3M purchased Dr. Simons' patents and hired several of his graduate students to develop products using PFAS.

21.     Over the next 50 years, 3M developed a major business in manufacturing and selling products containing PFAS.  3M used its own internal expertise to develop many types of PFAS, while keeping most of its knowledge regarding these compounds secret from the world, including from its customers and regulators.

22.     Given its ownership of Dr. Simons' patents, its hiring of his lab workers, and its early and ongoing research into PFAS chemicals, 3M was, and is, in a unique and superior position to understand the chemical properties of the PFAS chemicals in Scotchgard™.

**B.     3M Manufactures PFAS Products As Early as the 1950s**

23.     3M introduced its first PFAS–containing product to the market in the 1950s.

24.     During the ensuing decades, 3M developed and sold many other products containing PFAS, including fire retardants, stain repellants, stain removers, paints, hydraulic fluids, and semi–conductors.  These products were extremely profitable for 3M, resulting in hundreds of millions of dollars in annual revenues, over at least several decades.

25.     Some of the most popular and profitable PFAS–containing products that 3M manufactured were sold under the trademark "Scotchgard™," the brand name 3M gave to its extensive line of water– and stain–repellant products that included protectants for furniture, fabric, carpets, rugs and leather.  3M released its first Scotchgard™ product in 1956.

26.     Certain PFAS chemicals are a key ingredient in Scotchgard™, and enable the Scotchgard™ products to repel oil, water and stains.

27.     For purposes of this Complaint, all PFAS–containing Scotchgard™ 3M sold to Wolverine before the 2002 phase–out will be referred to as "Scotchgard™ Leather Protector."

**C.     3M Sells a PFAS–Containing Product to Wolverine**

28.     On information and belief, in the mid–1950s, 3M began actively fostering a market for Scotchgard™ amongst potential customers, including Wolverine.  3M studied

Wolverine's manufacturing processes to recommend a leather protector for Wolverine to apply to its shoes.  The Scotchgard™ Leather Protector allowed Wolverine to offer the first pigskin leather that was resistant to water, oil, and stains.

29.      During the parties' decades–long relationship, 3M routinely consulted with Wolverine regarding the application of Scotchgard™ and related performance testing, the proper use and handling of Scotchgard™ Leather Protector, and procedures for disposing of waste resulting from the application of Scotchgard™.

30.      In addition, 3M authorized Wolverine to label its shoes with the Scotchgard™ trademark.  From 1958 to at least 1971, 3M required Wolverine to allow 3M to inspect and study samples of the leather that Wolverine had treated with Scotchgard™ and to permit a representative of 3M to test Wolverine's products at random in Wolverine's plant or shipping room at reasonable times.  And, for a period of time from 1971, 3M required Wolverine to send 3M samples of such treated products every 30 days to ensure it met 3M's product specifications.

31.      Given that 3M designed Scotchgard™, and touted its extensive testing of the product and its general R&D capabilities, Wolverine reasonably relied upon 3M to disclose any risks with its product.

**D.      3M Has Expertise and Resources Rivaling Any Public or Private Institution, and Wolverine Relied on 3M's Extensive Expertise**

32.      3M had the instrumentation and technical knowledge to rival any public university or private laboratory in the world.

33.      3M advertised its extensive R&D capabilities to customers like Wolverine, inducing their trust and confidence that 3M had rigorously tested its products and that 3M's assurances about the safety of its products were rooted in truth and science.

34.    For example, by the 1960s, 3M, as a mining and manufacturing company, had a full geology department that had a thorough knowledge of the movement of liquids through porous media, like soil.  In 1962, 3M's geology department completed three soil borings to study the degree of penetration of waste chemicals in the underlying soils and groundwater at one of 3M's disposal sites in Woodbury, Minnesota ("the Woodbury Site").  Samples from these borings were analyzed for organic compounds, and in at least one of the borings, testing showed that the compounds had reached the level of the groundwater.

35.    3M also had extensive experience in industrial waste disposal.  In 1970, President Nixon appointed 3M's then–CEO as the Chairman of the National Industrial Pollution Control Council.  This appointment recognized 3M's advanced knowledge of waste disposal practices and their environmental effects.

36.    3M also had a "Central Research Analytical" division and later an "Environmental Laboratory" division, that was constantly developing new and better techniques to quantify PFAS levels.  By 1980, 3M could quantify PFOS and PFOA at parts–per–billion levels in ground and surface water samples.

37.    By contrast, Wolverine was a comparatively small company focused on the manufacture and sale of shoes, with no geology department or comparable R&D facilities. Unlike 3M, Wolverine had not conducted any studies on the movement of PFAS–containing liquids through soil, and had no internal capability to measure or detect substances in extremely small concentrations.  Wolverine's expertise was and always has been the design, manufacture and sale of shoes.

E.    **3M Discovers the Environmental Risks of Certain PFAS as Early as the Late 1950s**

38.    Wolverine used Scotchgard™ at its tannery at 123 North Main Street, Rockford, Michigan ("Rockford Tannery") to treat the leather it used to make shoes.  From 1958 until 1970, Wolverine disposed of the wastes from its use of Scotchgard™ at its House Street property.  House Street was (and is) an unoccupied parcel of land located in Kent County.  The alleged contamination at issue in this litigation stems primarily from the disposal of wastes potentially containing Scotchgard™ at House Street.  After Wolverine stopped using House Street in 1970, it continued to purchase and dispose of the particular formulation of Scotchgard™ at issue in this case for approximately another 30 years.

39.    From 1958 until 2002 (when 3M phased out and stopped selling the older formulations of Scotchgard™ to Wolverine), 3M was well aware of the various environmental risks associated with the disposal of wastes that contained Scotchgard™ and/or its byproducts.  Yet 3M never shared any of its concerns with Wolverine, when such disclosure would have materially impacted Wolverine's decision–making process with regard to disposal practices at House Street and later waste disposal sites, or its purchase and use of Scotchgard™ Leather Protector.

40.    3M understood very early on that PFAS in Scotchgard™ were mobile.  That is, 3M understood that these chemicals could migrate into the soil and eventually into the groundwater.  3M's own experience in its waste disposal facilities confirmed the mobility of PFAS in soil.  3M manufactured PFAS at its own plants, and these plants produced significant volumes of PFAS–containing wastes.  By the 1960s, 3M was aware that its waste chemicals had reached the groundwater level in one of the waste disposal sites it used for PFAS chemicals, the Woodbury Site.  An internal 3M memo from 1960 recognized that wastes dumped at the

10

Woodbury Site "will eventually reach the water table and pollute domestic wells." By the spring of 1962, 3M knew that chemicals disposed of at the Woodbury Site had reached 75 feet below ground—which was the level of the underlying groundwater at that time—within about one year of operation.

41.     3M learned around the same time that groundwater beneath another disposal site in Cottage Grove, Minnesota had contaminated a nearby water well. An internal 3M memo noted that the "the present waste pond has contaminated a nearby water supply well …We are convinced that contamination will gradually spread to other wells if no corrective measure is taken soon." As early as 1967, a hydrologist retained by 3M counseled the company that a carbon filtration system could produce "high quality water free of organic chemicals."

42.     Despite having this knowledge, 3M did not disclose to customers like Wolverine the problems associated with disposal of waste containing PFAS into the ground, which on information and belief, was the industry standard and a common practice for 3M customers during the same period.

43.     Based on internal studies it conducted in the 1950s to 1980s, 3M also understood that the PFAS chemicals in Scotchgard™ were a risk to the environment. Based on these studies, 3M researchers concluded in 1983 that "[i]n the case of fluorochemicals, structure considerations and test results to date give rise to ***concern for environmental safety*** … These concerns give rise to ***legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment***." (Emphasis added). Wolverine is informed and believes that 3M did not disclose the results of its internal studies to customers like Wolverine. Instead, 3M touted Scotchgard™ as safe despite its knowledge of the environmental risks of its product.

11

**F.    3M "Commands the Science" and Conceals the Environmental Risks Posed by the PFAS Chemicals in Scotchgard™**

44.    As 3M became increasingly aware of the potential environmental risks of PFAS, 3M worked to "command the science" and manipulate the research available to regulators and the public.

45.    Internal 3M documents revealed 3M's goal of conducting scientific research that it could use to mount "[d]efensive [b]arriers to [l]itigation."

46.    When deposed by the State of Minnesota, 3M witnesses admitted that 3M "stewarded information about fluorochemicals" in order to "protect the business," and 3M engaged in processes to ensure that scientific papers did not include "information that would appear to be contrary to 3M's business interests."

47.    3M had an internal committee called the "FC [fluorochemicals] Core Team" that developed a written plan titled the "1999 FC Communications Plan," which was a detailed and insidious scheme to manipulate the scientific and public discourse on PFAS.

48.    The 1999 FC Communications Plan outlined talking points in responding to studies adverse to 3M's interests:

- "3M is mainly a materials science company.  As such we rely heavily on scientific studies with solid methodology."

- "We realize that these studies may shed some light [sic] how these substances interact with the bodies of mammals.  Our best evidence is in the 20 years of study on the population with the most exposure—our employees.  These studies show there is no health effect, even at levels much higher than [present in] the general public."

49.     For at least two decades, 3M actively concealed the potential environmental risks posed by the PFAS in Scotchgard™ Leather Protector from scientists, regulators, 3M's customers and the general public.

50.     3M took steps to conceal the risks of PFAS from the scientific community.  For example, in 1975, two academic researchers—Dr. William Guy and Dr. Donald Taves— contacted 3M regarding their finding of organic fluorine in blood from blood banks around the country and their belief that 3M's products may have been the source.  3M pleaded ignorance and warned the scientists "not to speculate" about whether Scotchgard™ products were the source of the PFAS.  By 1977, however, 3M itself had confirmed that PFOS was the major organic fluorine compound found in human blood nationwide.

51.     3M also concealed critical information about PFAS from government regulators. Under federal law, 3M was required to immediately notify the EPA of any information that reasonably supports the conclusion that one of its products presents a substantial risk of injury to the environment.  *See* Toxic Substances Control Act, 15 U.S.C. § 2607(e) (hereinafter "TSCA"). Nevertheless, 3M withheld from the EPA numerous scientific studies—including studies it had conducted as early as the 1950s to 1970s.  Ultimately, in April 2006, the EPA fined 3M over a million dollars in penalties for over 240 violations of the TSCA dating back decades.  The EPA noted that "several of the violations concerned reporting on perfluorinated compounds," and that the previously unreported information was "valuable" and would have "help[ed] the scientific community to better understand the toxic substances in the environment."

52.     In March 1999, a 3M toxicologist, Dr. Richard Purdy, became so concerned with 3M's failure to inform the EPA about the environmental risks of PFAS that he copied the EPA on his letter resigning from 3M.

53.     In his resignation letter, Dr. Purdy explained that he was quitting 3M due to his "profound disappointment in 3M's handling of the environmental risks associated with the manufacture and use of perfluorinated sulfonates (PFOS)."  He expressed his outrage that the company continued to "make and sell these chemicals."

54.     Dr. Purdy's resignation letter outlined 3M's "roadblocks, delays, and indecision" stalling research into the risks of PFOS.  He noted that he had conducted a risk assessment that showed PFOS "constitutes a significant risk that should be reported to EPA under TSCA," but 3M ultimately "decided not to submit [the report] to EPA over [Purdy's] objection."

55.     In an internal email, Dr. Purdy described how 3M had stalled his efforts to conduct further studies into the risks of PFOS: "You continually ignore our plans and start new plans that slows [*sic*] the collection of data essential for our risk assessments.  You slow our progress in understanding the extent of PFOS pollution and damage.  For 20 years the division has been stalling the collection of data needed for evaluating the environmental impact of fluorochemicals."

56.     Dr. Purdy also noted in his resignation letter that there were alternative designs available to 3M.  According to Dr. Purdy, "the chemicals the company is considering for replacement are just as stable and biologically available."  (Indeed, in 2000—the same year the phase-out was announced publicly—3M expected to come up with substitutes ***within the same year***, suggesting that the delayed implementation of an alternative formulation was not due to the unavailability of an alternative design, but instead resulted from 3M's decades–long efforts to stall and suppress research into PFAS and/or, on information and belief, 3M's interest in disposing of all of its product using the prior formulation.)

57.     Notably, it was only after Dr. Purdy forced 3M's hand that 3M complied with its reporting obligations to the EPA.  On May 26, 1999, just weeks after the EPA received a copy of Dr. Purdy's resignation letter, 3M supplemented its prior submissions to the EPA to include the information that Dr. Purdy informed the EPA had been improperly omitted from 3M's original reports.

58.     3M's lack of candor extended to its customers, including Wolverine.  An internal 3M document from 1988 reveals that 3M was "perpetuating the myth" that its PFAS are biodegradable to both customers and regulators, even though 3M knew otherwise.  As Dr. Purdy explained, "3M waited too long to tell customers about the widespread dispersal of PFOS in people and the environment.  We [3M] knew before May of 1998, yet 3M did not start telling customers until January of 1999 … I kept waiting for 3M to do its duty, as I was continually assured that it would."

**G.      3M Instructs Employees to Conceal and Destroy Data Relating to PFAS**

59.     Evidence of 3M's complex scheme to conceal its knowledge of the risks of PFAS was publicly marshalled recently in papers filed by the State of Minnesota in November 2017.  The State of Minnesota had filed suit against 3M for its contamination of the environment in Minnesota as a result of its manufacturing of Scotchgard™ and other PFAS–containing products and its disposal of wastes stemming from its production processes.  In its motion to amend its complaint to seek punitive damages from 3M, the State of Minnesota chronicled 3M's decades–long campaign to distort the science and manipulate the press, its customers and regulators about the environmental risks of certain PFAS in Scotchgard™.  Shortly after its motion to amend was filed, 3M settled with the State of Minnesota for $850 million on February 20, 2018.

60.     In its motion to add a claim for punitive damages under Minnesota law, the State exposed 3M's large–scale internal effort to conceal any risks posed by PFAS by, among other

things, destroying documents discussing the risks of PFAS and instructing employees not to create a paper trail regarding their concerns about PFAS.

61.     According to the Minnesota Attorney General, 3M instructed its employees to routinely destroy documents related to PFAS.  For example, 3M's senior vice president, Charles Kiester, testified that any handwritten notes taken at meetings of 3M oversight committees relating to "FC" issues were discarded immediately.  Similarly, Jerry Walker, who was in charge of the 3M division that was responsible for manufacturing PFAS in 2000, testified that he was directed by 3M officials to place talking points relating to the phase–out in a "secure receptacle" for disposal.  In addition, a 3M laboratory notebook entry from September 2, 1998 contains a list of instructions relating to "document retention," one of which is "clean out computer of all electronic data" relating to PFAS.

62.     3M also instructed its employees not to document their concerns regarding PFAS issues.  For example, as Dr. Purdy explained at the time of his resignation in 1999, "3M told those of us working on the fluorochemical project not to write down our thoughts or have email discussions on issues because of how our speculation could be viewed in a legal discovery process.  This has stymied intellectual development on the issue, and stifled discussion on the serious ethical implications of decisions."

### H.     3M Assures Wolverine That Scotchgard™ is Safe

63.     3M's strategy of disinformation and concealment extended to Wolverine.  3M never disclosed to Wolverine that Scotchgard™ presented any actionable or unreasonable environmental risk.  There were certainly no such disclosures during the period between 1958 and 1970, when Wolverine was disposing of its wastes at House Street, consistent with then prevailing laws, regulations and industry standards.  Even when it announced its phase-out of the prior formula for Scotchgard™ in 1999 and 2000, 3M assured Wolverine that the product was

safe and posed no environmental or health risks.  To this day, 3M publicly maintains that its pre–2002 formulations of Scotchgard™, such as Scotchgard™ Leather Protector, present no environmental or health risks.

64.    In 2000, 3M publicly announced that it was "voluntarily" phasing out the production of certain PFAS.  Far from being voluntary, however, it is now known that 3M only announced the phase-out after the threat of enforcement by the EPA.

65.    As part of the multi–year phase–out, 3M engaged in a massive damage–control campaign to manipulate and contain its customers' reactions to the phase–out and to encourage them to continue buying its flawed, and therefore useless, product during the phase–out period. As part of this strategy, 3M met with and sent Wolverine numerous letters, repeatedly assuring Wolverine that Scotchgard™ posed no health or environmental risks.

66.    For example, in a January 15, 1999 letter, 3M assured Wolverine that it "conducted medical surveillance among employees occupationally exposed to PFOS for over twenty years" and "[n]o adverse health effects associated with PFOS exposure has been found in 3M employees."

67.    The letter also represented that "currently available evidence does not suggest any human health effect associated with the levels of PFOS found in serum samples of people without occupational exposure."

68.    Less than a month later, in a February 3, 1999 letter to Wolverine, 3M again represented that "[n]o human health effects have been attributed to the presence of organic fluorine at these levels.  For more than 20 years we have monitored our employees who have worked with organic fluorine.  Our studies have found no harm at levels about 100 times higher

than found in the general population.  A broad spectrum of scientific studies and a half–century of beneficial and worldwide use of our products support this finding."

69.     Despite 3M's own toxicologist's (Dr. Purdy's) March 1999 resignation letter describing the environmental dangers of PFAS, just two months later on May 30, 1999, 3M prepared letters to 19 Wolverine employees, designed to assure Wolverine that PFAS does not pose an environmental risk: "Sophisticated testing capabilities, some developed in only the last few years, shows that this persistent compound, like other materials in the environment, can be detected broadly at extremely low levels in the environment and people.  ***The presence of these materials at these very low levels does not pose a human health or environmental risk***." (Emphasis added).

70.     Yet internal 3M correspondence that same year shows that 3M knew of potential environmental risks associated with Wolverine's use and disposal of Scotchgard™ Leather Protector, but 3M chose not to share that information with Wolverine.  Doing so would have resulted in Wolverine and other 3M customers asking 3M to pay for changes to address the potential risks: "[c]ustomers may ask 3M to subsidize this increased cost as it is our product that is requiring the changes [to their waste disposal practices]."

71.     In a July 19, 1999 letter, 3M reiterated its previous statements that "we [3M] have found no adverse health effects from the levels of organic fluorine compounds measured to date in occupationally or non–occupationally exposed populations."

72.     When 3M announced the phase–out, Wolverine expressly asked 3M to provide assurances that the Scotchgard™ it had been selling to Wolverine for decades was safe.  3M's internal notes reflect that it would respond to Wolverine's request by "draft[ing] a letter to Wolverine assuring that 1) the product is safe, 2) the decision to phase out this product is solely

to prevent buildup of these harmless persistent compounds in the environment, 3) will advise Wolverine of any new studies or findings, 4) once applied to footwear and dried, the product is inert and no further releases are possible, and 5) no possible risk to the wearer of footwear."

73.     Throughout the entirety of the business dealings between 3M and Wolverine, 3M failed to disclose or actively misrepresented the potential environmental risks associated with the PFAS chemicals in Scotchgard™.

74.     An internal 1980 3M sales document sets forth the types of answers 3M was instructing be provided to customers like Wolverine, to assure them that Scotchgard™ did not pose an environmental risk:

- I have heard that fluorochemicals are persistent.  Does this risk mean they are like PCBs and DDT?  The answer is "NO."

  … To date, [there is] no evidence that a 3M fluorochemical presents an unreasonable environmental risk.

- Do fluorochemicals bioconcentrate?

  …. [A]lthough some fluorochemicals bioconcentrate, the data we have is that these fluorochemicals do not present any unreasonable environmental risk.

**I.     Wolverine Disposes of Waste Containing Scotchgard™ Consistent with 3M's Practices and Recommendations and in Compliance with Existing Laws and Industry Standards**

75.     Wolverine disposed of its waste containing Scotchgard™ in compliance with the laws and industry standards existing at the time and consistent with 3M's practices and recommendations.

76.     From 1958 until 1970, Wolverine disposed of its production waste, including waste containing Scotchgard™ Leather Protector and/or Scotchgard™ residuals, at its property in House Street.

77.     In 1965, Michigan passed a new law requiring waste to be disposed only at licensed facilities.  Prior to this time, waste disposal sites were not required to be licensed.

78.     In compliance with the new law, Wolverine applied for and was issued a license to dispose of production waste at House Street.

79.     Even before the law required a licensed waste disposal facility, Wolverine's disposal practices were carefully planned and in compliance with then–existing regulations and prevailing industry standards.  For example, Wolverine worked closely with Grand Rapids–Kent County Health Department officials, who visited and reviewed the operations at House Street.  Following one such visit in or about January 1965, a health official from the department wrote to Wolverine that "if a sanitary landfill operation is maintained as outlined in previous correspondence, no health hazard or nuisance should originate from this operation."  The letter also noted that the Michigan Water Resources Commission and the Michigan Department of Conservation "concur that the site is well located for a complete landfill operation."

80.     Although disposal practices in the 1960s and 1970s are different than today, Wolverine acted reasonably, in good–faith and in accordance with the prevailing practices and legal norms of the time.

81.     Wolverine's disposal practices were in compliance with 3M's recommendations and practices.  3M buried or landfilled PFAS–containing wastes (including in unlined landfills during the earlier periods), disposed of them through the chemical sewers and later through 3M's wastewater treatment plant, and also sent them to be buried in county landfills.  Wolverine engaged in similar disposal practices during the relevant time period, and accordingly, its disposal practices would have been reasonably foreseeable to 3M.  Unlike 3M, however,

20

Wolverine did not know of the environmental risks that 3M was in a unique and superior position to understand but failed to disclose to Wolverine.

82.     In fact, 3M was leery about advising its customers to do anything other than what Wolverine was already doing because of concerns that 3M would have to foot the bill if its customers were required to change their disposal practices to account for the risks of PFAS.  In 1999, after 3M advised Wolverine about the upcoming phase-out of PFAS–containing Scotchgard™, 3M conducted an industrial hygiene survey of Wolverine's production facilities. After that survey, 3M's industrial hygienist, Shawn Kruse, wanted to recommend an improved waste drainage approach for Wolverine to use.  However, Mr. Kruse's superiors at 3M cautioned that "ultimate drainage of [PFAS] into waste system is a ***very common and standard production process that is used by tanneries all over the world***."  (Emphasis added).  The cost to alter this approach would be substantial, and "[c]ustomers may ask 3M to subsidize this increased cost as it is our product that is requiring the changes."

83.     Ultimately, Mr. Kruse's suggestion for a different drainage approach was not included in the industrial hygiene report sent to Wolverine.  Instead, the report included such innocuous recommendations as replacing Wolverine employees' old gloves and imposing a hand–washing requirement.

84.     While the report noted the release of liquids suspected to contain PFAS into the floor drains, there was no suggestion that any such release was improper or posed a risk to the environment.

**J.      State of Michigan Sues Wolverine**

85.     On January 10, 2018, the MDEQ filed the instant lawsuit against Wolverine seeking, among other things, declaratory and injunctive relief for cleanup costs.  Additionally, the Townships have intervened and allege the same claims against Wolverine as the MDEQ.

86.    The MDEQ's suit followed its first drinking–water cleanup criterion, adopted on January 9, 2018, only a day before its lawsuit was filed.  Under the new drinking–water cleanup criterion, the State mandated that the amount of PFOA and/or PFOS (either separately or combined) cannot exceed 70 ppt in drinking water.

87.    Even before the MDEQ filed its lawsuit or set the new criterion, Wolverine was already working collaboratively with the MDEQ to investigate, mitigate and remediate the harms alleged by the State, once the MDEQ notified Wolverine on June 1, 2017 that testing at the Belmont Armory, located near House Street, showed "elevated PFCs" in the Armory's "drinking supply."

88.    To date, Wolverine has provided over 500 whole house water filtration systems and 200 point–of–use filters to affected homes.  These filtration systems have virtually eliminated the presence of PFOS and PFOA in residents' drinking water, and Wolverine has also offered bottled water delivery to every home whose well was sampled.

89.    Even after filtration systems are installed, Wolverine has continued to pay to monitor the drinking water.  Working closely with the MDEQ, Wolverine has paid to conduct re–samples on a weekly, monthly, quarterly or annual basis depending on the concentration levels of PFOS/PFOA in prior test results.

90.    To date, Wolverine has tested for the presence of PFAS in over 1,500 residential wells in the MDEQ–defined study areas.

91.    Even the MDEQ's suit against Wolverine acknowledges Wolverine's extensive efforts to investigate, mitigate and remediate the harms alleged by the State: "Wolverine has been engaged in the investigation, characterization, and/or remediation of these PFAS since their discovery in 2017, and has complied with several requests from MDEQ to conduct

investigations, sampling, and action to provide alternate water supplies at locations suspected or confirmed to have impacts to drinking water sources."

92.     On the same day the MDEQ suit was filed, the EPA also issued a UAO to Wolverine with an effective date of February 1, 2018.  The UAO was issued under section 106 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9606, and directs Wolverine to conduct certain "removal actions" under CERCLA, including both investigative and potential cleanup actions, at House Street and the Rockford Tannery.

93.     Wolverine has been implementing the UAO throughout 2018 and has spent millions of dollars conducting investigation work at both House Street and Rockford Tannery.  Wolverine will continue to conduct additional response activities under the UAO, including submission of final reports for both the Rockford Tannery and the House Street sites in 2019.

94.     As demonstrated by Wolverine's prior and ongoing efforts to investigate, mitigate and remediate the harms alleged by the MDEQ and the Townships, Wolverine is committed to helping the community in which it has been a resident and employer for over a century and where its employees and their families have lived for generations.  Wolverine is doing its part, and by this third–party complaint, it asks that 3M be compelled to do the same.

95.     3M designed and studied PFAS for decades.  Upon learning of the environmental risks inherent with the PFAS in Scotchgard™, 3M chose to suppress material information, control the scientific research available to the public, and withhold information from regulators like the EPA and customers like Wolverine.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### (Common Law Indemnity – House Street)

96.     Wolverine repeats, re–alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

97.     Wolverine's activities at House Street were proper and acceptable under the legal norms and industry standards of the time.  Wolverine complied with the laws and regulations existing at that time, acted consistently with industry practice, including the waste–disposal practices utilized by 3M for PFAS–containing wastes, and acted responsibly in a way to minimize any contamination as a result of its waste disposal at House Street.

98.     Because Wolverine's use of Scotchgard™ and disposal of waste containing it were proper and acceptable and Wolverine was not actively at fault, it would be unjust and inequitable to subject Wolverine to liability as a result.  Instead, the equities require imposing liability on the party ultimately at fault, 3M.

99.     Based on 3M's failure to disclose information regarding risks and concerns associated with certain PFAS compounds of which 3M had exclusive and superior knowledge as described above, and its active representation to Wolverine that PFAS compounds in Scotchgard™ were safe, Wolverine used Scotchgard™ and disposed of waste containing it in a manner compliant with the laws and industry standards existing at the time.

100.     If the MDEQ and the Townships prevail in their claims against Wolverine in relation to House Street, it is just and equitable that 3M bear ultimate responsibility and be required to indemnify Wolverine.

24

## SECOND CAUSE OF ACTION
### (Common Law Indemnity – Rockford Tannery)

101.    Wolverine repeats, re–alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

102.    Wolverine's activities at the Rockford Tannery were proper and acceptable under the legal norms and industry standards of the time.  Wolverine complied with the laws and regulations existing at that time, acted consistently with industry practice, including the waste–disposal practices utilized by 3M for PFAS–containing wastes, and acted responsibly in its operation and use of the Rockford Tannery.

103.    Because Wolverine's use of Scotchgard™ containing certain PFAS compounds at the Rockford Tannery were proper and acceptable and Wolverine was not actively at fault, it would be unjust and inequitable to subject Wolverine to liability as a result.  Instead, the equities require imposing liability on the party ultimately at fault, 3M.

104.    Based on 3M's failure to disclose information regarding risks and concerns associated with the PFAS compounds in Scotchgard™, of which 3M had exclusive and superior knowledge as described above, and its active representation to Wolverine that Scotchgard™ was safe, Wolverine used Scotchgard™ at the Rockford Tannery in a manner compliant with the laws and industry standards existing at that time.

105.    If the MDEQ and the Townships prevail in their claims against Wolverine in relation to the Rockford Tannery, it is just and equitable that 3M bear ultimate responsibility and be required to indemnify Wolverine.

## THIRD CAUSE OF ACTION
### (Common Law Indemnity – Wolven/Jewell)

106.     Wolverine repeats, re–alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

107.     In the event the MDEQ and the Townships establish that Wolverine disposed of waste at the location referred to in their Complaints as Wolven/Jewell, Wolverine's activities at or impacting Wolven/Jewell were proper and acceptable under the legal norms and industry standards of the time.  Wolverine complied with the laws and regulations existing at that time, acted consistently with industry practice, including the waste–disposal practices utilized by 3M for PFAS–containing wastes, and acted responsibly in relation to any alleged disposal at Wolven/Jewell.

108.     Because Wolverine's use and disposal of PFAS was proper and acceptable, it would be unjust and inequitable to subject Wolverine to liability as a result.  Instead, the equities require imposing liability on the party ultimately at fault, 3M.

109.     Based on 3M's failure to disclose information regarding risks and concerns associated with PFAS of which 3M had exclusive and superior knowledge as described above, and its active representation to Wolverine that Scotchgard™ was safe, Wolverine used Scotchgard™ and disposed of waste containing it in a manner compliant with the laws and industry standards existing at that time.

110.     If the MDEQ and the Townships prevail in their claims against Wolverine in relation to the Wolven/Jewell site, it is just and equitable that 3M bear ultimate responsibility and be required to indemnify Wolverine.

## FOURTH CAUSE OF ACTION
### (Fraud – Minnesota Law)

111.    Wolverine repeats, re–alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

112.    Wolverine alleges a claim for fraud under Minnesota law.  In Minnesota, the elements of fraud are: (1) false misrepresentation of a past or present material fact; (2) knowledge by the person making the false assertion that it is false or ignorance of the truth of the assertion; (3) an intention to induce the plaintiff to act or to justify the plaintiff to act; (4) the plaintiff must have been induced to act or justified in acting in reliance on the representation; and (5) the plaintiff must suffer damage proximately caused by the misrepresentation.

113.    Misrepresentation by omission is a variation of fraud recognized in Minnesota, and it occurs where: (1) a defendant conceals a material fact; (2) the fact is within the defendant's knowledge; (3) the defendant knows that the plaintiff will rely on this nondisclosure on the presumption that the fact does not exist; and (4) the defendant has a legal or equitable duty to communicate the fact.  As to the duty element, a duty exists when: (1) a confidential or fiduciary duty relationship exists; (2) disclosure is necessary to clarify misleading information already disclosed; or (3) one party has "special knowledge" of material facts to which the other party does not have access.

114.    Upon information and belief, from its corporate headquarters in Minnesota, 3M enacted a corporate policy and directive to conceal and misrepresent material information regarding the environmental risks of PFAS chemicals contained in Scotchgard™.

115.    Upon information and belief, from its corporate headquarters in Minnesota, 3M failed to disclose material information and made affirmatively false or materially misleading and incomplete statements to Wolverine regarding the safety of PFAS chemicals contained in

27

Scotchgard™ and the propriety of Wolverine's use and disposal of wastes potentially containing Scotchgard™.

116.   As a corporation with its principal place of business in Minnesota, 3M has availed itself of Minnesota law and should expect that Minnesota's laws will apply to its conduct.  3M has demonstrated an expectation and preference for the application of Minnesota law by inserting a Minnesota choice of law provision into certain contracts with customers, including a 1999 Trademark License Agreement between 3M and Wolverine that allowed Wolverine the right to use the Scotchgard™ trademark in marketing Wolverine's products as treated with Scotchgard™.

117.   Upon information and belief, since its first sales of  Scotchgard™ in 1958 to Wolverine, 3M assured Wolverine, expressly and/or impliedly, that Scotchgard™ was safe, not harmful and did not pose a threat to the environment.

118.   Upon information and belief, in 1980, 3M represented to its customers, including Wolverine, that Scotchgard™ products did not "present[] an unreasonable environmental risk."

119.   On May 30, 1999, a Business Director at 3M, Doug Johnson, prepared a letter to 19 Wolverine employees seeking to assure them that the presence of PFAS does not present an environmental risk.  Yet internal 3M correspondence that same year shows that 3M knew of potential environmental risks associated with Wolverine's use and disposal of Scotchgard™ Leather Protector, but 3M chose not to share that information with Wolverine.  Doing so would have resulted in Wolverine and other 3M customers asking 3M to pay for changes to address the potential risks: "[c]ustomers may ask 3M to subsidize this increased cost as it is our product that is requiring the changes [to their waste disposal practices]."

120.     In May 2000, Wolverine again asked 3M if the Scotchgard™ Leather Protector it had purchased and used for decades was safe.  Internal 3M notes indicate that 3M planned "to draft a letter to Wolverine assuring that . . . the product is safe."  Upon information and belief, 3M did communicate these assurances to Wolverine.

121.     3M knew its affirmative assurances to Wolverine that Scotchgard™ was safe and not harmful to the environment were false and/or half–truths, or recklessly made those representations, without knowledge of the truth of its assurances (and indeed, with knowledge of facts that should have raised doubts about the truth of its representations).

122.     Furthermore, 3M was aware of, but failed to disclose, numerous facts that indicated significant environmental concerns related to the PFAS chemicals in Scotchgard™, including but not limited to facts set forth in paragraphs 6, 8, 40-43, 51, 58, and 69 above.  In particular, at no time did 3M inform Wolverine that wastes from the application of Scotchgard™ and potentially containing certain PFAS compounds could enter the groundwater, that 3M had learned that wastes from its own factories that were engaged in the production of PFAS chemicals had leached into the groundwater and contaminated nearby wells, that 3M had decades of internal studies suggesting some association between certain PFAS compounds and adverse environmental effects, or that 3M's own scientist (Dr. Purdy) had told the EPA in March 1999 that 3M had intentionally failed to disclose known environmental risks about its product.

123.     3M had a duty to disclose facts relating to the environmental risks associated with its product because this disclosure was necessary to clarify other information and assurances provided by 3M regarding the supposed safety of Scotchgard™.  Moreover, 3M had superior and unique knowledge of the potential environmental risks associated with the use and disposal of its

product, which was unavailable to Wolverine, including internal studies about the potential environmental risks of PFAS chemicals dating back to the 1950s.

124.    3M made these false statements and/or material omissions with the intention of inducing Wolverine's reliance, including its continued purchases of Scotchgard™.

125.    Wolverine actually and reasonably relied on 3M for information regarding the safety of the chemicals 3M designed, researched, tested, manufactured and then sold to Wolverine.  3M was in a superior position to know about the risks of its own products, as compared to Wolverine, given 3M's decades of research and development of these compounds, its extensive testing of the compounds, its investigation into the effects of its own waste disposal practices, and its substantial scientific capabilities and resources.

126.    Wolverine was not aware that Scotchgard™ Leather Protector, when used and disposed of in line with then–prevailing industry and legal norms and consistent with 3M's recommendations and practices, would lead to groundwater or environmental contamination as alleged by the MDEQ and the Townships.  Wolverine did not know there was PFAS near its property at levels above 70 ppt until at the earliest, June 2017 when the MDEQ disclosed that the Belmont Armory had tested the drinking water adjacent to Wolverine's property.  And there was no legal obligation to cleanup until the MDEQ established a drinking–water cleanup criterion of 70 ppt for PFOA and PFOS on January 9, 2018.  Wolverine did not become aware of the harm caused by 3M's actions or omissions until that date.

127.    If Wolverine had known that its use and disposal of Scotchgard™ Leather Protector would cause the environmental contamination alleged by the MDEQ and the Townships, it would not have purchased Scotchgard™ Leather Protector in the first instance or would have ceased using it earlier, adopted different disposal practices, and/or otherwise

changed its decision–making process with regard to Scotchgard™ Leather Protector and/or wastes containing Scotchgard™ residuals.

128.    As a result of 3M's material misrepresentations and active concealment of the risks of the PFAS compounds contained in Scotchgard™, Wolverine now faces significant potential liability and property damage.

## FIFTH CAUSE OF ACTION
### (Fraud – Michigan Law)

129.    Wolverine repeats, re–alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein. To the extent Michigan law governs Wolverine's fraud cause of action, this claim is being pled in the alternative to Wolverine's fourth cause of action for fraud under Minnesota law.

130.    3M enacted a corporate policy and directive to conceal and misrepresent material information regarding the environmental risks of its PFAS–containing Scotchgard™.

131.    3M failed to disclose material information and made affirmative false statements to Wolverine regarding the environmental risks associated with PFAS compounds in Scotchgard™.

132.    Upon information and belief, since 3M first sold Wolverine Scotchgard™, 3M assured Wolverine that Scotchgard was safe, not harmful, and did not pose a threat to the environment.

133.    Upon information and belief, in 1980, 3M represented to its customers, including Wolverine, that Scotchgard™ products did not present an "unreasonable environmental risk."

134.    On May 30, 1999, another Business Director at 3M, Doug Johnson, prepared letters to send to 19 Wolverine employees, that sought to assure Wolverine that the PFAS compounds in Scotchgard™ do not present an environmental risk.  Yet internal 3M

correspondence that same year shows that 3M knew of potential environmental risks associated with Wolverine's use and disposal of Scotchgard™ Leather Protector, but 3M chose not to share that information with Wolverine.  Doing so would have resulted in Wolverine and other 3M customers asking 3M to pay for changes to address the potential risks: "[c]ustomers may ask 3M to subsidize this increased cost as it is our product that is requiring the changes [to their waste disposal practices]."

135.    In May 2000, Wolverine again asked 3M if the Scotchgard™ Leather Protector it had purchased and used for decades was safe.  Internal 3M notes indicate that 3M planned "to draft a letter to Wolverine assuring that . . . the product is safe."  Upon information and belief, 3M did communicate these assurances to Wolverine.

136.    3M knew its affirmative assurances to Wolverine that Scotchgard™ was safe and not harmful to the environment were false and/or half–truths, or recklessly made those representations, without knowledge of the truth of its assurances (and indeed, with knowledge of facts that should have raised doubts about the truth of its statements).

137.    Furthermore, 3M was aware of, but failed to disclose, numerous facts that indicated significant environmental concerns related to Scotchgard™, including but not limited to facts set forth in paragraphs 6, 8, 40-43, 51, 58, and 69 above.  In particular, at no time did 3M inform Wolverine that wastes from the application of Scotchgard™ and potentially containing certain PFAS compounds could enter the groundwater, that 3M had learned that wastes from its own factories which were engaged in the production of PFAS chemicals had leached into the groundwater and contaminated nearby wells, that 3M had decades of internal studies suggesting some association between certain PFAS compounds and adverse environmental effects, or that

3M's own scientist (Dr. Purdy) had told the EPA in March 1999 that 3M had intentionally failed to disclose known environmental risks about its product.

138.    3M had a duty to disclose facts relating to the environmental risks associated with its product because this disclosure was necessary to clarify other information and assurances provided by 3M regarding the supposed safety of Scotchgard™.  Moreover, 3M had superior and unique knowledge of the potential environmental risks associated with the use and disposal of its product, that was unavailable to Wolverine including internal studies about the potential environmental risks of PFAS chemicals dating back to the 1950s.

139.    3M made these false statements and/or omissions with the intention of inducing Wolverine's reliance, including its continued purchases of Scotchgard™.

140.    Wolverine actually and reasonably relied on 3M for information regarding the chemicals 3M designed, researched, tested, manufactured and then sold to Wolverine.  3M was in a superior position to know of any risks or concerns associated with its own product, as compared to Wolverine given its early research and development of the compounds, its extensive testing of the compounds, its investigation into the effects of its own waste disposal practices, and its substantial scientific capabilities and resources.

141.    Wolverine was not aware that its use of Scotchgard™ Leather Protector, when used and disposed of in line with then–prevailing industry and legal norms and consistent with 3M's recommendations and practices, would lead to groundwater or environmental contamination as alleged by the MDEQ and the Townships.  Wolverine did not know there was PFAS near its property at levels above 70 ppt until at the earliest, June 2017 when the MDEQ disclosed that the Belmont Armory had tested the drinking water adjacent to Wolverine's property.  And there was no legal obligation to cleanup until the MDEQ established a drinking–

water cleanup criterion of 70 ppt for PFOA and PFOS on January 9, 2018.  Wolverine did not become aware of the harm caused by 3M's actions or omissions until that date.

142.    If Wolverine had known that its use and disposal of Scotchgard™ Leather Protector would cause the environmental contamination alleged by the MDEQ and the Townships, it would not have purchased Scotchgard™ Leather Protector in the first instance or would have ceased using it earlier, adopted different disposal practices, and/or otherwise changed its decision–making process with regard to Scotchgard™ Leather Protector and/or wastes containing Scotchgard™ residuals.

143.    As a result of 3M's material misrepresentations and active concealment of the risks of the PFAS compounds contained in Scotchgard™, PFAS has caused damage to Wolverine's properties and the groundwater underneath the properties has been impacted by PFAS which in turn has contaminated the groundwater in adjoining properties (as alleged by the MDEQ and the Townships), and accordingly, Wolverine has incurred property damage as well as consequential damages resulting from 3M's actions and/or omissions.

### SIXTH CAUSE OF ACTION
### (Private Nuisance – Common Law)

144.    Wolverine repeats, re–alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

145.    3M's wrongful conduct has caused a significant interference with the use and enjoyment of Wolverine's property.

146.    3M produced and sold Scotchgard™ Leather Protector which it knew would contaminate ground water and pollute the environment.  As a result of 3M's sales of chemicals to Wolverine that the State of Michigan has deemed a hazardous substance and that 3M knew or

could reasonably foresee would be disposed of at Wolverine's properties, Wolverine has suffered property damage, including at House Street and Rockford Tannery.

147.    Wolverine did not know there was PFAS near its property at levels above 70 ppt until at the earliest, June 2017 when the MDEQ disclosed that the Belmont Armory had tested the drinking water adjacent to Wolverine's property.  And there was no legal obligation to cleanup until the MDEQ established a drinking–water cleanup criterion of 70 ppt for PFOA and PFOS on January 9, 2018.  Wolverine did not become aware of the harm caused by 3M's actions or omissions until that date.

148.    As a result of 3M's conduct described herein, 3M has substantially interfered with Wolverine's use and enjoyment of its properties and has caused physical harm to the properties and to the groundwater underneath the properties, which in turn has contaminated the groundwater in adjoining properties (as alleged by the MDEQ and the Townships), and accordingly, Wolverine has suffered property damage and incurred consequential damages resulting from 3M's actions and/or omissions.

## SEVENTH CAUSE OF ACTION
### (Public Nuisance – Common Law)

149.    Wolverine repeats, re–alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

150.    3M's wrongful conduct has caused a significant interference with the use and enjoyment of Wolverine's property.

151.    The State has alleged that Scotchgard™ Leather Protector caused pollution to the groundwater in and around House Street, Rockford Tannery and Wolven/Jewell.  The State and the Townships allege that the pollution constitutes a public nuisance.

152.    3M knew or should have known that its conduct would result in the pollution of public water systems, as alleged by the MDEQ and the Townships.

153.    Wolverine did not know there was PFAS near its property at levels above 70 ppt until at the earliest, June 2017 when the MDEQ disclosed that the Belmont Armory had tested the drinking water adjacent to Wolverine's property.  And there was no legal obligation to cleanup until the MDEQ established a drinking–water cleanup criterion of 70 ppt for PFOA and PFOS on January 9, 2018.  Wolverine did not become aware of the harm caused by 3M's actions or omissions until that date.

154.    As a result of 3M's wrongful conduct, Wolverine is now suffering unique harms including but not limited to significant liability, investigation and remediation costs stemming from the contamination of its properties and the groundwater underneath the properties which in turn has contaminated the groundwater in adjoining properties (as alleged by the MDEQ and the Townships), and accordingly, Wolverine has suffered property damage and consequential damages resulting from 3M's actions and/or omissions.

## EIGHTH CAUSE OF ACTION
### (Failure to Warn – MCL § 600.2948(3))

155.    Wolverine repeats, re–alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

156.    Wolverine's use and disposal of Scotchgard™ Leather Protector were reasonably foreseeable to 3M.  3M knew, or should have known, of Wolverine's disposal practices and advised customers like Wolverine of appropriate methods to dispose of 3M products. Wolverine's disposal practices were also substantially similar to those practiced by 3M.

157.    3M was aware of environmental risks associated with Scotchgard™ Leather Protector and had a duty to warn Wolverine of those risks.

158.    3M did not warn Wolverine of any of the environmental risks regarding the use and disposal of Scotchgard™, even though it was in a superior and unique position to understand them.

159.    3M failed to warn Wolverine that PFAS would reach the groundwater and cause substantial environmental harm as alleged by the State and the Townships.

160.    3M knew or should have known of these risks associated with the PFAS compounds contained in Scotchgard™ as early as 1958 and at all times thereafter.

161.    To the extent 3M learned of any risks after it sold Scotchgard™ to Wolverine, 3M also failed to warn Wolverine of these risks.

162.    The risks associated with PFAS were neither obvious nor known to Wolverine, nor were they a matter of common knowledge to other purchasers of Scotchgard™.  Indeed, Wolverine did not know there was PFAS near its property at levels above 70 ppt until at the earliest, June 2017 when the MDEQ disclosed that the Belmont Armory had tested the drinking water adjacent to Wolverine's property.  And there was no legal obligation to cleanup until the MDEQ established a drinking–water cleanup criterion of 70 ppt for PFOA and PFOS on January 9, 2018.  Wolverine did not become aware of the harm caused by 3M's actions or omissions until that date.

163.    Wolverine is a shoe manufacturer, not a chemical company.  Despite Wolverine's purchase of Scotchgard™ from 3M for many years, Wolverine's expertise was in designing, manufacturing, and selling shoes, not in the chemical properties of Scotchgard™ beyond its application to shoes, as part of Wolverine's leather tanning process.

164.    3M's actions demonstrate that it was aware that Wolverine's knowledge of Scotchgard™ was not as sophisticated as its own.  3M required Wolverine to send samples of

treated products to 3M for inspection every 30 days, and to allow 3M representatives to inspect Wolverine's products at random, for "performance monitoring purposes" and to ensure that the products "[met] the specified standards" as set out in the parties' agreement.  This exercise of control over its product demonstrates that 3M did not view Wolverine as a sophisticated user of Scotchgard™.

165.    Wolverine was merely a regular user of the product that 3M developed and mass produced.  Wolverine was unaware of the environmental risks alleged by the State arising from the disposal of waste containing Scotchgard™ and/or Scotchgard™ residuals, primarily because 3M concealed those hazards from Wolverine and others.

166.    If Wolverine had known that its use and disposal of Scotchgard™ Leather Protector would cause the environmental contamination alleged by the MDEQ and the Townships, it would not have purchased Scotchgard™ Leather Protector in the first instance or would have ceased using it earlier, adopted different disposal practices, and/or otherwise changed its decision–making process with regard to Scotchgard™ Leather Protector and/or wastes containing Scotchgard™ residuals.

167.    As a result of 3M's failure to warn Wolverine of the risks of the PFAS compounds in Scotchgard™, Wolverine's properties have been damaged and the groundwater underneath the properties has been contaminated by PFAS, which in turn has contaminated the groundwater in adjoining properties (as alleged by the MDEQ and the Townships), and accordingly, Wolverine has suffered property damage as well as consequential damages resulting from 3M's actions and/or omissions.

## NINTH CAUSE OF ACTION
### (Product Design Defect)

168.    Wolverine repeats, re–alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

169.    3M is in the business of designing, manufacturing, and distributing numerous PFAS–containing products, including Scotchgard™ Leather Protector.

170.    Wolverine purchased Scotchgard™ Leather Protector directly from 3M between the years of 1958 to 2002.

171.    3M had a duty to design, manufacture, and distribute its chemical products in a manner that would not cause environmental pollution and/or groundwater contamination when used for the purposes for which they were designed.

172.    3M breached its duty by designing, manufacturing, and distributing PFAS–containing products knowing that they would and did cause environmental pollution and groundwater contamination.

173.    It was reasonably foreseeable to 3M, and 3M knew, that its customers, including Wolverine, would use and dispose of waste potentially containing Scotchgard™ Leather Protector in a way that would cause PFAS to contaminate the environment as alleged by the MDEQ and the Townships.

174.    There was a reasonable alternative design available that would have reduced the foreseeable environmental risk posed by the older formulation of Scotchgard™.  Indeed, in the same year it announced the phase-out of the older formulations of Scotchgard™, 3M expected to come up with a substitute within the end of that same year.  On information and belief, 3M developed the alternative Scotchgard™ (containing non–C8 polymers rather than C–8's like PFOS) as early as 2001 and began selling it in 2003.  3M's ability to create—within such a short

window—an alternative Scotchgard™ formulation to address the EPA's environmental concerns about certain PFAS in Scotchgard™ Leather Protector suggests that the delayed implementation of an alternative design was not due to the unavailability of an alternative design, but resulted from 3M's decades–long effort to stall and suppress research into PFAS, and/or, on information and belief, 3M's interest in disposing of all of its product using the prior formulation.

175.    Wolverine did not know there was PFAS near its property at levels above 70 ppt until at the earliest, June 2017 when the MDEQ disclosed that the Belmont Armory had tested the drinking water adjacent to Wolverine's property.  And there was no legal obligation to cleanup until the MDEQ established a drinking–water cleanup criterion of 70 ppt for PFOA and PFOS on January 9, 2018.  Wolverine did not become aware of the harm caused by 3M's actions or omissions until that date.

176.    As a result of 3M's defective Scotchgard™ Leather Protector, Wolverine's properties have been damaged, and the groundwater underneath the properties has been contaminated by PFAS which in turn has contaminated the groundwater in adjoining properties (as alleged by the MDEQ and the Townships), and accordingly, Wolverine has incurred property damage as well as consequential damages resulting from 3M's actions and/or omissions.

### TENTH CAUSE OF ACTION
### (Breach of Implied Warranty of Merchantability)

177.    Wolverine repeats, re–alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

178.    3M was a merchant of PFAS–containing products.  3M designed, manufactured, and sold PFAS–containing products including Scotchgard™ Leather Protector.

179.    Wolverine purchased Scotchgard™ Leather Protector directly from 3M on a regular basis from 1958 until 2002.

180.   Scotchgard™ Leather Protector was defectively designed and was sold without the provision of reasonable instructions or warnings regarding the foreseeable risk that use and disposal of the product would result in environmental pollution, as alleged by the MDEQ and the Townships.

181.   Wolverine used Scotchgard™ Leather Protector in the manner it was intended, but the product was still defective and unmerchantable because, according to the MDEQ and the Townships, it contains a hazardous substance and has resulted in groundwater or environmental contamination.

182.   Scotchgard™ Leather Protector left 3M's possession in a defective condition.

183.   Wolverine only used Scotchgard™ Leather Protector for its intended use and consistent with 3M's recommendations and practices.

184.   The MDEQ and Townships have alleged that PFAS chemicals in Scotchgard™ are a hazardous substance and the direct and proximate cause of environmental pollution of properties belonging to Wolverine and others in the State of Michigan.

185.   As a result of 3M's breach of warranty, Wolverine's properties have been damaged, and the groundwater underneath the properties has been contaminated by PFAS, which in turn has contaminated the groundwater in adjoining properties (as alleged by the MDEQ and the Townships), and accordingly, Wolverine has incurred property damage as well as consequential damages resulting from 3M's actions and/or omissions.

## ELEVENTH CAUSE OF ACTION
### (Breach of Implied Warranty of Fitness for a Particular Purpose)

186.   Wolverine repeats, re–alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

41

187.     When it sold Scotchgard™ Leather Protector to Wolverine, 3M knew that the
particular purpose for which Scotchgard™ Leather Protector was to be used and disposed by
Wolverine.

188.     Wolverine reasonably relied on 3M's skill and judgment to ensure that Wolverine
properly used and disposed of Scotchgard™ Leather Protector in accordance with 3M's
expectations.

189.     3M knew that Wolverine was relying on 3M's skill and judgment to ensure that
Wolverine properly used and disposed of Scotchgard™ Leather Protector in accordance with
3M's expectations.

190.     3M knew of the risks inherent with the PFAS compounds in Scotchgard™
Leather Protector rendering it unfit for the particular purpose for which Wolverine intended it to
be used and disposed.

191.     3M knew that if Wolverine had known that its use and disposal of Scotchgard™
Leather Protector would cause the groundwater or environmental contamination alleged by the
MDEQ and the Townships, Wolverine would not have purchased the product in the first instance
or would have ceased using the product earlier, adopted different disposal practices, and/or
otherwise changed its decision-making process with regard to Scotchgard™ Leather Protector
and/or wastes containing Scotchgard™ residuals.

192.     3M, nonetheless, furnished Wolverine with a product that was not suitable for the
particular purposes known to 3M.

193.     As a result, 3M's breach of implied warranty of fitness for a particular purpose
Wolverine's properties have been damaged and the groundwater underneath the properties have
been contaminated by PFAS which in turn has contaminated the groundwater in adjoining
properties (as alleged by the MDEQ and the Townships), and accordingly, Wolverine has
incurred property damage as well as consequential damages resulting from 3M's actions and/or
omissions.

## TWELFTH CAUSE OF ACTION
### (Negligence)

194.    Wolverine repeats, re–alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

195.    3M owed a duty to Wolverine to act with care in creating, manufacturing, selling, and advising customers regarding the use and disposal of its PFAS–containing products.

196.    3M breached its duty to Wolverine by engaging in the conduct alleged above including, but not limited to, creating a product with environmental risks, failing to take action to mitigate those risks, selling products with knowledge of these risks, and failing to disclose those risks to its customers including Wolverine.

197.    Wolverine did not know there was PFAS near its property at levels above 70 ppt until at the earliest, June 2017 when the MDEQ disclosed that the Belmont Armory had tested the drinking water adjacent to Wolverine's property.  And there was no legal obligation to cleanup until the MDEQ established a drinking–water cleanup criterion of 70 ppt for PFOA and PFOS on January 9, 2018.  Wolverine did not become aware of the harm caused by 3M's actions or omissions until that date.

198.    As a result of 3M's negligence, Wolverine's properties have been damaged, and the groundwater underneath the properties has been contaminated by PFAS which in turn has contaminated the groundwater in adjoining properties (as alleged by the MDEQ and the Townships), and accordingly, Wolverine has incurred property damage as well as consequential damages resulting from 3M's actions and/or omissions.

## THIRTEENTH CAUSE OF ACTION
### (CERCLA Cost Recovery)

199.     Wolverine repeats, re–alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

200.     Wolverine is a "person" as defined by "CERCLA", section 101(21), 42 U.S.C. § 9601(21).

201.     3M is a "person" as defined by CERCLA section 101(21), 42 U.S.C. § 9601(21).

202.     There was an actual or threatened "release" of "hazardous substances" within the meaning of CERCLA sections 101(14) and (22), 42 U.S.C. §§ 9601(14), (22).

203.     Scotchgard$^{TM}$ Leather Protector contains 1,1,1,–trichloroethane (or "TCA"), which is a hazardous substance.

204.     Scotchgard$^{TM}$ Leather Protector and/or other hazardous substances within the meaning of sections 101(14), (22) of CERCLA, 42 U.S.C. § 9601(14), (22), have come to be located in surface and groundwater in Kent County, Michigan.

205.     Scotchgard$^{TM}$ Leather Protector and/or other hazardous substances have been detected at and migrating from House Street, the Rockford Tannery, Wolven/Jewell, and other similar or related facilities where Scotchgard$^{TM}$ and/or Scotchgard$^{TM}$ residuals have come to be located (collectively, the "Sites").

206.     Each Site is a "facility" within the meaning of CERCLA, 42 U.S.C. § 9601(9).

207.     3M arranged for disposal or treatment of "hazardous substances" at the Sites within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

208.     But for 3M's manufacture of Scotchgard$^{TM}$, the Sites would not be contaminated with Scotchgard$^{TM}$ or Scotchgard$^{TM}$ residuals and Wolverine would not be incurring response costs.

209.    At all relevant periods, Wolverine did not know Scotchgard™ Leather Protector would leach into the groundwater.

210.    3M knew Scotchgard™ migrated to groundwater.  3M also knew that Scotchgard™ was persistent and bioaccumulative.  3M intentionally shielded all of that information from others.

211.    In May of 2000, 3M announced it would cease production of Scotchgard™ Leather Protector.

212.    Before and during the phase–out of Scotchgard™, 3M continued selling Scotchgard™ Leather Protector.  3M continued to shield from others the full extent of its knowledge of the environmental risks posed by Scotchgard™ Leather Protector.  3M knew or should have known that no tannery, if fully informed about the facts as they were known to 3M, would have purchased and used Scotchgard™ Leather Protector.

213.    On information and belief, 3M created incentives for purchasers of Scotchgard™ Leather Protector because if the environmental risks of Scotchgard™ Leather Protector were known to the market (and not just 3M) there would have been little consumer demand for it.

214.    During the phase–out of Scotchgard™, the chief benefit to 3M in selling Scotchgard™ Leather Protector was in disposing of it.  During that time, any revenues from sales of Scotchgard™ Leather Protector were incidental to the immediate benefit of being rid of an overstock of unusable chemicals.  If Wolverine and others had known of the environmental impacts of Scotchgard™ Leather Protector, then the Scotchgard™ Leather Protector would have been of little or no value to 3M.

215.    To date, Wolverine has spent millions of dollars in response costs at the Sites, including costs incurred performing work under the UAO issued by the EPA.  Wolverine will

continue to incur costs, including pursuant to the UAO, and it will incur additional costs necessary to respond to the release of hazardous substances at the Sites.

216.    In connection with the releases of "hazardous substances" at the Sites, Wolverine has incurred and will incur "response costs" within the meaning of CERCLA section 101(25), 42 U.S.C. § 9601(25) to remediate the Sites.  These response costs were, and will be, necessary and consistent with the National Contingency Plan.

217.    3M is liable, pursuant to section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B), to Wolverine for past and future response costs.

## FOURTEENTH CAUSE OF ACTION
### (NREPA Part 201 Cost Recovery)

218.    Wolverine repeats, re–alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

219.    Wolverine is a "person" within the meaning of Part 201 of NREPA, Mich. Comp. Laws § 324.20126.

220.    3M is a "person" within the meaning of Part 201 of NREPA, Mich. Comp. Laws § 324.20126.

221.    Each Site is a "facility" within the meaning of Part 201 of NREPA, Mich. Comp. Laws § 324.20101(1)(s).

222.    3M arranged for disposal or treatment of Scotchgard$^{TM}$, which contains 1,1,1,– TCA, and other "hazardous substances" at the Sites within the meaning of Part 201 of NREPA, Mich. Comp. Laws § 324.20126(1)(b).

223.    In connection with the releases of "hazardous substances" at the Sites, Wolverine has incurred and will incur "costs of response activity" within the meaning of Part 201, Mich. Comp.

Laws §§ 324.20101(1)(ww) and 324.20126a(1)(b), to remediate the Sites. The costs of response activity were reasonably incurred under the circumstances.

224. 3M is liable, pursuant to Part 201 of NREPA, Mich. Comp. Laws § 324.20126a(1), to Wolverine for past and future costs of response activities.

**FIFTEENTH CAUSE OF ACTION**
**(CERCLA Contribution)**

225. Wolverine repeats, re–alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

226. Each Site is a "facility" within the meaning of CERCLA section 101(9), 42 U.S.C. § 9601(9).

227. Wolverine is a "person" within the meaning of CERCLA section 101(21), 42 U.S.C. § 9601(21).

228. 3M is a "person" within the meaning of CERCLA section 101(21), 42 U.S.C. § 9601(21).

229. There was an actual or threatened "release" of "hazardous substances" at the Sites within the meaning of CERCLA sections 101(14) and (22), 42 U.S.C. §§ 9601(14), (22).

230. 3M arranged for disposal or treatment of Scotchgard$^{TM}$, which contains 1,1,1,–TCA, and other "hazardous substances" within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

231. In connection with the releases of Scotchgard$^{TM}$ and other "hazardous substances" at the Sites, Wolverine has incurred and will incur "response costs" within the meaning of CERCLA section 101(25), 42 U.S.C. § 9601(25). These "response costs" were, and will be, necessary and consistent with the National Contingency Plan.

232.     Wolverine has incurred and may be ordered to incur costs for the investigation and remediation of the Sites that are greater than Wolverine's equitable share of those costs.

233.     3M is liable, pursuant to sections 107(a) and 113(f) of CERCLA, 42 U.S.C. §§ 9607(a), 9613(f), to Wolverine for past and future costs paid by Wolverine in excess of Wolverine's equitable share of such costs.

## SIXTEENTH CAUSE OF ACTION
### (NREPA Part 201 Contribution)

234.     Wolverine repeats, re–alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

235.     Wolverine is a "person" within the meaning of Part 201 of NREPA, Mich. Comp. Laws § 324.20126.

236.     3M is a "person" within the meaning of Part 201 of NREPA, Mich. Comp. Laws § 324.20126.

237.     Each Site is a "facility" within the meaning of Part 201 of NREPA, Mich. Comp. Laws § 324.20101(1)(s).

238.     There was an actual or threatened "release" of "hazardous substances" at the Sites within the meaning of Part 201, Mich. Comp. Laws §§ 324.20101(1)(pp) and 324.20126.

239.     3M arranged for disposal or treatment of Scotchgard$^{TM}$, which contains 1,1,1,– TCA, and other "hazardous substances" within the meaning of Part 201, Mich. Comp. Laws § 324.20126(1)(d).

240.     In connection with the releases of Scotchgard$^{TM}$ and other "hazardous substances" at the Sites, Wolverine has incurred and will incur "costs of response activity" within the meaning of Part 201, Mich. Comp. Laws § 324.20129(3).  The costs of response activity were reasonably incurred under the circumstances.

48

241.     Wolverine has incurred and may be ordered to incur costs of response activity associated with remediation of the Sites, which costs are greater than Wolverine's equitable share of those costs.

242.     3M is liable, pursuant to Part 201, Mich. Comp. Laws §§ 324.20126 (1), 20129(3), to Wolverine for past and future costs of response activity paid by Wolverine in excess of Wolverine's equitable share of such costs.

## SEVENTEENTH CAUSE OF ACTION
### (CERCLA Declaratory Relief)

243.     Wolverine repeats, re–alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

244.     Pursuant to section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), Wolverine is entitled to a declaratory judgment, binding in any subsequent action or actions, that holds 3M liable for any further response costs or damages incurred by Wolverine in connection with the Sites.

## EIGHTEENTH CAUSE OF ACTION
### (NREPA Declaratory Relief)

245.     Wolverine repeats, re–alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

246.     Pursuant to Part 201 of NREPA, Mich. Comp. Laws §§ 324.20126, 324.20129, and 324.20137(1)(d), Wolverine is entitled to a declaratory judgment, binding on any subsequent action or actions, that holds 3M liable for any further response activity costs or damages incurred by Wolverine in connection with the Sites.

## PRAYER FOR RELIEF

WHEREFORE, Wolverine prays that the Court enter judgment in its favor and against 3M as follows:

247.    For indemnification of all costs, losses and liabilities that Wolverine has incurred, and/or will incur, including remediation costs and all defense and related costs, as a result of the matters alleged herein, according to proof at trial;

248.    For damages, including all consequential damages, that Wolverine has suffered or will suffer, according to proof at trial, as a result of the matters alleged herein;

249.    For appropriate injunctive relief, including an injunction requiring 3M (1) to abate the nuisance and to clean, repair, and restore Wolverine's property and the groundwater thereunder as well as the groundwater in adjoining properties to levels required by applicable MDEQ cleanup criteria, standards and regulations; and (2) to perform any necessary investigation and response activity at the Sites;

250.    For cost recovery or contribution, as alleged herein;

251.    For declaratory relief as alleged herein, including declaratory relief that 3M is liable for any further response activity costs or damages incurred by Wolverine in connection with the Sites;

252.    For an order directing 3M to pay its equitable percentage of the past response costs that Wolverine has incurred at the Sites, plus interest (under CERCLA section 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B), and CERCLA section 113(f)(1), 42 U.S.C. § 9613(f)(1); Part 201, Mich. Comp. Laws §§ 324.20126(1), 20129(3));

253.    For a declaratory judgment, and other appropriate prospective relief, directing 3M to pay its equitable percentage of all future response costs associated with the cleanup of the Sites (under the Declaratory Judgment Act, 28 U.S.C. § 2201; CERCLA section 113(f)(1), 42 U.S.C. § 9613(f)(1), CERCLA section 113(g)(2), and/or 42 U.S.C. § 9613(g)(2);  and under Part 201, Mich. Comp. Laws §§ 324.20126, 324.20129);

254.   For reasonable attorney's fees and costs;

255.   For prejudgment interest at the legal rate on the foregoing sums;

256.   Such other and further relief as deemed appropriate and just by the Court.

## **JURY DEMAND**

257.   Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Wolverine hereby demands a trial by jury of all issues properly triable thereby.


DATED:  December 19, 2018              Respectfully submitted,


By /s/ Scott M. Watson
_____
John Byl (P35701)
James Moskal (P41885)
Scott M. Watson (P70185)
WARNER NORCROSS + JUDD LLP
111 Lyon, N.W., Ste. 900
Grand Rapids, MI 49503
(616) 752–2000
jbyl@wnj.com
jmoskal@wnj.com
swatson@wnj.com

Attorneys for Third-Party Plaintiff Wolverine
World Wide, Inc.