# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

MICHIGAN DEPARTMENT OF
ENVIRONMENTAL QUALITY,

     Plaintiff,

    vs.

WOLVERINE WORLD WIDE, INC.,

     Defendant.

CASE NO. 1:18-CV-00039-JTN-ESC


Hon. Janet T. Neff

---

PLAINFIELD CHARTER TOWNSHIP;
ALGOMA TOWNSHIP,

     Intervening Plaintiffs,

    vs.

WOLVERINE WORLD WIDE, INC.,

     Defendant.

---

WOLVERINE WORLD WIDE, INC.,

     Third-Party Plaintiff,

    vs.

3M COMPANY,

     Third-Party Defendant.

---

**THIRD-PARTY DEFENDANT 3M COMPANY'S ANSWER AND AFFIRMATIVE
DEFENSES TO WOLVERINE WORLD WIDE, INC.'S THIRD-PARTY
COMPLAINT AND COUNTERCLAIM**

Third-Party Defendant 3M Company ("3M") answers the Third-Party Complaint brought by Wolverine World Wide, Inc. ("Wolverine") as follows:

## INTRODUCTION

1.      3M is one of the largest chemical companies in the world, with annual revenues of $31 billion, an employee base of over 91,000 (including more than 8,000 scientists and researchers), and research facilities that dwarf those of most universities, major corporations and even some countries. It markets itself to customers based on its touted scientific expertise. Its trademarked slogan is: "3M. Science. Applied to Life.$^{TM}$" 3M boasts that "after more than 100 years, we know how to rock science."

**ANSWER:    3M admits that it is a diversified technology company operating in multiple business sectors, today including industrial, safety and graphics, health care, electronics and energy, and consumer.  Answering further, 3M admits that it had annual revenues for 2018 which exceeded $31 billion, and that it employs more than 91,000 persons (including more than 8,000 scientists and researchers). 3M further admits that it has a trademark for the slogan "3M Science. Applied to Life.$^{TM}$" 3M denies the remaining allegations contained in Paragraph 1.**

2.      In the 1940s, 3M began developing a group of organic fluorine chemical products, sometimes referred to as "PFAS" compounds. Two types of PFAS chemicals include PFOA and PFOS. These compounds were sold for a variety of household, commercial, and industrial uses, and when applied to a surface, they make that surface water- and stain-repellant.

**ANSWER:    3M admits that, as one part of its business, it began developing certain fluorochemical compounds, which include PFOA and PFOS, in the late 1940s and 1950s, which led to the initial commercial production of certain fluorochemical compounds in the**

1

**1950s. 3M further admits that it sold repellant and surfactant products that contained certain fluorochemical compounds and other constituents depending on the product at certain times, including in and after the 1950s.  3M admits that some refer to a broad group or class of various fluorochemical compounds which may contain thousands of chemicals as "PFAS" compounds.  3M denies the remaining allegations in Paragraph 2.**

3.      From the 1940s onward, 3M has been the world leader in understanding and using these chemicals, but it has kept secret much of what it has learned and found, for competitive and other reasons.

**ANSWER:     3M denies the allegations in Paragraph 3.**

4.      3M formulated numerous products using these PFAS chemicals, including Scotchgard™, which could be used to treat leather so as to make it water- and stain-repellant. 3M started selling Scotchgard™ in 1958. In marketing Scotchgard™, 3M assured its customers that Scotchgard™ was thoroughly tested, and that it was safe and appropriate for such uses.

**ANSWER:   3M admits that Scotchgard™ is a trademark and brand name applicable to a wide variety of products over time, and that, at certain times, it has used certain PFAS to manufacture certain Scotchgard™-branded leather protection products and certain other products for consumer and industrial use.  Not all Scotchgard™-branded products contained PFAS.   3M further admits that Wolverine began purchasing Scotchgard™-branded leather protection products that contained certain PFAS compounds in or after 1958.  Further answering, based on information and belief, 3M states that Wolverine worked with 3M in the initial development of Scotchgard™-branded leather protection products.  3M admits, subject to customer specifications and any applicable contracts or commercial terms, that Scotchgard™-branded leather products were**

2

appropriate for providing certain features to leather, including water-, soil- and stain-repellency, when used as intended.  3M denies Third-Party Plaintiff's characterization of 3M's business and denies the remaining allegations in Paragraph 4.

5.     On information and belief, in the mid-1950s, 3M began actively fostering a market amongst potential customers, including Wolverine, a Michigan-based shoe manufacturer of well-known brands, including Hush Puppies®, and convinced it to use Scotchgard$^{TM}$ to treat the leather used in its shoes. For the next 40+ years (starting in 1958), 3M sold Scotchgard$^{TM}$ to Wolverine. During that more than 40 year period, 3M regularly assured Wolverine and its other customers that Scotchgard$^{TM}$ was safe, effective, and appropriate for such uses.

**ANSWER:    3M admits that it began marketing certain Scotchgard$^{TM}$ Fabric and Upholstery Protector products to the textile industry in 1956.  3M admits that, subject to customer specifications and any applicable contracts or commercial terms, Scotchgard$^{TM}$-branded leather products were appropriate for providing certain features to leather, including water-, soil- and stain-repellency, when used as intended.  Further answering, 3M states, on information and belief, that, beginning in approximately 1909 and continuing through approximately 2009-2010, Wolverine operated a leather tannery in Rockford, Michigan using, hundreds of chemicals in the process, and also manufactured various brands of shoes over this time.  3M denies Third-Party Plaintiff's characterization of 3M's business and denies the remaining allegations in Paragraph 5.**

6.     In 1999, 3M began advising its customers that it would be phasing out Scotchgard$^{TM}$. In communicating this decision, 3M assured its customers, including Wolverine, that Scotchgard$^{TM}$ remained safe and did not pose a risk to human health or the environment. Rather, 3M claimed, it was discontinuing Scotchgard$^{TM}$ solely because of its persistence in the

environment, even though it did not pose an environmental risk. To this day, 3M publicly maintains that none of its products containing PFAS, including Scotchgard$^{TM}$, poses an environmental or human health risk.

**ANSWER:   Paragraph 6 purports to refer to unidentified documents or statements attributed to 3M.  Any such documents or statements speak for themselves, and 3M denies any characterization of such documents or statements by Third-Party Plaintiff.  To the extent any further response is required, 3M denies the allegations and characterizations in Paragraph 6.**

7.      Unbeknownst to Wolverine, one of 3M's primary reasons for phasing out its old Scotchgard$^{TM}$ formula was because a 3M scientist had written to the United States Environmental Protection Agency ("EPA") stating that he felt PFAS chemicals in Scotchgard$^{TM}$ posed environmental risks that 3M was hiding and ignoring. 3M withheld this information from Wolverine, however, instead assuring it that there were no environmental risks from the Scotchgard$^{TM}$ product that 3M had sold to Wolverine, and that Wolverine had used, for over 40 years. Recently, however, as a result of a November 2017 court filing by the State of Minnesota against 3M, it has come to light that 3M hid relevant test data and information about the PFAS compounds in its Scotchgard$^{TM}$ product for decades.

**ANSWER:   Paragraph 7 purports to refer to unidentified documents or statements attributed to a "3M scientist" and to an unidentified "court filing" attributed to the State of Minnesota.  Any such documents, statements, or filings speak for themselves,  and 3M denies any characterization of those documents, statements, or filings by Third-Party Plaintiff.  To the extent any further response is required, 3M denies the allegations in Paragraph 7.**

8.      As early as the 1940s-1960s, 3M was aware of the very properties of Scotchgard[TM] that made it a risk to the environment, as alleged by the Michigan Department of Environmental Quality ("MDEQ"). Based on its research into the PFAS chemicals in Scotchgard[TM] and studies 3M conducted on its own waste disposal sites in Minnesota, 3M knew PFAS was persistent, stable, mobile, and a potential environmental risk. Yet it kept this information secret. For example, the State of Minnesota described in its above-referenced filing how 3M instructed its scientists to destroy notes of meetings discussing the risks of PFAS. The State of Minnesota also discovered secret arrangements between 3M and scientists who agreed to present themselves to the press as independent arbiters of PFAS research-when in fact they were being paid by 3M and briefed by 3M's medical department. 3M eventually settled with the State of Minnesota for $850 million to resolve claims that 3M had polluted Minnesota's water supply.

**ANSWER:   3M admits that in 2018, it settled a lawsuit brought by the State of Minnesota and paid $850 million in connection with that settlement.  3M denies any liability for the claims asserted in that lawsuit.  Further answering, the allegations in Paragraph 8 purport to refer to unidentified allegations and filings attributed to the MDEQ and/or the State of Minnesota.  Any such allegations and filings speak for themselves, and 3M denies any characterization of those allegations and filings by Third-Party Plaintiff.  To the extent a further response is required, 3M denies the allegations in Paragraph 8.**

9.      On January 9, 2018, the MDEQ issued its first drinking water criterion for PFOA and PFOS, two of the PFAS compounds in Scotchgard[TM], setting that criterion at no more than 70 parts per trillion (ppt). The next day, the MDEQ filed a lawsuit against Wolverine. In its suit, the MDEQ alleges that Wolverine's disposal of Scotchgard[TM] and/or wastes containing Scotchgard[TM] residuals have contaminated the drinking water in and around sites where Wolverine used

Scotchgard[TM] in its tanning process or sites Wolverine used to dispose of the resulting tannery wastes. The MDEQ alleges that the primary source of contamination is an unoccupied parcel of land located at 1855 House Street, Belmont, Michigan ("House Street"), which Wolverine has not used as a disposal site since 1970. At the time Wolverine was disposing of waste potentially containing Scotchgard[TM]-and certainly, as of 1958 to 1970 when Wolverine was using House Street-Wolverine had no knowledge that Scotchgard[TM] posed any of the environmental risks now alleged by the MDEQ. Wolverine did not know there was PFAS near its property at levels above 70 ppt until at the earliest, June 2017 when the MDEQ disclosed that the Belmont Armory had tested the drinking water adjacent to Wolverine's property. And there was no legal obligation to cleanup until the MDEQ established a drinking-water cleanup criterion of 70 ppt for PFOA and PFOS on January 9, 2018.

**ANSWER:** **Paragraph 9 purports to refer to an MDEQ "drinking water criterion". To the extent this paragraph refers to MDEQ's Part 201 residential drinking water criteria for PFOA and PFOS, such criteria speak for themselves, and 3M denies any characterization of that criteria by Third-Party Plaintiff. Paragraph 9 also purports to refer to unidentified allegations attributed to the MDEQ. Such allegations attributed to MDEQ speak for themselves, and 3M denies any characterization of those allegations by Third-Party Plaintiff. The allegations in Paragraph 9 also state legal conclusions to which no responsive pleading is required. To the extent any further response is required, 3M lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 9 regarding Wolverine's knowledge of certain facts. 3M denies any further allegations in Paragraph 9.**

10. As a result of 3M's actions and omissions, Wolverine is now faced with damage to its own property, three class actions, hundreds of individual lawsuits alleging bodily injury and property damage, and two governmental actions (including a Unilateral Administrative Order or "UAO" by the EPA) seeking extensive investigation and remediation. While Wolverine does not agree with each of the MDEQ's allegations against Wolverine, it is now stuck defending a "product" -- which was ultimately a waste -- that was developed by 3M, researched by 3M, and marketed by 3M, and from which 3M made hundreds of millions of dollars annually, in part by actively concealing information regarding potential environmental risks known only to 3M.

**ANSWER: Paragraph 10 purports to refer to unidentified allegations attributed to the MDEQ and unidentified legal or administrative actions seeking relief against Wolverine for its own conduct and misconduct over decades, which Wolverine seeks to avoid in pursuing this action. Any such allegations, legal or administrative actions speak for themselves, and 3M denies any characterization of those allegations by Third-Party Plaintiff. The allegations in Paragraph 10 also state legal conclusions to which no responsive pleading is required. To the extent a further response is required, 3M denies the allegations in Paragraph 10.**

11. Wolverine has done its part to investigate, mitigate and remediate the environmental damage alleged by the State in its complaint and by the EPA in its UAO, including by implementing an extensive water sampling program, providing bottled water as a precaution, and providing and monitoring home filtration systems to hundreds of residents in Kent County, Michigan. Wolverine has requested that 3M participate in these actions to address the potential environmental risks, but 3M has unreasonably refused to do so. As the experts that studied PFAS for decades and failed to warn customers of the environmental risks associated with PFAS

compounds in Scotchgard™, 3M should be held responsible. Accordingly, Wolverine is filing this action to compel 3M to honor its obligations to Wolverine and this community.

**ANSWER:   Paragraph 11 purports to refer to unidentified allegations or administrative actions attributed to the State and the EPA.   Any such allegations or administrative actions speak for themselves, and 3M denies any characterization of those allegations by Third-Party Plaintiff.   Given that Wolverine has apparently failed to complete the investigation, mitigation and remediation sought by the MDEQ and the EPA and has ongoing obligations and has denied liability in this action, Wolverine has no basis to claim a right to relief from 3M for Wolverine's own failures, and 3M denies any and all liability to Wolverine.   The allegations in Paragraph 11 also state legal conclusions to which no responsive pleading is required.   To the extent a further response is required, 3M denies the allegations as to 3M in Paragraph 11. 3M lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 11.**

**PARTIES**

### A.      Third-Party Plaintiff Wolverine

12.      Third-Party Plaintiff Wolverine is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Rockford, Michigan. It started as a family-run business in 1883, and it has been designing and manufacturing shoes since 1903.

**ANSWER:     3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 12.**

### B.      Third-Party Defendant 3M

13.      Third-Party Defendant 3M is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in St. Paul, Minnesota. 3M is a massive

8

conglomerate with over 91,000 employees and extensive expertise in the chemical sciences. It is in the business of using that expertise to design, manufacture, and sell household, commercial and industrial products. According to 3M, it manufactures over 60,000 products, and its revenues for 2017 exceeded $31 billion.

**ANSWER:   3M admits it is a corporation organized under the laws of Delaware, with its principal place of business in Minnesota.  3M further admits that its revenue for 2017 exceeded $31 billion, that it employs over 91,000 persons, and that it manufactures over 60,000 products. 3M denies Third-Party Plaintiff's characterization of 3M's business and denies the remaining allegations in Paragraph 13.**

14.    On its website, 3M describes itself as a "global powerhouse" and a "constant name on the Fortune 500 list." It touts its research and development ("R&D") capabilities, with 8,100 scientists and researchers worldwide, labs in over 36 countries, over 112,000 patents and $1.7 billion in annual expenditures for R&D alone.

**ANSWER:   Paragraph 14 purports to refer to 3M's website.  Any such website speaks for itself, and 3M denies any characterization of that website by Third-Party Plaintiff.**

15.    Pursuant to Rule 14 of the Federal Rules of Civil Procedure, 3M is a third party who is liable to Wolverine for all or part of the claims of the MDEQ, Plainfield Charter Township and Algoma Township (jointly, "the Townships" and together with the MDEQ, "Plaintiffs"), including but not limited to, for damage to Wolverine's properties and resulting remediation and response costs.

**ANSWER:   The allegations in Paragraph 15 state legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M denies the allegations in Paragraph 15 and denies any liability to Wolverine.**

## JURISDICTION

16.     Pursuant to 28 U.S.C. § 1331, this Court has federal question jurisdiction over Wolverine's federal law claims. In addition, this Court has supplemental jurisdiction over Wolverine's state law claims under 28 U.S.C. § 1367(a), because these claims are closely related to, and form part of the same case and controversy as, the federal law claims asserted by Wolverine and Plaintiffs.

**ANSWER:    The allegations in Paragraph 16 state legal conclusions to which no responsive pleading is required.**

17.     Venue is proper in the Western District of Michigan pursuant to 28 U.S.C. § 1391(b)(2) in that the properties in question are situated in this District and a substantial portion of the events giving rise to the claims occurred in this District. Venue is also proper in this District pursuant to 42 U.S.C. § 6972(a) and 42 U.S.C. § 9613(b) because the alleged environmental damage occurred in this District.

**ANSWER:    The allegations in Paragraph 17 state legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 17.**

## BACKGROUND

### A.    3M Engages in Early Research and Mass Production of PFAS

18.     Poly- and perfluoroalkyl substances ("PFAS") are a subgroup of organic-fluorine compounds. There are many different types of PFAS, each of which has unique properties. The two PFAS primarily at issue in this case are perfluorooctanoic acid or "PFOA" and perfluorooctane sulfonate or "PFOS."

**ANSWER:** **3M lacks knowledge or information sufficient to form a belief as to the truth of that allegation that PFOA and PFOS are the two PFAS primarily at issue in the case. 3M admits that some refer to a broad group or class of various fluorochemical compounds which may contain thousands of chemicals as "PFAS" compounds.**

19. Initially, PFAS compounds were produced in very small amounts as part of a government-funded project. In the late 1940s, Dr. Joseph Simons, a scientist at Pennsylvania State University, developed a means for producing PFAS on a commercial scale. This process is known as the Simons Cell Electrofluorination (or "Simons ECF") process. Dr. Simons patented his ECF process in 1948.

**ANSWER:** **3M admits that Dr. Joseph Simons produced very small amounts of liquid fluorocarbon in his laboratory at Penn State University in or before 1942; that Dr. Simons then supplied small amounts of the liquid fluorocarbon to scientists engaged in government-funded research at Columbia University; and that Dr. Simons later developed technology that could be used to produce certain fluorochemicals on a larger scale. 3M admits that Dr. Simons was granted multiple patents for electrochemical fluorination processes in the 1940s. 3M lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 19.**

20. Recognizing the commercial potential of Dr. Simons' ECF process, 3M purchased Dr. Simons' patents and hired several of his graduate students to develop products using PFAS.

**ANSWER:** **3M admits that 3M licensed or acquired certain patents granted to Dr. Simons for electrochemical fluorination processes and hired one or more employees that had formerly been graduate students at Penn State University. 3M denies any remaining allegations in Paragraph 20.**

11

21.     Over the next 50 years, 3M developed a major business in manufacturing and selling products containing PFAS. 3M used its own internal expertise to develop many types of PFAS, while keeping most of its knowledge regarding these compounds secret from the world, including from its customers and regulators.

**ANSWER:     3M admits that, from the 1950s to the present, it has manufactured certain products using certain PFAS compounds, along with other constituents.  3M denies Third-Party Plaintiff's characterization of 3M's business and denies the remaining allegations in Paragraph 21.**

22.     Given its ownership of Dr. Simons' patents, its hiring of his lab workers, and its early and ongoing research into PFAS chemicals, 3M was, and is, in a unique and superior position to understand the chemical properties of the PFAS chemicals in Scotchgard$^{TM}$.

**ANSWER:     3M denies the allegations in Paragraph 22.**

**B.     3M Manufactures PFAS Products as Early as the 1950s**

23.     3M introduced its first PFAS-containing product to the market in the 1950s.

**ANSWER:     3M admits that, from the 1950s to the present, it has manufactured certain products using certain PFAS compounds, along with other constituents.  3M denies Third-Party Plaintiff's characterization of 3M's business and denies the remaining allegations in Paragraph 23.**

24.     During the ensuing decades, 3M developed and sold many other products containing PFAS, including fire retardants, stain repellants, stain removers, paints, hydraulic fluids, and semi-conductors. These products were extremely profitable for 3M, resulting in hundreds of millions of dollars in annual revenues, over at least several decades.

**ANSWER:   3M admits that, from the 1950s to the present, it has manufactured certain products using certain PFAS compounds, along with other constituents.  3M denies Third-Party Plaintiff's characterization of 3M's business and denies the remaining allegations in Paragraph 24.**

25.     Some of the most popular and profitable PFAS-containing products that 3M manufactured were sold under the trademark "Scotchgard$^{TM}$," the brand name 3M gave to its extensive line of water- and stain-repellant products that included protectants for furniture, fabric, carpets, rugs and leather. 3M released its first Scotchgard$^{TM}$ product in 1956.

**ANSWER:   3M admits that it began marketing certain Scotchgard$^{TM}$ Fabric and Upholstery Protector products to the textile industry in 1956 and admits that some of these products were made using certain PFAS among other constituents.  3M denies Third-Party Plaintiff's characterization of 3M's business and denies the remaining allegations in Paragraph 25.**

26.     Certain PFAS chemicals are a key ingredient in Scotchgard$^{TM}$, and enable the Scotchgard$^{TM}$ products to repel oil, water and stains.

**ANSWER:   3M admits that, from the 1950s to the present, it has manufactured certain Scotchgard$^{TM}$-branded leather protection products using certain PFAS compounds, and that the PFAS content enables the products to repel water, oil, and soil.  3M denies Third-Party Plaintiff's characterization of 3M's business and denies the remaining allegations contained in Paragraph 26.**

27.     For purposes of this Complaint, all PFAS-containing Scotchgard$^{TM}$ 3M sold to Wolverine before the 2002 phase-out will be referred to as "Scotchgard$^{TM}$ Leather Protector."

**ANSWER:** **3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27.**

C. **3M Sells a PFAS-Containing Product to Wolverine**

28. On information and belief, in the mid-1950s, 3M began actively fostering a market for Scotchgard<sup>TM</sup> amongst potential customers, including Wolverine. 3M studied Wolverine's manufacturing processes to recommend a leather protector for Wolverine to apply to its shoes. The Scotchgard<sup>TM</sup> Leather Protector allowed Wolverine to offer the first pigskin leather that was resistant to water, oil, and stains.

**ANSWER:** **3M admits that it began selling Scotchgard<sup>TM</sup> Leather Protector to Wolverine in the 1950's and that Wolverine worked with 3M on the formulations and uses of Scotchgard<sup>TM</sup> Leather Protector to treat leather in its tannery, allowing it to generate very substantial revenue over many years selling pigskin leather and selling shoes made with pigskin leather, which were resistant to water, oil, and stains. Further answering, Wolverine actively marketed these properties and derived substantial value and profits from the use of the Scotchgard<sup>TM</sup> brand in its own marketing, and still does to this day.3M denies Third-Party Plaintiff's characterization of 3M's business and denies the remaining allegations contained in Paragraph 28.**

29. During the parties' decades-long relationship, 3M routinely consulted with Wolverine regarding the application of Scotchgard<sup>TM</sup> and related performance testing, the proper use and handling of Scotchgard<sup>TM</sup> Leather Protector, and procedures for disposing of waste resulting from the application of Scotchgard<sup>TM</sup>.

**ANSWER:** **3M admits that it consulted with Wolverine regarding the proper use and application of Scotchgard<sup>TM</sup> Leather Protector and related performance testing. At**

14

various times, 3M provided applicable instructions for the disposal of Scotchgard™ products, but 3M denies that it consulted with Wolverine on the disposal of waste from the application of Scotchgard™ Leather Protector as part of Wolverine's overall waste-disposal process.  3M denies the remaining allegations in Paragraph 29.  On information and belief, (i) Wolverine and its employees and multiple environmental consultants oversaw and consulted with Wolverine on its waste processing operations and disposal over time; (ii) Wolverine's tanning operations involved multiple processes and use of multiple chemicals supplied by others and chosen and used by Wolverine; and (iii) Wolverine, as a manufacturer and user of such chemicals and products, had the responsibility to manage its own waste streams.

30.     In addition, 3M authorized Wolverine to label its shoes with the Scotchgard™ trademark. From 1958 to at least 1971, 3M required Wolverine to allow 3M to inspect and study samples of the leather that Wolverine had treated with Scotchgard™ and to permit a representative of 3M to test Wolverine's products at random in Wolverine's plant or shipping room at reasonable times. And, for a period of time from 1971, 3M required Wolverine to send 3M samples of such treated products every 30 days to ensure it met 3M's product specifications.

**ANSWER:     3M admits that, at certain times, pursuant to contractual agreements negotiated by and with Wolverine, Wolverine was authorized to use the Scotchgard™ trademark in various ways.  3M further admits that, from time to time it inspected and tested samples of Wolverine leather to assess certain characteristics of the leather.  At no time did this testing of leather samples involve testing or study of Wolverine's waste process or chemicals generated at the Rockford Tannery.  3M denies the remaining allegation in Paragraph 30.**

15

31.     Given that 3M designed Scotchgard™, and touted its extensive testing of the product and its general R&D capabilities, Wolverine reasonably relied upon 3M to disclose any risks with its product.

**ANSWER:     Paragraph 31 states legal conclusions to which no responsive pleading is required. To the extent any response is required, 3M denies the allegations in paragraph 31.**

### D.     3M Has Expertise and Resources Rivaling Any Public or Private Institution, and Wolverine Relied on 3M's Extensive Expertise

32.     3M had the instrumentation and technical knowledge to rival any public university or private laboratory in the world.

**ANSWER:     3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 32.**

33.     3M advertised its extensive R&D capabilities to customers like Wolverine, inducing their trust and confidence that 3M had rigorously tested its products and that 3M's assurances about the safety of its products were rooted in truth and science.

**ANSWER:     Paragraph 33 states legal conclusions to which no responsive pleading is required. The allegations in Paragraph 33 also purport to refer to unidentified advertising of 3M. Any such advertising speaks for itself, and 3M denies any characterization of that advertising by Wolverine. To the extent any further response is required, 3M denies the allegations in Paragraph 33.**

34.     For example, by the 1960s, 3M, as a mining and manufacturing company, had a full geology department that had a thorough knowledge of the movement of liquids through porous media, like soil. In 1962, 3M's geology department completed three soil borings to study the degree of penetration of waste chemicals in the underlying soils and groundwater at one of 3M's

disposal sites in Woodbury, Minnesota ("the Woodbury Site"). Samples from these borings were analyzed for organic compounds, and in at least one of the borings, testing showed that the compounds had reached the level of the groundwater.

**ANSWER:** **The allegations in Paragraph 34 purport to refer to certain soil-boring reports. Any such reports speak for themselves, and 3M denies any characterization of those reports by Wolverine. 3M admits that it had a geology department by the 1960s. 3M denies the remaining allegations in Paragraph 34.**

35. 3M also had extensive experience in industrial waste disposal. In 1970, President Nixon appointed 3M's then-CEO as the Chairman of the National Industrial Pollution Control Council. This appointment recognized 3M's advanced knowledge of waste disposal practices and their environmental effects.

**ANSWER:** **3M admits that, in 1970, President Nixon appointed 3M's then-CEO as Chairman of the National Industrial Pollution Control Council. 3M lacks knowledge or information sufficient to form a belief as the truth of Wolverine's allegations concerning the reasons for President Nixon acting as he did. 3M denies the remaining allegation in Paragraph 35. Further answering, 3M states, on information and belief, that Wolverine had operated a tannery in Rockford, Michigan and disposed of waste from that tannery operation since the early 1900s (nearly 50 years before Wolverine ever allegedly used Scotchgard<sup>TM</sup> products).**

36. 3M also had a "Central Research Analytical" division and later an "Environmental Laboratory" division, that was constantly developing new and better techniques to quantify PFAS levels. By 1980, 3M could quantify PFOS and PFOA at parts-per-billion levels in ground and surface water samples.

**ANSWER:   3M admits that, at certain times, it has had a "Central Research Analytical" laboratory and an "Environmental Laboratory" and that these laboratories worked on, among other things, development and refinement of analytical methods to better and more reliably analyze various chemicals, including certain PFAS in certain media over time.  3M further states that outside laboratories and researchers also worked to develop and refine such techniques, and these analytical methods were often published in literature available to the public, including Wolverine. 3M admits that the ability to test for the presence of PFOS or PFOA in particular media, and the methods to do so, have evolved over time, often without standardized and validated test methods available until more recently. 3M denies the remaining allegations in paragraph 36.**

37.     By contrast, Wolverine was a comparatively small company focused on the manufacture and sale of shoes, with no geology department or comparable R&D facilities. Unlike 3M, Wolverine had not conducted any studies on the movement of PFAS-containing liquids through soil, and had no internal capability to measure or detect substances in extremely small concentrations. Wolverine's expertise was and always has been the design, manufacture and sale of shoes.

**ANSWER:   On information and belief, 3M denies that Wolverine is or was a small corporation with unsophisticated research and development facilities and that Wolverine lacked expertise in its own employees or ready access to substantial expertise through numerous consultants and scientists it retained over time, including experts in environmental consulting, landfills and waste disposal, geology and hydrogeology, and testing of various chemicals or substances used in its tannery process.  3M lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 37.**

E.    **3M Discovers the Environmental Risks of Certain PFAS as Early as the Late 1950s**

38.    Wolverine used Scotchgard<sup>TM</sup> at its tannery at 123 North Main Street, Rockford, Michigan ("Rockford Tannery") to treat the leather it used to make shoes. From 1958 until 1970, Wolverine disposed of the wastes from its use of Scotchgard<sup>TM</sup> at its House Street property. House Street was (and is) an unoccupied parcel of land located in Kent County. The alleged contamination at issue in this litigation stems primarily from the disposal of wastes potentially containing Scotchgard<sup>TM</sup> at House Street. After Wolverine stopped using House Street in 1970, it continued to purchase and dispose of the particular formulation of Scotchgard<sup>TM</sup> at issue in this case for approximately another 30 years.

**ANSWER:    Paragraph 38 purports to refer to allegations "at issue in this litigation."  Any such allegations speak for themselves, and 3M denies any characterization of those allegations by Third-Party Plaintiff.  3M lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 38, except that it denies that the formulation of Scotchgard<sup>TM</sup> remained the same throughout the time period referenced in Paragraph 38.**

39.    From 1958 until 2002 (when 3M phased out and stopped selling the older formulations of Scotchgard<sup>TM</sup> to Wolverine), 3M was well aware of the various environmental risks associated with the disposal of wastes that contained Scotchgard<sup>TM</sup> and/or its byproducts. Yet 3M never shared any of its concerns with Wolverine, when such disclosure would have materially impacted Wolverine's decision-making process with regard to disposal practices at House Street and later waste disposal sites, or its purchase and use of Scotchgard<sup>TM</sup> Leather Protector.

**ANSWER:    3M denies the allegations in Paragraph 39.**

40.     3M understood very early on that PFAS in Scotchgard[TM] were mobile. That is, 3M understood that these chemicals could migrate into the soil and eventually into the groundwater. 3M's own experience in its waste disposal facilities confirmed the mobility of PFAS in soil. 3M manufactured PFAS at its own plants, and these plants produced significant volumes of PFAS-containing wastes. By the 1960s, 3M was aware that its waste chemicals had reached the groundwater level in one of the waste disposal sites it used for PFAS chemicals, the Woodbury Site. An internal 3M memo from 1960 recognized that wastes dumped at the Woodbury Site "will eventually reach the water table and pollute domestic wells." By the spring of 1962, 3M knew that chemicals disposed of at the Woodbury Site had reached 75 feet below ground-which was the level of the underlying groundwater at that time-within about one year of operation.

**ANSWER:     Paragraph 40 purports to refer to an unidentified "internal 3M memo." Any such "internal 3M memo" speaks for itself, and 3M denies any characterization of that "internal 3M memo" by Third-Party Plaintiff. 3M denies the remaining allegations in Paragraph 40, including on the basis that they are incomplete and/or incorrect descriptions of complex scientific and technical matters and therefore the proper subject of expert testimony.**

41.     3M learned around the same time that groundwater beneath another disposal site in Cottage Grove, Minnesota had contaminated a nearby water well. An internal 3M memo noted that the "the present waste pond has contaminated a nearby water supply well ...We are convinced that contamination will gradually spread to other wells if no corrective measure is taken soon." As early as 1967, a hydrologist retained by 3M counseled the company that a carbon filtration system could produce "high quality water free of organic chemicals."

20

**ANSWER:**    Paragraph 41 purports to refer to an unidentified "internal 3M memo" and an unidentified document or statement attributed to 3M or an unnamed hydrologist. Any such "internal 3M memo" and document or statement speak for themselves, and 3M denies any characterization of that "internal 3M memo" and document or statement by Third-Party Plaintiff.  3M denies the remaining allegations in Paragraph 41, including on the basis that they are incomplete and/or incorrect descriptions of complex scientific and technical matters and therefore the proper subject of expert testimony.

42.    Despite having this knowledge, 3M did not disclose to customers like Wolverine the problems associated with disposal of waste containing PFAS into the ground, which on information and belief, was the industry standard and a common practice for 3M customers during the same period.

**ANSWER:**    The allegations in Paragraph 42 state legal conclusions to which no responsive pleading is required.  The allegation that "disposal of waste containing PFAS into the ground was an industry standard" is too vague in terms of what industry standard is being referred to, what time period is involved, and what disposal methods are being referenced to enable 3M to form a belief as to the truth of the allegation, and therefore 3M denies the allegation. 3M denies the remaining allegations in Paragraph 42, including on the basis that they are incomplete and/or incorrect descriptions of complex scientific and technical matters and therefore the proper subject of expert testimony.

43.    Based on internal studies it conducted in the 1950s to 1980s, 3M also understood that the PFAS chemicals in Scotchgard™ were a risk to the environment. Based on these studies, 3M researchers concluded in 1983 that "[i]n the case of fluorochemicals, structure considerations and test results to date give rise to concern for environmental safety ... These concerns give rise to

21

legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment." (Emphasis added). Wolverine is informed and believes that 3M did not disclose the results of its internal studies to customers like Wolverine. Instead, 3M touted Scotchgard$^{TM}$ as safe despite its knowledge of the environmental risks of its product.

**ANSWER:   Paragraph 43 purports to refer to unidentified "studies" attributed to 3M.  Any such "studies" speak for themselves, and 3M denies any characterization of those "studies" by Third-Party Plaintiff.  3M denies the remaining allegations in Paragraph 43, including on the basis that they are incomplete and/or incorrect descriptions of complex scientific and technical matters and therefore the proper subject of expert testimony.**

**F.     3M "Commands the Science" and Conceals the Environmental Risks Posed by the PFAS Chemicals in Scotchgard$^{TM}$**

44.     As 3M became increasingly aware of the potential environmental risks of PFAS, 3M worked to "command the science" and manipulate the research available to regulators and the public.

**ANSWER:   Paragraph 44 purports to refer to unidentified documents or statements attributed to 3M.  Any such documents or statements speak for themselves, and 3M denies any characterization of those documents or statements by Third-Party Plaintiff. To the extent a further response is required, 3M denies the allegations in Paragraph 44.**

45.     Internal 3M documents revealed 3M's goal of conducting scientific research that it could use to mount "[d]efensive [b]arriers to [l]itigation."

**ANSWER:   Paragraph 45 purports to refer to unidentified documents or statements attributed to 3M.  Any such documents or statements speak for themselves, and 3M denies any characterization of those documents or statements by Third-Party Plaintiff. 3M denies the remaining allegations contained in Paragraph 45.**

22

46.     When deposed by the State of Minnesota, 3M witnesses admitted that 3M "stewarded information about fluorochemicals" in order to "protect the business," and 3M engaged in processes to ensure that scientific papers did not include "information that would appear to be contrary to 3M's business interests."

**ANSWER:     Paragraph 46 purports to refer to the transcripts of a deposition or depositions of unidentified 3M witnesses.  Such witnesses' testimony speaks for itself, and 3M denies any characterization of their testimony by Third-Party Plaintiff.  To the extent a further response is required, 3M denies the allegations in Paragraph 46 accurately or fully recount the testimony of 3M witnesses and the full context thereof.**

47.     3M had an internal committee called the "FC [fluorochemicals] Core Team" that developed a written plan titled the "1999 FC Communications Plan," which was a detailed and insidious scheme to manipulate the scientific and public discourse on PFAS.

**ANSWER:     3M admits it created an internal committee called the FC Core Team. Further answering, Paragraph 47 purports to refer to an unidentified "written plan" attributed to 3M.  Any such "written plan" speaks for itself, and 3M denies any characterization of that "written plan" by Third-Party Plaintiff.  3M denies the remaining allegations in Paragraph 47.**

48.     The 1999 FC Communications Plan outlined talking points in responding to studies adverse to 3M's interests:

- "3M is mainly a materials science company. As such we rely heavily on scientific studies with solid methodology."

- "We realize that these studies may shed some light [sic] how these substances interact with the bodies of mammals. Our best evidence is in the 20 years of study

23

on the population with the most exposure-our employees. These studies show there

is no health effect, even at levels much higher than [present in] the general public."

**ANSWER:     Paragraph 48 purports to refer to a "1999 FC Communications Plan" attributed to 3M.  Any such "1999 FC Communications Plan" speaks for itself, and 3M denies any characterization of that "1999 FC Communications Plan" by Third-Party Plaintiff.  To the extent any further response is required, 3M denies the allegations in Paragraph 48.**

49.     For at least two decades, 3M actively concealed the potential environmental risks posed by the PFAS in Scotchgard[TM] Leather Protector from scientists, regulators, 3M's customers and the general public.

**ANSWER:     3M denies the allegations in Paragraph 49.**

50.     3M took steps to conceal the risks of PFAS from the scientific community. For example, in 1975, two academic researcher -- Dr. William Guy and Dr. Donald Taves -- contacted 3M regarding their finding of organic fluorine in blood from blood banks around the country and their belief that 3M's products may have been the source. 3M pleaded ignorance and warned the scientists "not to speculate" about whether Scotchgard[TM] products were the source of the PFAS. By 1977, however, 3M itself had confirmed that PFOS was the major organic fluorine compound found in human blood nationwide.

**ANSWER:     Paragraph 50 purports to refer to unidentified documents or statements attributed to 3M or others.  Any such documents or statements speak for themselves, and 3M denies any characterization of those documents or statements by Third-Party Plaintiff.  3M denies the remaining allegations in Paragraph 50, including on the basis**

24

that they are incomplete and/or incorrect descriptions of complex scientific and technical matters and therefore the proper subject of expert testimony.

51.     3M also concealed critical information about PFAS from government regulators. Under federal law, 3M was required to immediately notify the EPA of any information that reasonably supports the conclusion that one of its products presents a substantial risk of injury to the environment. See Toxic Substances Control Act, 15 U.S.C. § 2607(e) (hereinafter "TSCA"). Nevertheless, 3M withheld from the EPA numerous scientific studies-including studies it had conducted as early as the 1950s to 1970s. Ultimately, in April 2006, the EPA fined 3M over a million dollars in penalties for over 240 violations of the TSCA dating back decades. The EPA noted that "several of the violations concerned reporting on perfluorinated compounds," and that the previously unreported information was "valuable" and would have "help[ed] the scientific community to better understand the toxic substances in the environment."

**ANSWER:     3M admits that it reached a 2006 settlement agreement with the EPA in which 3M agreed to pay approximately $1.5 million. 3M further states that as part of the settlement agreement it did "not admit, acknowledge or agree that [the studies it voluntarily disclosed] require[d] reporting under TSCA § 8(e) or constitute violations under TSCA § 15(3)(B)," and EPA acknowledged it did "not conduct[] its own independent compliance review of the [studies] … and hence, [] made no substantive determination regarding these items."  3M denies the allegations in the first sentence of Paragraph 51 that it "concealed critical information about PFAS from government regulators," and 3M denies the allegations in the third sentence of Paragraph 51 that it "withheld from the EPA numerous scientific studies, including studies it had conducted as early as the 1950s to 1970s".  Further answering, the allegations in the second sentence of Paragraph 51 state legal conclusions**

25

about a law that did not even exist until 1976 to which no responsive pleading is required. To the extent any response is required, 3M denies the allegations that "its products present[ed] a substantial risk of injury to the environment." The allegations in the last sentence of Paragraph 51 purport to refer to documents or statements attributed to the Environmental Protection Agency. Any such documents or statements speak for themselves, and 3M denies any characterization of those documents or statements by Third-Party Plaintiff. To the extent a further response is required, 3M denies the remaining allegations in Paragraph 51.

52.   In March 1999, a 3M toxicologist, Dr. Richard Purdy, became so concerned with 3M's failure to inform the EPA about the environmental risks of PFAS that he copied the EPA on his letter resigning from 3M.

**ANSWER:   3M admits that, in 1999, Richard Purdy tendered a resignation letter to 3M. Dr. Purdy's letter speaks for itself, and 3M denies any characterization of that letter by Third-Party Plaintiff. 3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning the motivations for Dr. Purdy's actions. 3M denies any remaining allegations in Paragraph 52.**

53.   In his resignation letter, Dr. Purdy explained that he was quitting 3M due to his "profound disappointment in 3M's handling of the environmental risks associated with the manufacture and use of perfluorinated sulfonates (PFOS)." He expressed his outrage that the company continued to "make and sell these chemicals."

**ANSWER:   3M admits that, in 1999, Richard Purdy tendered a resignation letter to 3M that included the quoted language contained in Paragraph 53. Dr. Purdy's letter**

speaks for itself, and 3M denies any characterization of that letter by Third-Party Plaintiff. 3M denies any remaining allegations in Paragraph 53.

54.     Dr. Purdy's resignation letter outlined 3M's "roadblocks, delays, and indecision" stalling research into the risks of PFOS. He noted that he had conducted a risk assessment that showed PFOS "constitutes a significant risk that should be reported to EPA under TSCA," but 3M ultimately "decided not to submit [the report] to EPA over [Purdy's] objection."

**ANSWER:     Paragraph 54 purports to refer to a "resignation letter" attributed to Richard Purdy.  Dr. Purdy's letter speaks for itself, and 3M denies any characterization of that letter by Third-Party Plaintiff.  Further answering, the allegations in the second sentence of Paragraph 54 state legal conclusions to which no responsive pleading is required. To the extent any response is required, 3M denies the allegations that its products "constitute[d] a significant risk that should be reported to EPA under TSCA."  3M denies any remaining allegations in Paragraph 54.**

55.     In an internal email, Dr. Purdy described how 3M had stalled his efforts to conduct further studies into the risks of PFOS: "You continually ignore our plans and start new plans that slows [sic] the collection of data essential for our risk assessments. You slow our progress in understanding the extent of PFOS pollution and damage. For 20 years the division has been stalling the collection of data needed for evaluating the environmental impact of fluorochemicals."

**ANSWER:     Paragraph 55 purports to refer to an "internal email" attributed to Richard Purdy.   Any such "internal email" speaks for itself, and 3M denies any characterization of that "internal email" by Third-Party Plaintiff.  To the extent any further response is required, 3M denies the allegations in Paragraph 55.**

56.     Dr. Purdy also noted in his resignation letter that there were alternative designs available to 3M. According to Dr. Purdy, "the chemicals the company is considering for replacement are just as stable and biologically available." (Indeed, in 2000 -- the same year the phase-out was announced publicly -- 3M expected to come up with substitutes within the same year, suggesting that the delayed implementation of an alternative formulation was not due to the unavailability of an alternative design, but instead resulted from 3M's decades-long efforts to stall and suppress research into PFAS and/or, on information and belief, 3M's interest in disposing of all of its product using the prior formulation.)

**ANSWER:     Paragraph 56 states legal conclusions and argument to which no responsive pleading is required.  To the extent any response is required, Dr. Purdy's letter speaks for itself, and 3M denies any characterization of that letter by Third-Party Plaintiff. 3M denies any remaining allegations and characterizations in Paragraph 56, including on the basis that they are incomplete and/or incorrect descriptions of complex scientific and technical matters and therefore the proper subject of expert testimony.**

57.     Notably, it was only after Dr. Purdy forced 3M's hand that 3M complied with its reporting obligations to the EPA. On May 26, 1999, just weeks after the EPA received a copy of Dr. Purdy's resignation letter, 3M supplemented its prior submissions to the EPA to include the information that Dr. Purdy informed the EPA had been improperly omitted from 3M's original reports.

**ANSWER:     Paragraph 57 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, Paragraph 57 also purports to refer to May 26, 1999 documents or statements attributed to 3M.  Any such documents or statements**

speak for themselves, and 3M denies any characterization of those documents or statements by Third-Party Plaintiff. 3M denies any remaining allegations in Paragraph 57.

58.     3M's lack of candor extended to its customers, including Wolverine. An internal 3M document from 1988 reveals that 3M was "perpetuating the myth" that its PFAS are biodegradable to both customers and regulators, even though 3M knew otherwise. As Dr. Purdy explained, "3M waited too long to tell customers about the widespread dispersal of PFOS in people and the environment. We [3M] knew before May of 1998, yet 3M did not start telling customers until January of 1999 ... I kept waiting for 3M to do its duty, as I was continually assured that it would."

**ANSWER:     3M denies the allegations in the first sentence of Paragraph 58.  Further answering, Paragraph 58 purports to refer to an "internal 3M document" and to documents or statements attributed to Richard Purdy or others.  Any such documents or statements speak for themselves, and 3M denies any characterization of that "internal 3M document" and documents or statements attributed to Dr. Purdy or others by Third-Party Plaintiff.  3M denies the remaining allegations in Paragraph 58, including on the basis that they are incomplete and/or incorrect descriptions of complex scientific and technical matters and therefore the proper subject of expert testimony.**

### G.     3M Instructs Employees to Conceal and Destroy Data Relating to PFAS

59.     Evidence of 3M's complex scheme to conceal its knowledge of the risks of PFAS was publicly marshalled recently in papers filed by the State of Minnesota in November 2017. The State of Minnesota had filed suit against 3M for its contamination of the environment in Minnesota as a result of its manufacturing of Scotchgard[TM] and other PFAS-containing products and its disposal of wastes stemming from its production processes. In its motion to amend its complaint

to seek punitive damages from 3M, the State of Minnesota chronicled 3M's decades-long campaign to distort the science and manipulate the press, its customers and regulators about the environmental risks of certain PFAS in Scotchgard™. Shortly after its motion to amend was filed, 3M settled with the State of Minnesota for $850 million on February 20, 2018.

**ANSWER:   3M admits that, in 2018, it settled a lawsuit brought by the State of Minnesota and that it paid $850 million in connection with that settlement.  3M denies any liability for the claims asserted in that lawsuit.  Further answering, Paragraph 59 purports to refer to various unidentified "papers filed by the State of Minnesota."  Any such "papers filed by the State of Minnesota" speak for themselves, and 3M denies any characterization of those "papers filed by the State of Minnesota" by Third-Party Plaintiff.  3M denies any remaining allegations in Paragraph 59.**

60.     In its motion to add a claim for punitive damages under Minnesota law, the State exposed 3M's large-scale internal effort to conceal any risks posed by PFAS by, among other things, destroying documents discussing the risks of PFAS and instructing employees not to create a paper trail regarding their concerns about PFAS.

**ANSWER:   Paragraph 60 purports to refer to a motion attributed to the State of Minnesota.  Any such "motion" speaks for itself, and 3M denies any characterization of that "motion" by Third-Party Plaintiff.  3M denies the remaining allegations in Paragraph 60.**

61.     According to the Minnesota Attorney General, 3M instructed its employees to routinely destroy documents related to PFAS. For example, 3M's senior vice president, Charles Kiester, testified that any handwritten notes taken at meetings of 3M oversight committees relating to "FC" issues were discarded immediately. Similarly, Jerry Walker, who was in charge of the 3M division that was responsible for manufacturing PFAS in 2000, testified that he was directed by

3M officials to place talking points relating to the phase-out in a "secure receptacle" for disposal. In addition, a 3M laboratory notebook entry from September 2, 1998 contains a list of instructions relating to "document retention," one of which is "clean out computer of all electronic data" relating to PFAS.

**ANSWER:   3M denies the allegations in the first sentence of Paragraph 61 that it "instructed its employees to routinely destroy documents related to PFAS."  Paragraph 61 also purports to refer to unidentified allegations, documents or statements attributed to the Minnesota Attorney General and/or 3M personnel.  Any such documents or statements speak for themselves, and 3M denies any characterization of those documents or statements by Third-Party Plaintiff.  3M denies the remaining allegations in Paragraph 61 and denies that Paragraph 61 accurately and fully reflects the testimony and context of the alleged documents or testimony.**

62.     3M also instructed its employees not to document their concerns regarding PFAS issues. For example, as Dr. Purdy explained at the time of his resignation in 1999, "3M told those of us working on the fluorochemical project not to write down our thoughts or have email discussions on issues because of how our speculation could be viewed in a legal discovery process. This has stymied intellectual development on the issue, and stifled discussion on the serious ethical implications of decisions."

**ANSWER:   3M denies the allegations in the first sentence of Paragraph 62 that it "instructed its employees not to document their concerns regarding PFAS issues." Paragraph 62 also purports to refer to a "resignation letter" attributed to Richard Purdy. Dr. Purdy's letter speaks for itself, and 3M denies any characterization of that letter by Third-Party Plaintiff.  3M denies any remaining allegations in Paragraph 62.**

H.     **3M Assures Wolverine That Scotchgard<sup>TM</sup> is Safe**

63.     3M's strategy of disinformation and concealment extended to Wolverine. 3M never disclosed to Wolverine that Scotchgard<sup>TM</sup> presented any actionable or unreasonable environmental risk. There were certainly no such disclosures during the period between 1958 and 1970, when Wolverine was disposing of its wastes at House Street, consistent with then prevailing laws, regulations and industry standards. Even when it announced its phase-out of the prior formula for Scotchgard<sup>TM</sup> in 1999 and 2000, 3M assured Wolverine that the product was safe and posed no environmental or health risks. To this day, 3M publicly maintains that its pre-2002 formulations of Scotchgard<sup>TM</sup>, such as Scotchgard<sup>TM</sup> Leather Protector, present no environmental or health risks.

**ANSWER:     Paragraph 63 states legal conclusions to which no responsive pleading is required.  Paragraph 63 also purports to refer to unidentified documents or statements attributed to 3M.  Any such documents or statements speak for themselves, and 3M denies any characterization of such documents or statements by Third-Party Plaintiff.  To the extent any further response is required, 3M denies the allegations in Paragraph 63.  Further answering, 3M states that Scotchgard<sup>TM</sup> products containing certain PFAS in different formulations over time do not pose and did not pose an unreasonable risk to the environment or human health when used as intended and based on the levels seen in the environment.**

64.     In 2000, 3M publicly announced that it was "voluntarily" phasing out the production of certain PFAS. Far from being voluntary, however, it is now known that 3M only announced the phase-out after the threat of enforcement by the EPA.

**ANSWER:   3M admits that it publicly announced that it was phasing out of the perfluorooctanyl chemistry that it used to produce certain repellants and surfactant products on May 16, 2000.  3M denies the remaining allegations in Paragraph 64.**

65.   As part of the multi-year phase-out, 3M engaged in a massive damage-control campaign to manipulate and contain its customers' reactions to the phase-out and to encourage them to continue buying its flawed, and therefore useless, product during the phase-out period. As part of this strategy, 3M met with and sent Wolverine numerous letters, repeatedly assuring Wolverine that Scotchgard™ posed no health or environmental risks.

**ANSWER:   Paragraph 65 purports to refer to unidentified "numerous letters" attributed to 3M.  Any such "numerous letters" speak for themselves, and 3M denies any characterization of those "numerous letters" by Third-Party Plaintiff.  3M denies the remaining allegations in Paragraph 65.**

66.   For example, in a January 15, 1999 letter, 3M assured Wolverine that it "conducted medical surveillance among employees occupationally exposed to PFOS for over twenty years" and "[n]o adverse health effects associated with PFOS exposure has been found in 3M employees."

**ANSWER:   Paragraph 66 purports to refer to a "January 15, 1999 letter" attributed to 3M.  Any such "January 15, 1999 letter" speaks for itself, and 3M denies any characterization of that "January 15, 1999 letter" by Third-Party Plaintiff.  3M denies the remaining allegations in Paragraph 66.**

67.   The letter also represented that "currently available evidence does not suggest any human health effect associated with the levels of PFOS found in serum samples of people without occupational exposure."

**ANSWER:   Paragraph 67 purports to refer to a "January 15, 1999 letter" attributed to 3M.  Any such "January 15, 1999 letter" speaks for itself, and 3M denies any characterization of that "January 15, 1999 letter" by Third-Party Plaintiff.  3M denies the remaining allegations in Paragraph 67.**

68.   Less than a month later, in a February 3, 1999 letter to Wolverine, 3M again represented that "[n]o human health effects have been attributed to the presence of organic fluorine at these levels. For more than 20 years we have monitored our employees who have worked with organic fluorine. Our studies have found no harm at levels about 100 times higher than found in the general population. A broad spectrum of scientific studies and a half-century of beneficial and worldwide use of our products support this finding."

**ANSWER:   Paragraph 66 purports to refer to a "February 3, 1999 letter" attributed to 3M.  Any such "February 3, 1999 letter" speaks for itself, and 3M denies any characterization of that "February 3, 1999 letter" by Third-Party Plaintiff.  3M denies the remaining allegations in Paragraph 68.**

69.   Despite 3M's own toxicologist's (Dr. Purdy's) March 1999 resignation letter describing the environmental dangers of PFAS, just two months later on May 30, 1999, 3M prepared letters to 19 Wolverine employees, designed to assure Wolverine that PFAS does not pose an environmental risk: "Sophisticated testing capabilities, some developed in only the last few years, shows that this persistent compound, like other materials in the environment, can be detected broadly at extremely low levels in the environment and people. The presence of these materials at these very low levels does not pose a human health or environmental risk." (Emphasis added).

**ANSWER:** Paragraph 69 purports to refer to "letters" attributed to 3M. Any such "letters" speak for themselves, and 3M denies any characterization of those "letters" by Third-Party Plaintiff. 3M denies that the "letters" referenced in Paragraph 69 were sent on May 30, 1999, and states that the date on the letters was a typographical error and was intended to be May 30, 2000. 3M denies the remaining allegations in Paragraph 69.

70. Yet internal 3M correspondence that same year shows that 3M knew of potential environmental risks associated with Wolverine's use and disposal of Scotchgard[TM] Leather Protector, but 3M chose not to share that information with Wolverine. Doing so would have resulted in Wolverine and other 3M customers asking 3M to pay for changes to address the potential risks: "[c]ustomers may ask 3M to subsidize this increased cost as it is our product that is requiring the changes [to their waste disposal practices]."

**ANSWER:** Paragraph 70 purports to refer to unidentified documents or statements attributed to 3M. Any such documents or statements speak for themselves, and 3M denies any characterization of those documents or statements by Third-Party Plaintiff. 3M denies the remaining allegations in Paragraph 70.

71. In a July 19, 1999 letter, 3M reiterated its previous statements that "we [3M] have found no adverse health effects from the levels of organic fluorine compounds measured to date in occupationally or non-occupationally exposed populations."

**ANSWER:** Paragraph 71 purports to refer to a "July 19, 1999 letter" attributed to 3M. Any such "July 19, 1999 letter" speaks for itself, and 3M denies any characterization of that "July 19, 1999 letter" by Third-Party Plaintiff. 3M denies the remaining allegations in Paragraph 71.

72.    When 3M announced the phase-out, Wolverine expressly asked 3M to provide assurances that the Scotchgard™ it had been selling to Wolverine for decades was safe. 3M's internal notes reflect that it would respond to Wolverine's request by "draft[ing] a letter to Wolverine assuring that 1) the product is safe, 2) the decision to phase out this product is solely to prevent buildup of these harmless persistent compounds in the environment, 3) will advise Wolverine of any new studies or findings, 4) once applied to footwear and dried, the product is inert and no further releases are possible, and 5) no possible risk to the wearer of footwear."

**ANSWER:    Paragraph 72 purports to refer to "internal notes" attributed to 3M. Any such communication or "internal notes" speak for themselves, and 3M denies any characterization of such communication or "internal notes" by Third-Party Plaintiff.  3M denies the remaining allegations in Paragraph 72.**

73.    Throughout the entirety of the business dealings between 3M and Wolverine, 3M failed to disclose or actively misrepresented the potential environmental risks associated with the PFAS chemicals in Scotchgard™.

**ANSWER:    3M denies the allegations in Paragraph 73.**

74.    An internal 1980 3M sales document sets forth the types of answers 3M was instructing be provided to customers like Wolverine, to assure them that Scotchgard™ did not pose an environmental risk:

- I have heard that fluorochemicals are persistent. Does this risk mean they are like PCBs and DDT? The answer is "NO."

  ... To date, [there is] no evidence that a 3M fluorochemical presents an unreasonable environmental risk.

- Do fluorochemicals bioconcentrate?

  .... [A]lthough some fluorochemicals bioconcentrate, the data we have is that these fluorochemicals do not present any unreasonable environmental risk.

**ANSWER:** Paragraph 74 purports to refer to an "internal 1980 3M sales document." Any such "internal 1980 3M sales document" speaks for itself, and 3M denies any characterization of that "internal 1980 3M sales document" by Third-Party Plaintiff. 3M denies the remaining allegations in Paragraph 74.

### I. Wolverine Disposes of Waste Containing Scotchgard™ Consistent with 3M's Practices and Recommendations and in Compliance with Existing Laws and Industry Standards

75.    Wolverine disposed of its waste containing Scotchgard™ in compliance with the laws and industry standards existing at the time and consistent with 3M's practices and recommendations.

**ANSWER:** Paragraph 75 states legal conclusions to which no responsive pleading is required. To the extent a response is required, 3M denies that it recommended disposal practices to Wolverine for its waste from the Rockford Tannery or that 3M ever engaged in disposal of tannery wastes or had any practices or recommendations regarding disposal of tannery wastes. 3M otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 75.

76.    From 1958 until 1970, Wolverine disposed of its production waste, including waste containing Scotchgard™ Leather Protector and/or Scotchgard™ residuals, at its property on House Street.

**ANSWER:** 3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 76, but admits that Wolverine would have, in fact, known the contents of its tannery production waste and that it was disposing of tannery production waste that, at various times, contained multiple chemicals, including

Scotchgard™ Leather Protector and/or Scotchgard™ residuals that it then dumped at the House Street property.

77. In 1965, Michigan passed a new law requiring waste to be disposed only at licensed facilities. Prior to this time, waste disposal sites were not required to be licensed.

**ANSWER:** **Paragraph 77 states legal conclusions to which no responsive pleading is required. To the extent a response is required, 3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 77.**

78. In compliance with the new law, Wolverine applied for and was issued a license to dispose of production waste at House Street.

**ANSWER:** **Paragraph 78 states legal conclusions to which no responsive pleading is required. To the extent a response is required, 3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 78.**

79. Even before the law required a licensed waste disposal facility, Wolverine's disposal practices were carefully planned and in compliance with then-existing regulations and prevailing industry standards. For example, Wolverine worked closely with Grand Rapids-Kent County Health Department officials, who visited and reviewed the operations at House Street. Following one such visit on or about January 1965, a health official from the department wrote to Wolverine that "if a sanitary landfill operation is maintained as outlined in previous correspondence, no health hazard or nuisance should originate from this operation." The letter also noted that the Michigan Water Resources Commission and the Michigan Department of Conservation "concur that the site is well located for a complete landfill operation."

**ANSWER:** **Paragraph 79 states legal conclusions to which no responsive pleading is required. Paragraph 79 also purports to refer to a "letter" attributed to Grand Rapids-**

38

Kent County Health Department.  Any such "letter" speaks for itself, and 3M denies any characterization of that letter by Third-Party Plaintiff.  To the extent any response is required, 3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 79.

80.    Although disposal practices in the 1960s and 1970s are different than today, Wolverine acted reasonably, in good-faith and in accordance with the prevailing practices and legal norms of the time.

**ANSWER:    Paragraph 80 states legal conclusions to which no responsive pleading is required.  To the extent a response is required, 3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 80.**

81.    Wolverine's disposal practices were in compliance with 3M's recommendations and practices. 3M buried or landfilled PFAS-containing wastes (including in unlined landfills during the earlier periods), disposed of them through the chemical sewers and later through 3M's wastewater treatment plant, and also sent them to be buried in county landfills. Wolverine engaged in similar disposal practices during the relevant time period, and accordingly, its disposal practices would have been reasonably foreseeable to 3M. Unlike 3M, however, Wolverine did not know of the environmental risks that 3M was in a unique and superior position to understand but failed to disclose to Wolverine.

**ANSWER:    Paragraph 81 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, Wolverine's historical waste disposal practices were unknown to 3M and not disclosed by Wolverine, and, therefore, 3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations**

regarding Wolverine's waste disposal practices. The allegations concerning 3M's waste disposal practices are not sufficiently specific concerning time periods or geography for 3M to form a belief as to the trust of the allegations, and, therefore, 3M denies such allegations. Further answering, on information and belief, (i) Wolverine and its employees and multiple environmental consultants oversaw and consulted with Wolverine on its waste processing operations and disposal over time; (ii) Wolverine's tanning operations involved multiple processes and use of multiple chemicals supplied by others and chosen and used by Wolverine; and (iii) Wolverine, as a manufacturer and user of such chemicals and products, had the responsibility to manage its own waste streams.  3M denies any remaining allegations in Paragraph 81.

82.     In fact, 3M was leery about advising its customers to do anything other than what Wolverine was already doing because of concerns that 3M would have to foot the bill if its customers were required to change their disposal practices to account for the risks of PFAS. In 1999, after 3M advised Wolverine about the upcoming phase-out of PFAS-containing Scotchgard™, 3M conducted an industrial hygiene survey of Wolverine's production facilities. After that survey, 3M's industrial hygienist, Shawn Kruse, wanted to recommend an improved waste drainage approach for Wolverine to use. However, Mr. Kruse's superiors at 3M cautioned that "ultimate drainage of [PFAS] into waste system is a very common and standard production process that is used by tanneries all over the world." (Emphasis added). The cost to alter this approach would be substantial, and "[c]ustomers may ask 3M to subsidize this increased cost as it is our product that is requiring the changes."

**ANSWER:**     **3M admits that, in August 1999, nearly 30 years after Wolverine claims to have stopped using its House Street dump, 3M conducted an industrial hygiene survey at**

**Wolverine's tannery to evaluate the potential for exposure to fluorochemical-containing compounds and to offer suggestions for how Wolverine World Wide might avoid or reduce worker exposures.  Paragraph 82 purports to refer to unidentified documents or statements attributed to 3M.  Any such documents or statements speak for themselves, and 3M denies any characterization of those documents or statements by Third-Party Plaintiff. Further answering, the industrial hygiene survey for worker exposures did not address Wolverine's historical waste disposal practices which were unknown to 3M and not disclosed by Wolverine.  Wolverine never sought information about its historical waste disposal practices or disclosed its House Street disposal site to 3M.  Indeed, on information and belief, Wolverine sought to avoid any inspection of House Street that might reveal its past or simply ignored House Street and did nothing in light of its past use as a dump site.  3M denies the remaining allegations in Paragraph 82.**

83.    Ultimately, Mr. Kruse's suggestion for a different drainage approach was not included in the industrial hygiene report sent to Wolverine. Instead, the report included such innocuous recommendations as replacing Wolverine employees' old gloves and imposing a hand-washing requirement.

**ANSWER:   Paragraph 83 purports to refer to a "report" attributed to Shawn Kruse.  Any such "report" speaks for itself, and 3M denies any characterization of that "report" by Third-Party Plaintiff.  3M denies any remaining allegations in Paragraph 84.**

84.    While the report noted the release of liquids suspected to contain PFAS into the floor drains, there was no suggestion that any such release was improper or posed a risk to the environment.

**ANSWER:    Paragraph 84 purports to refer to a "report" attributed to Shawn Kruse.  Any such "report" speaks for itself, and 3M denies any characterization of that "report" by Third-Party Plaintiff.  3M denies the remaining allegations in Paragraph 84.**

J.       **State of Michigan Sues Wolverine**

85.     On January 10, 2018, the MDEQ filed the instant lawsuit against Wolverine seeking, among other things, declaratory and injunctive relief for cleanup costs. Additionally, the Townships have intervened and allege the same claims against Wolverine as the MDEQ.

**ANSWER:    Paragraph 85 purports to refer to the complaints filed by MDEQ and the Townships in this lawsuit.  These pleadings speak for themselves, and 3M denies any characterization of those documents by Third-Party Plaintiff.**

86.     The MDEQ's suit followed its first drinking-water cleanup criterion, adopted on January 9, 2018, only a day before its lawsuit was filed. Under the new drinking-water cleanup criterion, the State mandated that the amount of PFOA and/or PFOS (either separately or combined) cannot exceed 70 ppt in drinking water.

**ANSWER:    Paragraph 86 purports to refer to an MDEQ "drinking water criterion".  To the extent this paragraph refers to MDEQ's Part 201 residential drinking water criteria for PFOA and PFOS, such criteria speak for themselves, and 3M denies any characterization of that criteria by Third-Party Plaintiff.  The allegations in Paragraph 86 also state legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M denies the allegations in Paragraph 86, including on the basis that they are incomplete and/or incorrect descriptions of the applicable law.**

87.     Even before the MDEQ filed its lawsuit or set the new criterion, Wolverine was already working collaboratively with the MDEQ to investigate, mitigate and remediate the harms

42

alleged by the State, once the MDEQ notified Wolverine on June 1, 2017 that testing at the Belmont Armory, located near House Street, showed "elevated PFCs" in the Armory's "drinking supply."

**ANSWER:    Paragraph 87 purports to refer to unidentified "testing" attributed to the MDEQ.  Any such "testing" speaks for itself, and 3M denies any characterization of that "testing" by Third-Party Plaintiff.  3M lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 87.**

88.    To date, Wolverine has provided over 500 whole house water filtration systems and 200 point-of-use filters to affected homes. These filtration systems have virtually eliminated the presence of PFOS and PFOA in residents' drinking water, and Wolverine has also offered bottled water delivery to every home whose well was sampled.

**ANSWER:    3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 88.**

89.    Even after filtration systems are installed, Wolverine has continued to pay to monitor the drinking water. Working closely with the MDEQ, Wolverine has paid to conduct re-samples on a weekly, monthly, quarterly or annual basis depending on the concentration levels of PFOS/PFOA in prior test results.

**ANSWER:    3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 89.**

90.    To date, Wolverine has tested for the presence of PFAS in over 1,500 residential wells in the MDEQ-defined study areas.

**ANSWER:    3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 90.**

43

91.     Even the MDEQ's suit against Wolverine acknowledges Wolverine's extensive efforts to investigate, mitigate and remediate the harms alleged by the State: "Wolverine has been engaged in the investigation, characterization, and/or remediation of these PFAS since their discovery in 2017, and has complied with several requests from MDEQ to conduct investigations, sampling, and action to provide alternate water supplies at locations suspected or confirmed to have impacts to drinking water sources."

**ANSWER:     Paragraph 91 refers to a portion of Paragraph 27 of the MDEQ complaint.  This paragraph of the MDEQ complaint speaks for itself, and 3M denies any characterization of that document or statement by Third-Party Plaintiff.   3M lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 91.**

92.     On the same day the MDEQ suit was filed, the EPA also issued a UAO to Wolverine with an effective date of February 1, 2018. The UAO was issued under section 106 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9606, and directs Wolverine to conduct certain "removal actions" under CERCLA, including both investigative and potential cleanup actions, at House Street and the Rockford Tannery.

**ANSWER:     Paragraph 92 states legal conclusions to which no responsive pleading is required.  Further answering, Paragraph 92 purports to refer to a "UAO" issued by EPA. Any such "UAO" speaks for itself, and 3M denies any characterization of that "UAO" by Third-Party Plaintiff.   To the extent any response is required, 3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 92.**

93.   Wolverine has been implementing the UAO throughout 2018 and has spent millions of dollars conducting investigation work at both House Street and Rockford Tannery. Wolverine will continue to conduct additional response activities under the UAO, including submission of final reports for both the Rockford Tannery and the House Street sites in 2019.

**ANSWER:   Paragraph 93 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 93.**

94.   As demonstrated by Wolverine's prior and ongoing efforts to investigate, mitigate and remediate the harms alleged by the MDEQ and the Townships, Wolverine is committed to helping the community in which it has been a resident and employer for over a century and where its employees and their families have lived for generations. Wolverine is doing its part, and by this third-party complaint, it asks that 3M be compelled to do the same.

**ANSWER:   3M denies that it has any obligation to indemnify or owes any damages to Wolverine.  3M otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 94.**

95.   3M designed and studied PFAS for decades. Upon learning of the environmental risks inherent with the PFAS in Scotchgard$^{TM}$, 3M chose to suppress material information, control the scientific research available to the public, and withhold information from regulators like the EPA and customers like Wolverine.

**ANSWER:   3M admits that it has studied certain PFAS over the course of many years and admits that many others have researched various PFAS over time.  3M denies the remaining allegations in Paragraph 95.**

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### (Common Law Indemnity - House Street)

96.     Wolverine repeats, re-alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

**ANSWER:    3M incorporates by reference its responses to the allegations contained in the preceding paragraphs.   3M further states that incorporating all prior factual allegations into specific causes of action by reference renders it impossible to determine which factual allegations are intended to support each separate cause of action asserted by Third-Party Plaintiff, and 3M hereby objects to Wolverine's pleading practice.**

97.     Wolverine's activities at House Street were proper and acceptable under the legal norms and industry standards of the time. Wolverine complied with the laws and regulations existing at that time, acted consistently with industry practice, including the waste-disposal practices utilized by 3M for PFAS-containing wastes, and acted responsibly in a way to minimize any contamination as a result of its waste disposal at House Street.

**ANSWER:    Paragraph 97 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 97.**

98.     Because Wolverine's use of Scotchgard$^{TM}$ and disposal of waste containing it were proper and acceptable and Wolverine was not actively at fault, it would be unjust and inequitable to subject Wolverine to liability as a result. Instead, the equities require imposing liability on the party ultimately at fault, 3M.

**ANSWER:    Paragraph 98 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M denies the allegations in Paragraph**

98 as they pertain to 3M.  3M lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 98.

99.    Based on 3M's failure to disclose information regarding risks and concerns associated with certain PFAS compounds of which 3M had exclusive and superior knowledge as described above, and its active representation to Wolverine that PFAS compounds in Scotchgard[TM] were safe, Wolverine used Scotchgard[TM] and disposed of waste containing it in a manner compliant with the laws and industry standards existing at the time.

**ANSWER:    Paragraph 99 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M denies the allegations in Paragraph 99 as they pertain to 3M.  3M lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 99.**

100.    If the MDEQ and the Townships prevail in their claims against Wolverine in relation to House Street, it is just and equitable that 3M bear ultimate responsibility and be required to indemnify Wolverine.

**ANSWER:    Paragraph 100 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M denies the allegations in Paragraph 100.**

<u>**SECOND CAUSE OF ACTION**</u>
<u>**(Common Law Indemnity - Rockford Tannery)**</u>

101.    Wolverine repeats, re-alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

**ANSWER:    3M incorporates by reference its responses to the allegations contained in the preceding paragraphs.  3M further states that incorporating all prior factual allegations into specific causes of action by reference renders it impossible to determine**

which factual allegations are intended to support each separate claim asserted by Third-Party Plaintiff, and 3M hereby objects to Wolverine's pleading practice.

102.   Wolverine's activities at the Rockford Tannery were proper and acceptable under the legal norms and industry standards of the time. Wolverine complied with the laws and regulations existing at that time, acted consistently with industry practice, including the waste-disposal practices utilized by 3M for PFAS-containing wastes, and acted responsibly in its operation and use of the Rockford Tannery.

**ANSWER:   Paragraph 102 states legal conclusions to which no responsive pleading is required.   To the extent any response is required, 3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 102.**

103.   Because Wolverine's use of Scotchgard[TM] containing certain PFAS compounds at the Rockford Tannery were proper and acceptable and Wolverine was not actively at fault, it would be unjust and inequitable to subject Wolverine to liability as a result. Instead, the equities require imposing liability on the party ultimately at fault, 3M.

**ANSWER:   Paragraph 103 states legal conclusions to which no responsive pleading is required.   To the extent any response is required, 3M denies the allegations in Paragraph 103 as they pertain to 3M.   3M lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 103.**

104.   Based on 3M's failure to disclose information regarding risks and concerns associated with the PFAS compounds in Scotchgard[TM], of which 3M had exclusive and superior knowledge as described above, and its active representation to Wolverine that Scotchgard[TM] was safe, Wolverine used Scotchgard[TM] at the Rockford Tannery in a manner compliant with the laws and industry standards existing at that time.

**ANSWER:** Paragraph 104 states legal conclusions to which no responsive pleading is required. To the extent any response is required, 3M denies the allegations in Paragraph 104 as they pertain to 3M. 3M lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 104.

105. If the MDEQ and the Townships prevail in their claims against Wolverine in relation to the Rockford Tannery, it is just and equitable that 3M bear ultimate responsibility and be required to indemnify Wolverine.

**ANSWER:** Paragraph 105 states legal conclusions to which no responsive pleading is required. To the extent any response is required, 3M denies the allegations in Paragraph 105.

**THIRD CAUSE OF ACTION**
**(Common Law Indemnity - Wolven/Jewell)**

106. Wolverine repeats, re-alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

**ANSWER:** 3M incorporates by reference its responses to the allegations contained in the preceding paragraphs. 3M further states that incorporating all prior factual allegations into specific causes of action by reference renders it impossible to determine which factual allegations are intended to support each separate claim asserted by Third-Party Plaintiff, and 3M hereby objects to Wolverine's pleading practice.

107. In the event the MDEQ and the Townships establish that Wolverine disposed of waste at the location referred to in their Complaints as Wolven/Jewell, Wolverine's activities at or impacting Wolven/Jewell were proper and acceptable under the legal norms and industry standards of the time. Wolverine complied with the laws and regulations existing at that time, acted consistently with industry practice, including the waste-disposal practices utilized by 3M for

PFAS-containing wastes, and acted responsibly in relation to any alleged disposal at Wolven/Jewell.

**ANSWER:    Paragraph 107 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 107.**

108.    Because Wolverine's use and disposal of PFAS was proper and acceptable, it would be unjust and inequitable to subject Wolverine to liability as a result. Instead, the equities require imposing liability on the party ultimately at fault, 3M.

**ANSWER:    Paragraph 108 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M denies the allegations in Paragraph 108 as they pertain to 3M.  3M lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 108.**

109.    Based on 3M's failure to disclose information regarding risks and concerns associated with PFAS of which 3M had exclusive and superior knowledge as described above, and its active representation to Wolverine that Scotchgard™ was safe, Wolverine used Scotchgard™ and disposed of waste containing it in a manner compliant with the laws and industry standards existing at that time.

**ANSWER:    Paragraph 109 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M denies the allegations in Paragraph 109 as they pertain to 3M.  3M lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 109.**

110. If the MDEQ and the Townships prevail in their claims against Wolverine in relation to the Wolven/Jewell site, it is just and equitable that 3M bear ultimate responsibility and be required to indemnify Wolverine.

**ANSWER: Paragraph 110 states legal conclusions to which no responsive pleading is required. To the extent any response is required, 3M denies the allegations in Paragraph 110.**

### FOURTH CAUSE OF ACTION
### (Fraud - Minnesota Law)

111. Wolverine repeats, re-alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

**ANSWER: 3M incorporates by reference its responses to the allegations contained in the preceding paragraphs. 3M further states that incorporating all prior factual allegations into specific causes of action by reference renders it impossible to determine which factual allegations are intended to support each separate claim asserted by Third-Party Plaintiff, and 3M hereby objects to Wolverine's pleading practice.**

112. Wolverine alleges a claim for fraud under Minnesota law. In Minnesota, the elements of fraud are: (1) false misrepresentation of a past or present material fact; (2) knowledge by the person making the false assertion that it is false or ignorance of the truth of the assertion; (3) an intention to induce the plaintiff to act or to justify the plaintiff to act; (4) the plaintiff must have been induced to act or justified in acting in reliance on the representation; and (5) the plaintiff must suffer damage proximately caused by the misrepresentation.

**ANSWER: Paragraph 112 states legal conclusions to which no responsive pleading is required. To the extent any response is required, 3M denies that it is liable for fraud.**

113.    Misrepresentation by omission is a variation of fraud recognized in Minnesota, and it occurs where: (1) a defendant conceals a material fact; (2) the fact is within the defendant's knowledge; (3) the defendant knows that the plaintiff will rely on this nondisclosure on the presumption that the fact does not exist; and (4) the defendant has a legal or equitable duty to communicate the fact. As to the duty element, a duty exists when: (1) a confidential or fiduciary duty relationship exists; (2) disclosure is necessary to clarify misleading information already disclosed; or (3) one party has "special knowledge" of material facts to which the other party does not have access.

**ANSWER:    Paragraph 113 states legal conclusions to which no responsive pleading is required.   To the extent any response is required, 3M denies that it is liable for misrepresentation by omission and denies that Paragraph 113 accurately or fully states Minnesota law.**

114.    Upon information and belief, from its corporate headquarters in Minnesota, 3M enacted a corporate policy and directive to conceal and misrepresent material information regarding the environmental risks of PFAS chemicals contained in Scotchgard[TM].

**ANSWER:    3M denies the allegations in Paragraph 114.**

115.    Upon information and belief, from its corporate headquarters in Minnesota, 3M failed to disclose material information and made affirmatively false or materially misleading and incomplete statements to Wolverine regarding the safety of PFAS chemicals contained in Scotchgard[TM] and the propriety of Wolverine's use and disposal of wastes potentially containing Scotchgard[TM].

**ANSWER:    3M denies the allegations in Paragraph 115.**

116.    As a corporation with its principal place of business in Minnesota, 3M has availed itself of Minnesota law and should expect that Minnesota's laws will apply to its conduct. 3M has demonstrated an expectation and preference for the application of Minnesota law by inserting a Minnesota choice of law provision into certain contracts with customers, including a 1999 Trademark License Agreement between 3M and Wolverine that allowed Wolverine the right to use the Scotchgard[TM] trademark in marketing Wolverine's products as treated with Scotchgard[TM].

**ANSWER:    Paragraph 116 states legal conclusions to which no responsive pleading is required.  3M admits its principal place of business is in Minnesota and that a 1999 Trademark License Agreement between 3M and Wolverine contains a Minnesota choice of law provision. To the extent any further response is required, 3M denies the allegations in Paragraph 116.**

117.    Upon information and belief, since its first sales of Scotchgard[TM] in 1958 to Wolverine, 3M assured Wolverine, expressly and/or impliedly, that Scotchgard[TM] was safe, not harmful and did not pose a threat to the environment.

**ANSWER:    Paragraph 117 states legal conclusions to which no responsive pleading is required.  3M denies the remaining allegations in Paragraph 117, including on the basis that they are incomplete and/or incorrect descriptions of complex scientific and technical matters and therefore the proper subject of expert testimony.**

118.    Upon information and belief, in 1980, 3M represented to its customers, including Wolverine, that Scotchgard[TM] products did not "present[] an unreasonable environmental risk."

**ANSWER:    Paragraph 118 purports to refer to unidentified documents or statements attributed to 3M.  Any such documents or statements speak for themselves, and 3M denies any characterization of those documents or statements by Third-Party Plaintiff.**

119.    On May 30, 1999, a Business Director at 3M, Doug Johnson, prepared a letter to 19 Wolverine employees seeking to assure them that the presence of PFAS does not present an environmental risk. Yet internal 3M correspondence that same year shows that 3M knew of potential environmental risks associated with Wolverine's use and disposal of Scotchgard™ Leather Protector, but 3M chose not to share that information with Wolverine. Doing so would have resulted in Wolverine and other 3M customers asking 3M to pay for changes to address the potential risks: "[c]ustomers may ask 3M to subsidize this increased cost as it is our product that is requiring the changes [to their waste disposal practices]."

**ANSWER:   Paragraph 119 purports to refer to unidentified documents or statements attributed to 3M.  Any such documents or statements speak for themselves, and 3M denies any characterization of those documents or statements by Third-Party Plaintiff. 3M states that the date on the letters was a typographical error and was intended to be May 30, 2000.  3M denies the remaining allegations in Paragraph 119.**

120.    In May 2000, Wolverine again asked 3M if the Scotchgard™ Leather Protector it had purchased and used for decades was safe. Internal 3M notes indicate that 3M planned "to draft a letter to Wolverine assuring that . . . the product is safe." Upon information and belief, 3M did communicate these assurances to Wolverine.

**ANSWER:    Paragraph 120 purports to refer to "[i]nternal 3M notes."  Any such "[i]nternal 3M notes" speak for themselves, and 3M denies any characterization of those "[i]nternal 3M notes" by Third-Party Plaintiff.   3M denies the remaining allegations in Paragraph 120, including on the basis that they are incomplete and/or incorrect descriptions of complex scientific and technical matters and therefore the proper subject of expert testimony.**

121.    3M knew its affirmative assurances to Wolverine that Scotchgard™ was safe and not harmful to the environment were false and/or half-truths, or recklessly made those representations, without knowledge of the truth of its assurances (and indeed, with knowledge of facts that should have raised doubts about the truth of its representations).

**ANSWER:    3M denies the allegations in Paragraph 121.**

122.    Furthermore, 3M was aware of, but failed to disclose, numerous facts that indicated significant environmental concerns related to the PFAS chemicals in Scotchgard™, including but not limited to facts set forth in paragraphs 6, 8, 40-43, 51, 58, and 69 above. In particular, at no time did 3M inform Wolverine that wastes from the application of Scotchgard™ and potentially containing certain PFAS compounds could enter the groundwater, that 3M had learned that wastes from its own factories that were engaged in the production of PFAS chemicals had leached into the groundwater and contaminated nearby wells, that 3M had decades of internal studies suggesting some association between certain PFAS compounds and adverse environmental effects, or that 3M's own scientist (Dr. Purdy) had told the EPA in March 1999 that 3M had intentionally failed to disclose known environmental risks about its product.

**ANSWER:    3M incorporates by reference its answers to Paragraphs 6, 8, 40-43, 51, 58, and 69.  Paragraph 122 purports to refer to "internal studies" attributed to 3M.  Any such "internal studies" speak for themselves, and 3M denies any characterization of those "internal studies" by Third-Party Plaintiff, including on the basis that they are incomplete and/or incorrect descriptions of complex scientific and technical matters and therefore the proper subject of expert testimony. 3M denies any remaining allegations in Paragraph 122.**

123.    3M had a duty to disclose facts relating to the environmental risks associated with its product because this disclosure was necessary to clarify other information and assurances

provided by 3M regarding the supposed safety of Scotchgard™. Moreover, 3M had superior and unique knowledge of the potential environmental risks associated with the use and disposal of its product, which was unavailable to Wolverine, including internal studies about the potential environmental risks of PFAS chemicals dating back to the 1950s.

**ANSWER:      Paragraph 123 states legal conclusions to which no responsive pleading is required.  Paragraph 123 also purports to refer to "internal studies" attributed to 3M. Any such "internal studies" speak for themselves, and 3M denies any characterization of those "internal studies" by Third-Party Plaintiff, including on the basis that they are incomplete and/or incorrect descriptions of complex scientific and technical matters and therefore the proper subject of expert testimony.  To the extent any further response is required, 3M denies the allegations in Paragraph 123.**

124.    3M made these false statements and/or material omissions with the intention of inducing Wolverine's reliance, including its continued purchases of Scotchgard™.

**ANSWER:      Paragraph 124 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M denies the allegations in Paragraph 124.**

125.    Wolverine actually and reasonably relied on 3M for information regarding the safety of the chemicals 3M designed, researched, tested, manufactured and then sold to Wolverine. 3M was in a superior position to know about the risks of its own products, as compared to Wolverine, given 3M's decades of research and development of these compounds, its extensive testing of the compounds, its investigation into the effects of its own waste disposal practices, and its substantial scientific capabilities and resources.

**ANSWER:    Paragraph 125 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M denies the allegations in Paragraph 125.**

126.    Wolverine was not aware that Scotchgard™ Leather Protector, when used and disposed of in line with then-prevailing industry and legal norms and consistent with 3M's recommendations and practices, would lead to groundwater or environmental contamination as alleged by the MDEQ and the Townships. Wolverine did not know there was PFAS near its property at levels above 70 ppt until at the earliest, June 2017 when the MDEQ disclosed that the Belmont Armory had tested the drinking water adjacent to Wolverine's property. And there was no legal obligation to cleanup until the MDEQ established a drinking-water cleanup criterion of 70 ppt for PFOA and PFOS on January 9, 2018. Wolverine did not become aware of the harm caused by 3M's actions or omissions until that date.

**ANSWER:    The allegations in the first sentence regarding "then-prevailing industry and legal norms" and in the third sentence that "there was no legal obligation to cleanup until the MDEQ established a drinking-water cleanup criterion of 70 ppt for PFOA and PFOS on January 9, 2018" state legal conclusions to which no responsive pleading is required.  To the extent any response is required, the "drinking-water cleanup criterion" speaks for itself, and 3M denies any characterization of that "drinking-water cleanup criterion" by Third-Party Plaintiff.  3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 126 that "Wolverine did not know there was PFAS near its property at levels above 70 ppt until at the earliest, June 2017 when the MDEQ disclosed that the Belmont Armory had tested the drinking water adjacent to Wolverine's property."  3M denies the remaining allegations in**

**Paragraph 126, including on the basis that they are incomplete and/or incorrect descriptions of complex scientific and technical matters and therefore the proper subject of expert testimony.**

127.    If Wolverine had known that its use and disposal of Scotchgard™ Leather Protector would cause the environmental contamination alleged by the MDEQ and the Townships, it would not have purchased Scotchgard™ Leather Protector in the first instance or would have ceased using it earlier, adopted different disposal practices, and/or otherwise changed its decision-making process with regard to Scotchgard™ Leather Protector and/or wastes containing Scotchgard™ residuals.

**ANSWER:    The allegations in Paragraph 127 purport to refer to unidentified allegations attributed to the MDEQ and Townships.   Any such allegations speak for themselves, and 3M denies any characterization of those allegations by Third-Party Plaintiff. To the extent any response is required, 3M denies the allegations in Paragraph 127, including on the basis that they are incomplete and/or incorrect descriptions of complex scientific and technical matters and therefore the proper subject of expert testimony.   As to Wolverine's purported speculation about what it would have done, 3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.**

128.    As a result of 3M's material misrepresentations and active concealment of the risks of the PFAS compounds contained in Scotchgard™, Wolverine now faces significant potential liability and property damage.

**ANSWER:    Paragraph 128 states legal conclusions to which no responsive pleading is required.   To the extent any response is required, 3M denies the allegations in Paragraph 128.**

## FIFTH CAUSE OF ACTION
### (Fraud - Michigan Law)

129.    Wolverine repeats, re-alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein. To the extent Michigan law governs Wolverine's fraud cause of action, this claim is being pled in the alternative to Wolverine's fourth cause of action for fraud under Minnesota law.

**ANSWER:    3M incorporates by reference its responses to the allegations contained in the preceding paragraphs.  3M further states that incorporating all prior factual allegations into specific causes of action by reference renders it impossible to determine which factual allegations are intended to support each separate claim asserted by Third-Party Plaintiff, and 3M hereby objects to Wolverine's pleading practice.**

130.    3M enacted a corporate policy and directive to conceal and misrepresent material information regarding the environmental risks of its PFAS-containing Scotchgard$^{TM}$.

**ANSWER:    3M denies the allegations in Paragraph 130.**

131.    3M failed to disclose material information and made affirmative false statements to Wolverine regarding the environmental risks associated with PFAS compounds in Scotchgard$^{TM}$.

**ANSWER:    Paragraph 131 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M denies the allegations in Paragraph 131.**

132.    Upon information and belief, since 3M first sold Wolverine Scotchgard$^{TM}$, 3M assured Wolverine that Scotchgard was safe, not harmful, and did not pose a threat to the environment.

**ANSWER:    Because Paragraph 132 neither alleges the basis for the information and belief nor indicates the nature, form or content of any such assurances in sufficient**

59

detail, 3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

133. Upon information and belief, in 1980, 3M represented to its customers, including Wolverine, that Scotchgard$^{TM}$ products did not present an "unreasonable environmental risk."

**ANSWER: Because Paragraph 133 neither alleges the basis for the information and belief nor indicates the nature, form or content of any such representations in sufficient detail, 3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.**

134. On May 30, 1999, another Business Director at 3M, Doug Johnson, prepared letters to send to 19 Wolverine employees, that sought to assure Wolverine that the PFAS compounds in Scotchgard$^{TM}$ do not present an environmental risk. Yet internal 3M correspondence that same year shows that 3M knew of potential environmental risks associated with Wolverine's use and disposal of Scotchgard$^{TM}$ Leather Protector, but 3M chose not to share that information with Wolverine. Doing so would have resulted in Wolverine and other 3M customers asking 3M to pay for changes to address the potential risks: "[c]ustomers may ask 3M to subsidize this increased cost as it is our product that is requiring the changes [to their waste disposal practices]."

**ANSWER: Paragraph 134 purports to refer to unidentified documents or statements attributed to 3M. Any such documents or statements speak for themselves, and 3M denies any characterization of those documents or statements by Third-Party Plaintiff. 3M states that the date on the letters was a typographical error and was intended to be May 30, 2000. 3M denies the remaining allegations in Paragraph 134.**

135. In May 2000, Wolverine again asked 3M if the Scotchgard$^{TM}$ Leather Protector it had purchased and used for decades was safe. Internal 3M notes indicate that 3M planned "to draft

a letter to Wolverine assuring that . . . the product is safe." Upon information and belief, 3M did communicate these assurances to Wolverine.

**ANSWER:  Paragraph 135 purports to refer to "[i]nternal 3M notes."  Any such "[i]nternal 3M notes" speak for themselves, and 3M denies any characterization of those "[i]nternal 3M notes" by Third-Party Plaintiff.  3M denies the remaining allegations in Paragraph 135, including on the basis that they are incomplete and/or incorrect descriptions of complex scientific and technical matters and therefore the proper subject of expert testimony.**

136.    3M knew its affirmative assurances to Wolverine that Scotchgard$^{TM}$ was safe and not harmful to the environment were false and/or half-truths, or recklessly made those representations, without knowledge of the truth of its assurances (and indeed, with knowledge of facts that should have raised doubts about the truth of its statements).

**ANSWER:    3M denies the allegations in Paragraph 136.**

137.    Furthermore, 3M was aware of, but failed to disclose, numerous facts that indicated significant environmental concerns related to Scotchgard$^{TM}$, including but not limited to facts set forth in paragraphs 6, 8, 40-43, 51, 58, and 69 above. In particular, at no time did 3M inform Wolverine that wastes from the application of Scotchgard$^{TM}$ and potentially containing certain PFAS compounds could enter the groundwater, that 3M had learned that wastes from its own factories which were engaged in the production of PFAS chemicals had leached into the groundwater and contaminated nearby wells, that 3M had decades of internal studies suggesting some association between certain PFAS compounds and adverse environmental effects, or that 3M's own scientist (Dr. Purdy) had told the EPA in March 1999 that 3M had intentionally failed to disclose known environmental risks about its product.

**ANSWER:** **3M incorporates by reference its answers to Paragraphs 6, 8, 40-43, 51, 58, and 69. Paragraph 137 purports to refer to "internal studies" attributed to 3M. Any such "internal studies" speak for themselves, and 3M denies any characterization of those "internal studies" by Third-Party Plaintiff, including on the basis that they are incomplete and/or incorrect descriptions of complex scientific and technical matters and therefore the proper subject of expert testimony. 3M denies all remaining allegations in Paragraph 137.**

138.    3M had a duty to disclose facts relating to the environmental risks associated with its product because this disclosure was necessary to clarify other information and assurances provided by 3M regarding the supposed safety of Scotchgard$^{TM}$. Moreover, 3M had superior and unique knowledge of the potential environmental risks associated with the use and disposal of its product, that was unavailable to Wolverine including internal studies about the potential environmental risks of PFAS chemicals dating back to the 1950s.

**ANSWER:** **Paragraph 138 states legal conclusions to which no responsive pleading is required. Paragraph 138 also purports to refer to "internal studies" attributed to 3M. Any such "internal studies" speak for themselves, and 3M denies any characterization of those "internal studies" by Third-Party Plaintiff, including on the basis that they are incomplete and/or incorrect descriptions of complex scientific and technical matters and therefore the proper subject of expert testimony. To the extent any further response is required, 3M denies the allegations in Paragraph 138.**

139.    3M made these false statements and/or omissions with the intention of inducing Wolverine's reliance, including its continued purchases of Scotchgard$^{TM}$.

**ANSWER:** Paragraph 139 states legal conclusions to which no responsive pleading is required. To the extent any response is required, 3M denies the allegations in Paragraph 139.

140. Wolverine actually and reasonably relied on 3M for information regarding the chemicals 3M designed, researched, tested, manufactured and then sold to Wolverine. 3M was in a superior position to know of any risks or concerns associated with its own product, as compared to Wolverine given its early research and development of the compounds, its extensive testing of the compounds, its investigation into the effects of its own waste disposal practices, and its substantial scientific capabilities and resources.

**ANSWER:** Paragraph 140 states legal conclusions to which no responsive pleading is required. To the extent any response is required, 3M denies the allegations in Paragraph 140, including on the basis that they are incomplete and/or incorrect descriptions of complex scientific and technical matters and therefore the proper subject of expert testimony.

141. Wolverine was not aware that its use of Scotchgard™ Leather Protector, when used and disposed of in line with then-prevailing industry and legal norms and consistent with 3M's recommendations and practices, would lead to groundwater or environmental contamination as alleged by the MDEQ and the Townships. Wolverine did not know there was PFAS near its property at levels above 70 ppt until at the earliest, June 2017 when the MDEQ disclosed that the Belmont Armory had tested the drinking water adjacent to Wolverine's property. And there was no legal obligation to cleanup until the MDEQ established a drinking-water cleanup criterion of 70 ppt for PFOA and PFOS on January 9, 2018. Wolverine did not become aware of the harm caused by 3M's actions or omissions until that date.

**ANSWER:** The allegations in the first sentence regarding "then-prevailing industry and legal norms" and in the third sentence that "there was no legal obligation to cleanup until the MDEQ established a drinking-water cleanup criterion of 70 ppt for PFOA and PFOS on January 9, 2018" state legal conclusions to which no responsive pleading is required. To the extent any response is required, the "drinking-water cleanup criterion" speaks for itself, and 3M denies any characterization of that "drinking-water cleanup criterion" by Third-Party Plaintiff. 3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 141 that "Wolverine did not know there was PFAS near its property at levels above 70 ppt until at the earliest, June 2017 when the MDEQ disclosed that the Belmont Armory had tested the drinking water adjacent to Wolverine's property." 3M denies the remaining allegations in Paragraph 141, including on the basis that they are incomplete and/or incorrect descriptions of complex scientific and technical matters and therefore the proper subject of expert testimony.

142. If Wolverine had known that its use and disposal of Scotchgard™ Leather Protector would cause the environmental contamination alleged by the MDEQ and the Townships, it would not have purchased Scotchgard™ Leather Protector in the first instance or would have ceased using it earlier, adopted different disposal practices, and/or otherwise changed its decision-making process with regard to Scotchgard™ Leather Protector and/or wastes containing Scotchgard™ residuals.

**ANSWER:** The allegations in Paragraph 142 purport to refer to unidentified allegations attributed to the MDEQ and Townships. Any such allegations speak for themselves, and 3M denies any characterization of those allegations by Third-Party Plaintiff.

**To the extent any response is required, 3M denies the allegations in Paragraph 142, including on the basis that they are incomplete and/or incorrect descriptions of complex scientific and technical matters and therefore the proper subject of expert testimony. As to Wolverine's purported speculation about what it would have done, 3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.**

143.    As a result of 3M's material misrepresentations and active concealment of the risks of the PFAS compounds contained in Scotchgard$^{TM}$, PFAS has caused damage to Wolverine's properties and the groundwater underneath the properties has been impacted by PFAS which in turn has contaminated the groundwater in adjoining properties (as alleged by the MDEQ and the Townships), and accordingly, Wolverine has incurred property damage as well as consequential damages resulting from 3M's actions and/or omissions.

**ANSWER:    Paragraph 143 states legal conclusions to which no responsive pleading is required. The allegations in Paragraph 143 also purport to refer to unidentified allegations attributed to the MDEQ and Townships. Any such allegations speak for themselves, and 3M denies any characterization of those allegations by Third-Party Plaintiff. To the extent any response is required, 3M denies the allegations in Paragraph 143, including on the basis that they are incomplete and/or incorrect descriptions of complex scientific and technical matters and therefore the proper subject of expert testimony.**

### SIXTH CAUSE OF ACTION
### (Private Nuisance - Common Law)

144.    Wolverine repeats, re-alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

**ANSWER:    3M incorporates by reference its responses to the allegations contained in the preceding paragraphs. 3M further states that incorporating all prior factual**

allegations into specific causes of action by reference renders it impossible to determine which factual allegations are intended to support each separate claim asserted by Third-Party Plaintiff, and 3M hereby objects to Wolverine's pleading practice.

145.   3M's wrongful conduct has caused a significant interference with the use and enjoyment of Wolverine's property.

**ANSWER:   Paragraph 145 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M denies the allegations in Paragraph 145.**

146.   3M produced and sold Scotchgard$^{TM}$ Leather Protector which it knew would contaminate ground water and pollute the environment. As a result of 3M's sales of chemicals to Wolverine that the State of Michigan has deemed a hazardous substance and that 3M knew or could reasonably foresee would be disposed of at Wolverine's properties, Wolverine has suffered property damage, including at House Street and Rockford Tannery.

**ANSWER:   Paragraph 146 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M denies the allegations in Paragraph 146, including on the basis that they are incomplete and/or incorrect descriptions of complex scientific and technical matters and therefore the proper subject of expert testimony.**

147.   Wolverine did not know there was PFAS near its property at levels above 70 ppt until at the earliest, June 2017 when the MDEQ disclosed that the Belmont Armory had tested the drinking water adjacent to Wolverine's property. And there was no legal obligation to cleanup until the MDEQ established a drinking-water cleanup criterion of 70 ppt for PFOA and PFOS on January 9, 2018. Wolverine did not become aware of the harm caused by 3M's actions or omissions until that date.

**ANSWER:** The allegations in the second sentence that "there was no legal obligation to cleanup until the MDEQ established a drinking-water cleanup criterion of 70 ppt for PFOA and PFOS on January 9, 2018" state legal conclusions to which no responsive pleading is required. To the extent any response is required, the "drinking-water cleanup criterion" speaks for itself, and 3M denies any characterization of that "drinking-water cleanup criterion" by Third-Party Plaintiff. 3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 147 that "Wolverine did not know there was PFAS near its property at levels above 70 ppt until at the earliest, June 2017 when the MDEQ disclosed that the Belmont Armory had tested the drinking water adjacent to Wolverine's property." 3M denies the remaining allegations in Paragraph 147, including on the basis that they are incomplete and/or incorrect descriptions of complex scientific and technical matters and therefore the proper subject of expert testimony.

148. As a result of 3M's conduct described herein, 3M has substantially interfered with Wolverine's use and enjoyment of its properties and has caused physical harm to the properties and to the groundwater underneath the properties, which in turn has contaminated the groundwater in adjoining properties (as alleged by the MDEQ and the Townships), and accordingly, Wolverine has suffered property damage and incurred consequential damages resulting from 3M's actions and/or omissions.

**ANSWER:** Paragraph 148 states legal conclusions to which no responsive pleading is required. The allegations in Paragraph 148 also purport to refer to unidentified allegations attributed to the MDEQ and Townships. Any such allegations speak for themselves, and 3M

denies any characterization of those allegations by Third-Party Plaintiff. To the extent any response is required, 3M denies the allegations in Paragraph 148.

### SEVENTH CAUSE OF ACTION
### (Public Nuisance - Common Law)

149. Wolverine repeats, re-alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

**ANSWER: 3M incorporates by reference its responses to the allegations contained in the preceding paragraphs. 3M further states that incorporating all prior factual allegations into specific causes of action by reference renders it impossible to determine which factual allegations are intended to support each separate claim asserted by Third-Party Plaintiff, and 3M hereby objects to Wolverine's pleading practice.**

150. 3M's wrongful conduct has caused a significant interference with the use and enjoyment of Wolverine's property.

**ANSWER: Paragraph 150 states legal conclusions to which no responsive pleading is required. To the extent any response is required, 3M denies the allegations in Paragraph 150.**

151. The State has alleged that Scotchgard™ Leather Protector caused pollution to the groundwater in and around House Street, Rockford Tannery and Wolven/Jewell. The State and the Townships allege that the pollution constitutes a public nuisance.

**ANSWER: The allegations in Paragraph 151 state legal conclusions to which no responsive pleading is required. The allegations in Paragraph 151 also purport to refer to unidentified allegations attributed to the State and Townships. Any such allegations speak for themselves, and 3M denies any characterization of those allegations by Third-Party**

Plaintiff.  To the extent any response is required, 3M lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 151.

152.   3M knew or should have known that its conduct would result in the pollution of public water systems, as alleged by the MDEQ and the Townships.

**ANSWER:**   The allegations in Paragraph 152 state legal conclusions to which no responsive pleading is required.  The allegations in Paragraph 152 also purport to refer to unidentified allegations attributed to the State and Townships.  Any such allegations speak for themselves, and 3M denies any characterization of those allegations by Third-Party Plaintiff.  To the extent any response is required, 3M denies the allegations in Paragraph 152 as they pertain to 3M.

153.   Wolverine did not know there was PFAS near its property at levels above 70 ppt until at the earliest, June 2017 when the MDEQ disclosed that the Belmont Armory had tested the drinking water adjacent to Wolverine's property. And there was no legal obligation to cleanup until the MDEQ established a drinking-water cleanup criterion of 70 ppt for PFOA and PFOS on January 9, 2018. Wolverine did not become aware of the harm caused by 3M's actions or omissions until that date.

**ANSWER:**   The allegations in the second sentence that "there was no legal obligation to cleanup until the MDEQ established a drinking-water cleanup criterion of 70 ppt for PFOA and PFOS on January 9, 2018" state legal conclusions to which no responsive pleading is required.  To the extent any response is required, the "drinking-water cleanup criterion" speaks for itself, and 3M denies any characterization of that "drinking-water cleanup criterion" by Third-Party Plaintiff.  3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 153 that

**"Wolverine did not know there was PFAS near its property at levels above 70 ppt until at the earliest, June 2017 when the MDEQ disclosed that the Belmont Armory had tested the drinking water adjacent to Wolverine's property." 3M denies the remaining allegations in Paragraph 153, including on the basis that they are incomplete and/or incorrect descriptions of complex scientific and technical matters and therefore the proper subject of expert testimony.**

154.    As a result of 3M's wrongful conduct, Wolverine is now suffering unique harms including but not limited to significant liability, investigation and remediation costs stemming from the contamination of its properties and the groundwater underneath the properties which in turn has contaminated the groundwater in adjoining properties (as alleged by the MDEQ and the Townships), and accordingly, Wolverine has suffered property damage and consequential damages resulting from 3M's actions and/or omissions.

**ANSWER:    The allegations in Paragraph 154 state legal conclusions to which no responsive pleading is required.  The allegations in Paragraph 154 also purport to refer to unidentified allegations attributed to the MDEQ and Townships.  Any such allegations speak for themselves, and 3M denies any characterization of those allegations by Third-Party Plaintiff.  To the extent any response is required, 3M denies the allegations in Paragraph 154.**

<u>**EIGHTH CAUSE OF ACTION**</u>
<u>**(Failure to Warn - MCL § 600.2948(3))**</u>

155.    Wolverine repeats, re-alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

**ANSWER:    3M incorporates by reference its responses to the allegations contained in the preceding paragraphs.  3M further states that incorporating all prior factual**

allegations into specific causes of action by reference renders it impossible to determine which factual allegations are intended to support each separate claim asserted by Third-Party Plaintiff, and 3M hereby objects to Wolverine's pleading practice.

156.    Wolverine's use and disposal of Scotchgard$^{TM}$ Leather Protector were reasonably foreseeable to 3M. 3M knew, or should have known, of Wolverine's disposal practices and advised customers like Wolverine of appropriate methods to dispose of 3M products. Wolverine's disposal practices were also substantially similar to those practiced by 3M.

**ANSWER:    Paragraph 156 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M denies the allegations in Paragraph 156 as they pertain to 3M.  3M lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 156.**

157.    3M was aware of environmental risks associated with Scotchgard$^{TM}$ Leather Protector and had a duty to warn Wolverine of those risks.

**ANSWER:    Paragraph 157 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M denies the allegations in Paragraph 157.**

158.    3M did not warn Wolverine of any of the environmental risks regarding the use and disposal of Scotchgard$^{TM}$, even though it was in a superior and unique position to understand them.

**ANSWER:    3M denies the allegations in Paragraph 158.**

159.    3M failed to warn Wolverine that PFAS would reach the groundwater and cause substantial environmental harm as alleged by the State and the Townships.

**ANSWER:    Paragraph 159 purports to refer to unidentified allegations attributed to the State and Townships.  Any such allegations speak for themselves, and 3M denies any**

71

characterization of those allegations by Third-Party Plaintiff.  To the extent any response is required, 3M denies the allegations in Paragraph 159, including that 3M had any duty to warn or had knowledge of the disposal practices employed by Wolverine.

160.    3M knew or should have known of these risks associated with the PFAS compounds contained in Scotchgard$^{TM}$ as early as 1958 and at all times thereafter.

**ANSWER:    Paragraph 160 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M denies the allegations in Paragraph 160.**

161.    To the extent 3M learned of any risks after it sold Scotchgard$^{TM}$ to Wolverine, 3M also failed to warn Wolverine of these risks.

**ANSWER:    The allegations in Paragraph 161 state legal conclusions to the extent they imply a duty to warn under certain circumstances, to which no responsive pleading is required. To the extent any response is required,  3M denies the allegations in Paragraph 161.**

162.    The risks associated with PFAS were neither obvious nor known to Wolverine, nor were they a matter of common knowledge to other purchasers of Scotchgard$^{TM}$. Indeed, Wolverine did not know there was PFAS near its property at levels above 70 ppt until at the earliest, June 2017 when the MDEQ disclosed that the Belmont Armory had tested the drinking water adjacent to Wolverine's property. And there was no legal obligation to cleanup until the MDEQ established a drinking-water cleanup criterion of 70 ppt for PFOA and PFOS on January 9, 2018. Wolverine did not become aware of the harm caused by 3M's actions or omissions until that date.

**ANSWER:    The allegations in the third sentence that "there was no legal obligation to cleanup until the MDEQ established a drinking-water cleanup criterion of 70 ppt for**

PFOA and PFOS on January 9, 2018" state legal conclusions to which no responsive pleading is required.  To the extent any response is required, the "drinking-water cleanup criterion" speaks for itself, and 3M denies any characterization of that "drinking-water cleanup criterion" by Third-Party Plaintiff.  3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 162 that "Wolverine did not know there was PFAS near its property at levels above 70 ppt until at the earliest, June 2017 when the MDEQ disclosed that the Belmont Armory had tested the drinking water adjacent to Wolverine's property."  3M denies the remaining allegations in Paragraph 162, including on the basis that they are incomplete and/or incorrect descriptions of complex scientific and technical matters and therefore the proper subject of expert testimony.

163.    Wolverine is a shoe manufacturer, not a chemical company. Despite Wolverine's purchase of Scotchgard$^{TM}$ from 3M for many years, Wolverine's expertise was in designing, manufacturing, and selling shoes, not in the chemical properties of Scotchgard$^{TM}$ beyond its application to shoes, as part of Wolverine's leather tanning process.

**ANSWER:   3M admits that Wolverine manufactures shoes, but denies that Wolverine lacks knowledge and expertise with respect to the chemicals and products it used in its manufacturing processes, including Scotchgard$^{TM}$. Further answering, 3M states, on information and belief, that Wolverine operated a leather tannery in Rockford, Michigan, using hundreds of chemicals in the process, beginning in approximately 1909 and continuing through approximately 2009-2010, and also manufactured various brands of shoes over time. 3M further states, on information and belief, that over the years, in addition to its own employees, Wolverine retained and relied on numerous consultants and technical experts to**

73

advise it and provide services related to building, maintaining, operating, and modifying its wastewater treatment plant, characterizing wastes generated by Wolverine at the tannery, characterizing chemicals used by Wolverine for reporting to various federal, state, or local authorities, testing Wolverine's waste streams, and testing chemicals used by Wolverine in the tannery. 3M otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 163.

164.   3M's actions demonstrate that it was aware that Wolverine's knowledge of Scotchgard$^{TM}$ was not as sophisticated as its own. 3M required Wolverine to send samples of treated products to 3M for inspection every 30 days, and to allow 3M representatives to inspect Wolverine's products at random, for "performance monitoring purposes" and to ensure that the products "[met] the specified standards" as set out in the parties' agreement. This exercise of control over its product demonstrates that 3M did not view Wolverine as a sophisticated user of Scotchgard$^{TM}$ .

**ANSWER:   Paragraph 164 purports to refer to unidentified communications or statements attributed to 3M.  Any such communications or statements speak for themselves, and 3M denies any characterization of those communications or statements by Third-Party Plaintiff.  3M denies the remaining allegations in Paragraph 164.**

165.   Wolverine was merely a regular user of the product that 3M developed and mass produced. Wolverine was unaware of the environmental risks alleged by the State arising from the disposal of waste containing Scotchgard$^{TM}$ and/or Scotchgard$^{TM}$ residuals, primarily because 3M concealed those hazards from Wolverine and others.

**ANSWER:   Paragraph 165 purports to refer to unidentified allegations attributed to the State.  Any such allegations speak for themselves, and 3M denies any characterization**

of those allegations by Third-Party Plaintiff.  To the extent any response is required, 3M denies the allegations in Paragraph 165, including on the basis that they are incomplete and/or incorrect descriptions of complex scientific and technical matters and therefore the proper subject of expert testimony.

166.    If Wolverine had known that its use and disposal of Scotchgard™ Leather Protector would cause the environmental contamination alleged by the MDEQ and the Townships, it would not have purchased Scotchgard™ Leather Protector in the first instance or would have ceased using it earlier, adopted different disposal practices, and/or otherwise changed its decision-making process with regard to Scotchgard™ Leather Protector and/or wastes containing Scotchgard™ residuals.

ANSWER:    The allegations in Paragraph 166 purport to refer to unidentified allegations attributed to the MDEQ and Townships.  Any such allegations speak for themselves, and 3M denies any characterization of those allegations by Third-Party Plaintiff. To the extent any response is required, 3M denies the allegations in Paragraph 166, including on the basis that they are incomplete and/or incorrect descriptions of complex scientific and technical matters and therefore the proper subject of expert testimony.  As to Wolverine's purported speculation about what it would have done, 3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

167.    As a result of 3M's failure to warn Wolverine of the risks of the PFAS compounds in Scotchgard™, Wolverine's properties have been damaged and the groundwater underneath the properties has been contaminated by PFAS, which in turn has contaminated the groundwater in adjoining properties (as alleged by the MDEQ and the Townships), and accordingly, Wolverine

has suffered property damage as well as consequential damages resulting from 3M's actions and/or omissions.

**ANSWER:** **Paragraph 167 states legal conclusions to which no responsive pleading is required. The allegations in Paragraph 167 also purport to refer to unidentified allegations attributed to the MDEQ and Townships. Any such allegations speak for themselves, and 3M denies any characterization of those allegations by Third-Party Plaintiff. To the extent any further response is required, 3M denies the allegations in Paragraph 167.**

## NINTH CAUSE OF ACTION
### (Product Design Defect)

168.     Wolverine repeats, re-alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

**ANSWER:** **3M incorporates by reference its responses to the allegations contained in the preceding paragraphs. 3M further states that incorporating all prior factual allegations into specific causes of action by reference renders it impossible to determine which factual allegations are intended to support each separate claim asserted by Third-Party Plaintiff, and 3M hereby objects to Wolverine's pleading practice.**

169.     3M is in the business of designing, manufacturing, and distributing numerous PFAS-containing products, including Scotchgard[TM] Leather Protector.

**ANSWER:** **3M admits that it manufactured and conducted as one part of 3M's business the design, manufacture, marketing, distribution and sale of certain products, including certain PFAS-containing products and products under the brand name of Scotchgard.[TM]3M denies the allegations in Paragraph 169 insofar as they are vague and ambiguous and mischaracterize 3M's business.**

170.    Wolverine purchased Scotchgard<sup>TM</sup> Leather Protector directly from 3M between the years of 1958 to 2002.

**ANSWER:    3M admits the truth of the allegations in Paragraph 170 to the extent that, based on information and belief, Wolverine purchased directly from 3M but may have also purchased through a distributor at times.**

171.    3M had a duty to design, manufacture, and distribute its chemical products in a manner that would not cause environmental pollution and/or groundwater contamination when used for the purposes for which they were designed.

**ANSWER:    The allegations in Paragraph 171 state legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M denies the allegations in Paragraph 171.**

172.    3M breached its duty by designing, manufacturing, and distributing PFAS-containing products knowing that they would and did cause environmental pollution and groundwater contamination.

**ANSWER:    The allegations in Paragraph 172 state legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M denies the allegations in Paragraph 172.**

173.    It was reasonably foreseeable to 3M, and 3M knew, that its customers, including Wolverine, would use and dispose of waste potentially containing Scotchgard<sup>TM</sup> Leather Protector in a way that would cause PFAS to contaminate the environment as alleged by the MDEQ and the Townships.

**ANSWER:** **The allegations in Paragraph 173 state legal conclusions to which no responsive pleading is required. To the extent any response is required, 3M denies the allegations in Paragraph 173.**

174. There was a reasonable alternative design available that would have reduced the foreseeable environmental risk posed by the older formulation of Scotchgard[TM]. Indeed, in the same year it announced the phase-out of the older formulations of Scotchgard[TM], 3M expected to come up with a substitute within the end of that same year. On information and belief, 3M developed the alternative Scotchgard[TM] (containing non-C8 polymers rather than C-8's like PFOS) as early as 2001 and began selling it in 2003. 3M's ability to create-within such a short window-an alternative Scotchgard[TM] formulation to address the EPA's environmental concerns about certain PFAS in Scotchgard[TM] Leather Protector suggests that the delayed implementation of an alternative design was not due to the unavailability of an alternative design, but resulted from 3M's decades-long effort to stall and suppress research into PFAS, and/or, on information and belief, 3M's interest in disposing of all of its product using the prior formulation.

**ANSWER:** **The allegations in Paragraph 174 state legal conclusions to which no responsive pleading is required. To the extent any response is required, 3M admits that it began selling Scotchgard[TM] for leather containing non-C8 polymers in 2003. 3M denies the remaining allegations in Paragraph 174.**

175. Wolverine did not know there was PFAS near its property at levels above 70 ppt until at the earliest, June 2017 when the MDEQ disclosed that the Belmont Armory had tested the drinking water adjacent to Wolverine's property. And there was no legal obligation to cleanup until the MDEQ established a drinking-water cleanup criterion of 70 ppt for PFOA and PFOS on

January 9, 2018. Wolverine did not become aware of the harm caused by 3M's actions or omissions until that date.

**ANSWER:** **The allegations in the second sentence of Paragraph 175 that "there was no legal obligation to cleanup until the MDEQ established a drinking-water cleanup criterion of 70 ppt for PFOA and PFOS on January 9, 2018" state legal conclusions to which no responsive pleading is required. To the extent any response is required, the "drinking-water cleanup criterion" speaks for itself, and 3M denies any characterization of that "drinking-water cleanup criterion" by Third-Party Plaintiff. 3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 175 that "Wolverine did not know there was PFAS near its property at levels above 70 ppt until at the earliest, June 2017 when the MDEQ disclosed that the Belmont Armory had tested the drinking water adjacent to Wolverine's property." 3M denies the remaining allegations in Paragraph 175, including on the basis that they are incomplete and/or incorrect descriptions of complex scientific and technical matters and therefore the proper subject of expert testimony.**

176.   As a result of 3M's defective Scotchgard™ Leather Protector, Wolverine's properties have been damaged, and the groundwater underneath the properties has been contaminated by PFAS which in turn has contaminated the groundwater in adjoining properties (as alleged by the MDEQ and the Townships), and accordingly, Wolverine has incurred property damage as well as consequential damages resulting from 3M's actions and/or omissions.

**ANSWER:** **Paragraph 176 states legal conclusions to which no responsive pleading is required. The allegations in Paragraph 176 also purport to refer to unidentified allegations attributed to the MDEQ and Townships. Any such allegations speak for themselves, and 3M**

79

denies any characterization of those allegations by Third-Party Plaintiff.  To the extent any response is required, 3M denies the allegations in Paragraph 176.

## TENTH CAUSE OF ACTION
### (Breach of Implied Warranty of Merchantability)

177.    Wolverine repeats, re-alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

**ANSWER:    3M incorporates by reference its responses to the allegations contained in the preceding paragraphs.  3M further states that incorporating all prior factual allegations into specific causes of action by reference renders it impossible to determine which factual allegations are intended to support each separate claim asserted by Third-Party Plaintiff, and 3M hereby objects to Wolverine's pleading practice.**

178.    3M was a merchant of PFAS-containing products. 3M designed, manufactured, and sold PFAS-containing products including Scotchgard$^{TM}$ Leather Protector.

**ANSWER:    The allegations in Paragraph 178 state legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M admits that it designed, manufactured, and conducted a business of marketing and selling certain PFAS-containing products and products under the brand name of Scotchgard.$^{TM}$3M denies the remaining allegations in Paragraph 178 insofar as they are vague and ambiguous and mischaracterize 3M's business.**

179.    Wolverine purchased Scotchgard$^{TM}$ Leather Protector directly from 3M on a regular basis from 1958 until 2002.

**ANSWER:    3M admits the truth of the allegations in Paragraph 179 to the extent that, based on information and belief, Wolverine purchased directly from 3M but may have also purchased through a distributor at times.**

180.     Scotchgard<sup>TM</sup> Leather Protector was defectively designed and was sold without the provision of reasonable instructions or warnings regarding the foreseeable risk that use and disposal of the product would result in environmental pollution, as alleged by the MDEQ and the Townships.

**ANSWER:    The allegations in Paragraph 180 state legal conclusions to which no responsive pleading is required.  The allegations in Paragraph 180 also purport to refer to unidentified allegations attributed to the MDEQ and Townships.  Any such allegations speak for themselves, and 3M denies any characterization of those allegations by Third-Party Plaintiff.  To the extent any response is required, 3M denies the allegations in Paragraph 180.**

181.     Wolverine used Scotchgard<sup>TM</sup> Leather Protector in the manner it was intended, but the product was still defective and unmerchantable because, according to the MDEQ and the Townships, it contains a hazardous substance and has resulted in groundwater or environmental contamination.

**ANSWER:    The allegations in Paragraph 181 state legal conclusions to which no responsive pleading is required.  The allegations in Paragraph 181 also purport to refer to unidentified documents or statements attributed to the MDEQ and Townships.  Any such documents or statements speak for themselves, and 3M denies any characterization of those documents or statements by Third-Party Plaintiff.  To the extent any response is required, 3M denies the allegations in Paragraph 181.**

182.     Scotchgard<sup>TM</sup> Leather Protector left 3M's possession in a defective condition.

**ANSWER:** The allegations in Paragraph 182 state legal conclusions to which no responsive pleading is required. To the extent any response is required, 3M denies the allegations in Paragraph 182.

183. Wolverine only used Scotchgard™ Leather Protector for its intended use and consistent with 3M's recommendations and practices.

**ANSWER:** The allegations in Paragraph 183 state legal conclusions to which no responsive pleading is required. To the extent any response is required, 3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 183.

184. The MDEQ and Townships have alleged that PFAS chemicals in Scotchgard™ are a hazardous substance and the direct and proximate cause of environmental pollution of properties belonging to Wolverine and others in the State of Michigan.

**ANSWER:** Paragraph 184 states legal conclusions to which no responsive pleading is required. The allegations in Paragraph 184 also purport to refer to unidentified allegations attributed to the MDEQ and Townships. Any such allegations speak for themselves, and 3M denies any characterization of those allegations by Third-Party Plaintiff. To the extent any response is required, 3M denies the allegations in Paragraph 184.

185. As a result of 3M's breach of warranty, Wolverine's properties have been damaged, and the groundwater underneath the properties has been contaminated by PFAS, which in turn has contaminated the groundwater in adjoining properties (as alleged by the MDEQ and the Townships), and accordingly, Wolverine has incurred property damage as well as consequential damages resulting from 3M's actions and/or omissions.

**ANSWER:** Paragraph 185 states legal conclusions to which no responsive pleading is required. The allegations in Paragraph 185 also purport to refer to unidentified allegations

attributed to the MDEQ and Townships. Any such allegations speak for themselves, and 3M denies any characterization of those allegations by Third-Party Plaintiff. To the extent any response is required, 3M denies the allegations in Paragraph 185.

**ELEVENTH CAUSE OF ACTION**
**(Breach of Implied Warranty of Fitness for a Particular Purpose)**

186. Wolverine repeats, re-alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

**ANSWER:** **3M incorporates by reference its responses to the allegations contained in the preceding paragraphs. 3M further states that incorporating all prior factual allegations into specific causes of action by reference renders it impossible to determine which factual allegations are intended to support each separate claim asserted by Third-Party Plaintiff, and 3M hereby objects to Wolverine's pleading practice.**

187. When it sold Scotchgard[TM] Leather Protector to Wolverine, 3M knew that the particular purpose for which Scotchgard[TM] Leather Protector was to be used and disposed by Wolverine.

**ANSWER:** **Paragraph 187 states legal conclusions to which no responsive pleading is required. To the extent any response is required, 3M denies the allegations in Paragraph 187.**

188. Wolverine reasonably relied on 3M's skill and judgment to ensure that Wolverine properly used and disposed of Scotchgard[TM] Leather Protector in accordance with 3M's expectations.

**ANSWER:** **Paragraph 188 states legal conclusions to which no responsive pleading is required. To the extent any response is required, 3M denies the allegations in Paragraph 188.**

189.     3M knew that Wolverine was relying on 3M's skill and judgment to ensure that Wolverine properly used and disposed of Scotchgard<sup>TM</sup> Leather Protector in accordance with 3M's expectations.

**ANSWER:     3M denies the allegations contained in Paragraph 189.**

190.     3M knew of the risks inherent with the PFAS compounds in Scotchgard<sup>TM</sup> Leather Protector rendering it unfit for the particular purpose for which Wolverine intended it to be used and disposed.

**ANSWER:     Paragraph 190 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M denies the allegations in Paragraph 190.**

191.     3M knew that if Wolverine had known that its use and disposal of Scotchgard<sup>TM</sup> Leather Protector would cause the groundwater or environmental contamination alleged by the MDEQ and the Townships, Wolverine would not have purchased the product in the first instance or would have ceased using the product earlier, adopted different disposal practices, and/or otherwise changed its decision-making process with regard to Scotchgard<sup>TM</sup> Leather Protector and/or wastes containing Scotchgard<sup>TM</sup> residuals.

**ANSWER:     The allegations in Paragraph 191 purport to refer to unidentified allegations attributed to the MDEQ and Townships.  Any such allegations speak for themselves, and 3M denies any characterization of those allegations by Third-Party Plaintiff. To the extent any response is required, 3M denies the allegations in Paragraph 191.**

192.     3M, nonetheless, furnished Wolverine with a product that was not suitable for the particular purposes known to 3M.

**ANSWER:** **Paragraph 192 states legal conclusions to which no responsive pleading is required. To the extent any response is required, 3M denies the allegations in Paragraph 192.**

193. As a result, 3M's breach of implied warranty of fitness for a particular purpose Wolverine's properties have been damaged and the groundwater underneath the properties have been contaminated by PFAS which in turn has contaminated the groundwater in adjoining properties (as alleged by the MDEQ and the Townships), and accordingly, Wolverine has incurred property damage as well as consequential damages resulting from 3M's actions and/or omissions.

**ANSWER:** **Paragraph 193 states legal conclusions to which no responsive pleading is required. The allegations in Paragraph 193 also purport to refer to unidentified allegations attributed to the MDEQ and Townships. Any such allegations speak for themselves, and 3M denies any characterization of those allegations by Third-Party Plaintiff. To the extent any response is required, 3M denies the allegations in Paragraph 193.**

## TWELFTH CAUSE OF ACTION
### (Negligence)

194. Wolverine repeats, re-alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

**ANSWER:** **3M incorporates by reference its responses to the allegations contained in the preceding paragraphs. 3M further states that incorporating all prior factual allegations into specific causes of action by reference renders it impossible to determine which factual allegations are intended to support each separate claim asserted by Third-Party Plaintiff, and 3M hereby objects to Wolverine's pleading practice.**

195. 3M owed a duty to Wolverine to act with care in creating, manufacturing, selling, and advising customers regarding the use and disposal of its PFAS-containing products.

**ANSWER:    Paragraph 195 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M denies the allegations in Paragraph 195.**

196.    3M breached its duty to Wolverine by engaging in the conduct alleged above including, but not limited to, creating a product with environmental risks, failing to take action to mitigate those risks, selling products with knowledge of these risks, and failing to disclose those risks to its customers including Wolverine.

**ANSWER:    Paragraph 196 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M denies the allegations in Paragraph 196.**

197.    Wolverine did not know there was PFAS near its property at levels above 70 ppt until at the earliest, June 2017 when the MDEQ disclosed that the Belmont Armory had tested the drinking water adjacent to Wolverine's property. And there was no legal obligation to cleanup until the MDEQ established a drinking-water cleanup criterion of 70 ppt for PFOA and PFOS on January 9, 2018. Wolverine did not become aware of the harm caused by 3M's actions or omissions until that date.

**ANSWER:    The allegations in the second sentence of Paragraph 197 that "there was no legal obligation to cleanup until the MDEQ established a drinking-water cleanup criterion of 70 ppt for PFOA and PFOS on January 9, 2018" state legal conclusions to which no responsive pleading is required.  To the extent any response is required, the "drinking-water cleanup criterion" speaks for itself, and 3M denies any characterization of that "drinking-water cleanup criterion" by Third-Party Plaintiff.  3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph**

**197** that "Wolverine did not know there was PFAS near its property at levels above 70 ppt until at the earliest, June 2017 when the MDEQ disclosed that the Belmont Armory had tested the drinking water adjacent to Wolverine's property." 3M denies the remaining allegations in Paragraph 197.

198.    As a result of 3M's negligence, Wolverine's properties have been damaged, and the groundwater underneath the properties has been contaminated by PFAS which in turn has contaminated the groundwater in adjoining properties (as alleged by the MDEQ and the Townships), and accordingly, Wolverine has incurred property damage as well as consequential damages resulting from 3M's actions and/or omissions.

**ANSWER:    Paragraph 198 states legal conclusions to which no responsive pleading is required.  The allegations in Paragraph 198 also purport to refer to unidentified allegations attributed to the MDEQ and Townships.  Any such allegations speak for themselves, and 3M denies any characterization of those allegations by Third-Party Plaintiff.  To the extent any response is required, 3M denies the allegations in Paragraph 198.**

### THIRTEENTH CAUSE OF ACTION
### (CERCLA Cost Recovery)

199.    Wolverine repeats, re-alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

**ANSWER:    3M incorporates by reference its responses to the allegations contained in the preceding paragraphs.  3M further states that incorporating all prior factual allegations into specific causes of action by reference renders it impossible to determine which factual allegations are intended to support each separate claim asserted by Third-Party Plaintiff, and 3M hereby objects to Wolverine's pleading practice.**

200.     Wolverine is a "person" as defined by "CERCLA", section 101(21), 42 U.S.C. § 9601(21).

**ANSWER:     Paragraph 200 states legal conclusions to which no responsive pleading is required.**

201.     3M is a "person" as defined by CERCLA section 101(21), 42 U.S.C. § 9601(21).

**ANSWER:     Paragraph 201 states legal conclusions to which no responsive pleading is required.**

202.     There was an actual or threatened "release" of "hazardous substances" within the meaning of CERCLA sections 101(14) and (22), 42 U.S.C. §§ 9601(14), (22).

**ANSWER:     Paragraph 202 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 202.**

203.     Scotchgard™ Leather Protector contains 1,1,1,-trichloroethane (or "TCA"), which is a hazardous substance.

**ANSWER:     Paragraph 203 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M denies the allegations in Paragraph 203.**

204.     Scotchgard™ Leather Protector and/or other hazardous substances within the meaning of sections 101(14), (22) of CERCLA, 42 U.S.C. § 9601(14), (22), have come to be located in surface and groundwater in Kent County, Michigan.

**ANSWER:     Paragraph 204 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M denies that Scotchgard™ Leather**

**Protector is a hazardous substance and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 204.**

205.    Scotchgard$^{TM}$ Leather Protector and/or other hazardous substances have been detected at and migrating from House Street, the Rockford Tannery, Wolven/Jewell, and other similar or related facilities where Scotchgard$^{TM}$ and/or Scotchgard$^{TM}$ residuals have come to be located (collectively, the "Sites").

**ANSWER:    Paragraph 205 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M denies that Scotchgard$^{TM}$ Leather Protector is a hazardous substance and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 205.**

206.    Each Site is a "facility" within the meaning of CERCLA, 42 U.S.C. § 9601(9).

**ANSWER:    Paragraph 206 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 206.**

207.    3M arranged for disposal or treatment of "hazardous substances" at the Sites within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

**ANSWER:    Paragraph 207 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M denies the allegations in Paragraph 207.**

208.    But for 3M's manufacture of Scotchgard$^{TM}$, the Sites would not be contaminated with Scotchgard$^{TM}$ or Scotchgard$^{TM}$ residuals, and Wolverine would not be incurring response costs.

**ANSWER:** Paragraph 208 states legal conclusions to which no responsive pleading is required. To the extent any response is required, 3M denies the allegations in Paragraph 208.

209. At all relevant periods, Wolverine did not know Scotchgard™ Leather Protector would leach into the groundwater.

**ANSWER:** 3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 209.

210. 3M knew Scotchgard™ migrated to groundwater. 3M also knew that Scotchgard™ was persistent and bioaccumulative. 3M intentionally shielded all of that information from others.

**ANSWER:** The allegations contained in Paragraph 210 are too vague as to the time frame and content of what 3M allegedly knew and allegedly shielded from disclosure, and, therefore, 3M denies the allegations contained in Paragraph 210.

211. In May of 2000, 3M announced it would cease production of Scotchgard™ Leather Protector.

**ANSWER:** 3M admits the truth of the allegations in Paragraph 211 to the extent that in May 2000, 3M announced that it would phase out production of, among other things, Scotchgard™ Leather Protector made with certain perfluoroalkyl chemistries.

212. Before and during the phase-out of Scotchgard™, 3M continued selling Scotchgard™ Leather Protector. 3M continued to shield from others the full extent of its knowledge of the environmental risks posed by Scotchgard™ Leather Protector. 3M knew or should have known that no tannery, if fully informed about the facts as they were known to 3M, would have purchased and used Scotchgard™ Leather Protector.

90

**ANSWER:   3M admits that it sold Scotchgard[TM] Leather Protector to Wolverine for some period after May 2000.  3M otherwise denies the allegations contained in Paragraph 212.**

213.    On information and belief, 3M created incentives for purchasers of Scotchgard TM Leather Protector because if the environmental risks of Scotchgard[TM] Leather Protector were known to the market (and not just 3M) there would have been little consumer demand for it.

**ANSWER:    3M denies the allegations in Paragraph 213.**

214.    During the phase-out of Scotchgard[TM], the chief benefit to 3M in selling Scotchgard[TM] Leather Protector was in disposing of it. During that time, any revenues from sales of Scotchgard[TM] Leather Protector were incidental to the immediate benefit of being rid of an overstock of unusable chemicals. If Wolverine and others had known of the environmental impacts of Scotchgard[TM] Leather Protector, then the Scotchgard[TM] Leather Protector would have been of little or no value to 3M.

**ANSWER:    3M denies the allegations contained in Paragraph 214.**

215.    To date, Wolverine has spent millions of dollars in response costs at the Sites, including costs incurred performing work under the UAO issued by the EPA. Wolverine will continue to incur costs, including pursuant to the UAO, and it will incur additional costs necessary to respond to the release of hazardous substances at the Sites.

**ANSWER:    Paragraph 215 states legal conclusions to which no responsive pleading is required.  Paragraph 215 also purports to refer to a "UAO" attributed to the EPA.  Any such "UAO" speaks for itself, and 3M denies any characterization of that UAO by Third-Party Plaintiff.  To the extent any response is required, 3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 215.**

216.    In connection with the releases of "hazardous substances" at the Sites, Wolverine has incurred and will incur "response costs" within the meaning of CERCLA section 101(25), 42 U.S.C. § 9601(25) to remediate the Sites. These response costs were, and will be, necessary and consistent with the National Contingency Plan.

**ANSWER:    Paragraph 216 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 216.**

217.    3M is liable, pursuant to section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B), to Wolverine for past and future response costs.

**ANSWER:    Paragraph 217 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M denies the allegations in Paragraph 217.**

<u>FOURTEENTH CAUSE OF ACTION</u>
<u>(NREPA Part 201 Cost Recovery)</u>

218.    Wolverine repeats, re-alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

**ANSWER:    3M incorporates by reference its responses to the allegations contained in the preceding paragraphs.  3M further states that incorporating all prior factual allegations into specific causes of action by reference renders it impossible to determine which factual allegations are intended to support each separate claim asserted by Third-Party Plaintiff, and 3M hereby objects to Wolverine's pleading practice.**

219.    Wolverine is a "person" within the meaning of Part 201 of NREPA, Mich. Comp. Laws § 324.20126.

**ANSWER:** **Paragraph 219 states legal conclusions to which no responsive pleading is required.**

220.    3M is a "person" within the meaning of Part 201 of NREPA, Mich. Comp. Laws § 324.20126.

**ANSWER:** **Paragraph 220 states legal conclusions to which no responsive pleading is required.**

221.    Each Site is a "facility" within the meaning of Part 201 of NREPA, Mich. Comp. Laws § 324.20101(1)(s).

**ANSWER:** **Paragraph 221 states legal conclusions to which no responsive pleading is required. To the extent any response is required, 3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 221.**

222.    3M arranged for disposal or treatment of Scotchgard$^{TM}$, which contains 1,1,1,-TCA, and other "hazardous substances" at the Sites within the meaning of Part 201 of NREPA, Mich. Comp. Laws § 324.20126(1)(b).

**ANSWER:** **Paragraph 222 states legal conclusions to which no responsive pleading is required. To the extent a response is required, 3M denies the allegations in paragraph 222.**

223.    In connection with the releases of "hazardous substances" at the Sites, Wolverine has incurred and will incur "costs of response activity" within the meaning of Part 201, Mich. Comp. Laws §§ 324.20101(1)(ww) and 324.20126a(1)(b), to remediate the Sites. The costs of response activity were reasonably incurred under the circumstances.

**ANSWER:** **Paragraph 223 states legal conclusions to which no responsive pleading is required. To the extent any response is required, 3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 223.**

224.     3M is liable, pursuant to Part 201 of NREPA, Mich. Comp. Laws §324.20126a(1), to Wolverine for past and future costs of response activities.

**ANSWER:     Paragraph 224 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M denies the allegations contained in Paragraph 224.**

## FIFTEENTH CAUSE OF ACTION
### (CERCLA Contribution)

225.     Wolverine repeats, re-alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

**ANSWER:     3M incorporates by reference its responses to the allegations contained in the preceding paragraphs.  3M further states that incorporating all prior factual allegations into specific causes of action by reference renders it impossible to determine which factual allegations are intended to support each separate claim asserted by Third-Party Plaintiff, and 3M hereby objects to Wolverine's pleading practice.**

226.     Each Site is a "facility" within the meaning of CERCLA section 101(9), 42 U.S.C. § 9601(9).

**ANSWER:     Paragraph 226 states legal conclusions to which no responsive pleading is required.**

227.     Wolverine is a "person" within the meaning of CERCLA section 101(21), 42 U.S.C. § 9601(21).

**ANSWER:     Paragraph 227 states legal conclusions to which no responsive pleading is required.**

228.     3M is a "person" within the meaning of CERCLA section 101(21), 42 U.S.C. § 9601(21).

**ANSWER:** Paragraph 228 states legal conclusions to which no responsive pleading is required.

229.    There was an actual or threatened "release" of "hazardous substances" at the Sites within the meaning of CERCLA sections 101(14) and (22), 42 U.S.C. §§ 9601(14), (22).

**ANSWER:** Paragraph 229 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 229.

230.    3M arranged for disposal or treatment of Scotchgard[TM], which contains 1,1,1,-TCA, and other "hazardous substances" within the meaning of CERCLA section 107(a)(3), 42 U.S.C. § 9607(a)(3).

**ANSWER:** Paragraph 230 states legal conclusions to which no responsive pleading is required.  To the extent a response is required, 3M denies the allegations in Paragraph 230.

231.    In connection with the releases of Scotchgard[TM] and other "hazardous substances" at the Sites, Wolverine has incurred and will incur "response costs" within the meaning of CERCLA section 101(25), 42 U.S.C. § 9601(25). These "response costs" were, and will be, necessary and consistent with the National Contingency Plan.

**ANSWER:** Paragraph 231 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M denies Scotchgard[TM] is a hazardous substance.  3M lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 231.

232.    Wolverine has incurred and may be ordered to incur costs for the investigation and remediation of the Sites that are greater than Wolverine's equitable share of those costs.

**ANSWER:** Paragraph 232 states legal conclusions to which no responsive pleading is required. To the extent any response is required, 3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 232.

233. 3M is liable, pursuant to sections 107(a) and 113(f) of CERCLA, 42 U.S.C. §§ 9607(a), 9613(f), to Wolverine for past and future costs paid by Wolverine in excess of Wolverine's equitable share of such costs.

**ANSWER:** Paragraph 233 states legal conclusions to which no responsive pleading is required. To the extent any response is required, 3M denies the allegations in Paragraph 233.

### SIXTEENTH CAUSE OF ACTION
### (NREPA Part 201 Contribution)

234. Wolverine repeats, re-alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

**ANSWER:** 3M incorporates by reference its responses to the allegations contained in the preceding paragraphs. 3M further states that incorporating all prior factual allegations into specific causes of action by reference renders it impossible to determine which factual allegations are intended to support each separate claim asserted by Third-Party Plaintiff, and 3M hereby objects to Wolverine's pleading practice.

235. Wolverine is a "person" within the meaning of Part 201 of NREPA, Mich. Comp. Laws § 324.20126.

**ANSWER:** Paragraph 235 states legal conclusions to which no responsive pleading is required.

236. 3M is a "person" within the meaning of Part 201 of NREPA, Mich. Comp. Laws § 324.20126.

**ANSWER:**    Paragraph 236 states legal conclusions to which no responsive pleading is required.

237.    Each Site is a "facility" within the meaning of Part 201 of NREPA, Mich. Comp. Laws § 324.20101(1)(s).

**ANSWER:**    Paragraph 237 states legal conclusions to which no responsive pleading is required.

238.    There was an actual or threatened "release" of "hazardous substances" at the Sites within the meaning of Part 201, Mich. Comp. Laws §§ 324.20101(1)(pp) and 324.20126.

**ANSWER:**    Paragraph 238 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 238.

239.    3M arranged for disposal or treatment of Scotchgard$^{TM}$, which contains 1,1,1,-TCA, and other "hazardous substances" within the meaning of Part 201, Mich. Comp. Laws § 324.20126(1)(d).

**ANSWER:**    Paragraph 239 states legal conclusions to which no responsive pleading is required.  To the extent a response is required, 3M denies the allegations in Paragraph 239.

240.    In connection with the releases of Scotchgard$^{TM}$ and other "hazardous substances" at the Sites, Wolverine has incurred and will incur "costs of response activity" within the meaning of Part 201, Mich. Comp. Laws § 324.20129(3). The costs of response activity were reasonably incurred under the circumstances.

**ANSWER:**    Paragraph 240 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M denies Scotchgard$^{TM}$ is a hazardous

substance and otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 240.

241.    Wolverine has incurred and may be ordered to incur costs of response activity associated with remediation of the Sites, which costs are greater than Wolverine's equitable share of those costs.

**ANSWER:    Paragraph 241 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 241.**

242.    3M is liable, pursuant to Part 201, Mich. Comp. Laws §§ 324.20126 (1), 20129(3), to Wolverine for past and future costs of response activity paid by Wolverine in excess of Wolverine's equitable share of such costs.

**ANSWER:    Paragraph 242 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M denies the allegations in Paragraph 242.**

## SEVENTEENTH CAUSE OF ACTION
### (CERCLA Declaratory Relief)

243.    Wolverine repeats, re-alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

**ANSWER:    3M incorporates by reference its responses to the allegations contained in the preceding paragraphs.  3M further states that incorporating all prior factual allegations into specific causes of action by reference renders it impossible to determine which factual allegations are intended to support each separate claim asserted by Third-Party Plaintiff, and 3M hereby objects to Wolverine's pleading practice.**

244.     Pursuant to section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), Wolverine is entitled to a declaratory judgment, binding in any subsequent action or actions, that holds 3M liable for any further response costs or damages incurred by Wolverine in connection with the Sites.

**ANSWER:     Paragraph 244 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M denies the allegations in Paragraph 244.**

### EIGHTEENTH CAUSE OF ACTION
#### (NREPA Declaratory Relief)

245.     Wolverine repeats, re-alleges, and incorporates herein by reference each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

**ANSWER:     3M incorporates by reference its responses to the allegations contained in the preceding paragraphs.  3M further states that incorporating all prior factual allegations into specific causes of action by reference renders it impossible to determine which factual allegations are intended to support each separate claim asserted by Third-Party Plaintiff, and 3M hereby objects to Wolverine's pleading practice.**

246.     Pursuant to Part 201 of NREPA, Mich. Comp. Laws §§ 324.20126, 324.20129, and 324.20137(1)(d), Wolverine is entitled to a declaratory judgment, binding on any subsequent action or actions, that holds 3M liable for any further response activity costs or damages incurred by Wolverine in connection with the Sites.

**ANSWER:     Paragraph 246 states legal conclusions to which no responsive pleading is required.  To the extent any response is required, 3M denies the allegations in Paragraph 246.**

**WHEREFORE,** 3M denies that Wolverine is entitled to any of the relief requested in its Third-Party Complaint, respectfully requests that the Court dismiss the Third-Party Complaint

with prejudice, and respectfully requests that the Court award 3M its reasonable attorneys' fees and costs incurred to defend this action.

## AFFIRMATIVE DEFENSES

3M asserts that Wolverine's claims are barred, in whole or in part, by the following affirmative or other defenses. By alleging these defenses, 3M does not assume the burden of any fact, issue, or element of a cause of action where such burden properly belongs to Wolverine. 3M reserves its right to amend this answer, including its defenses.

1.      Wolverine's claims are or may be barred, in whole or in part, because the Third-Party Complaint fails to state a claim upon which relief can be granted.

2.      Wolverine's claims are or may be barred, in whole or in part, by applicable statutes of limitations, statute of repose, and laches.

3.      Wolverine's claims are or may be barred, in whole or in part, by the doctrine of waiver, estoppel, unclean hands, *in pari delicto,* assumption of risk, and acquiescence.

4.      Wolverine lacks standing because it has not suffered compensable harm.

5.      Wolverine's claims are or may be barred, in whole or in part, by the economic loss doctrine.

6.      Wolverine's common law indemnity claims (Counts I-III) are or may be barred, in whole or in part, because Wolverine was actively negligent or engaged in intentional misconduct with respect to the underlying events.

7.      Wolverine's fraud claims (Counts IV-V) are or may be barred, in whole or in part, by applicable statutes of limitations.

8.      Wolverine's fraud claims (Counts IV-V) are or may be barred, in whole or in part, because Wolverine did not reasonably rely on 3M's alleged nondisclosures and representations.

9.     Wolverine's nuisance claims (Counts VI-VII) are or may be barred, in whole or in part,  because 3M, as a manufacturer, lacked the necessary control over its products after the point of sale.

10.    Wolverine's nuisance claims (Counts VI-VII) are or may be barred, in whole or in part, by applicable statutes of limitations.

11.    Wolverine's failure to warn claim (Count VIII) is or may be barred, in whole or in part, because Wolverine was a sophisticated PFAS user.

12.    Wolverine's failure to warn claim (Count VIII) is or may be barred, in whole or in part, because 3M cannot be liable for failure to warn because the risks of disposing of PFAS in the environment were or should have been obvious to Wolverine.

13.    Wolverine's failure to warn claim (Count VIII) is or may be barred, in whole or in part, by applicable statutes of limitations.

14.    Wolverine's design defect claim (Count IX) is or may be barred, in whole or in part, because there was no feasible alternative design during the relevant time period.

15.    Wolverine's design defect claim (Count IX) is or may be barred, in whole or in part, by applicable statutes of limitations.

16.    Wolverine's breach of implied warranty of merchantability claim (Count X) is or may be barred, in whole or in part, because 3M's products were functioning properly at the time of the alleged injuries.

17.    Wolverine's breach of implied warranty of merchantability claim (Count X) is or may be barred, in whole or in part, because Wolverine was a sophisticated user of PFAS.

18.    Wolverine's breach of implied warranty of merchantability claim (Count X) is or may be barred, in whole or in part, because the contracts between the parties and/or other

102

applicable documents, including material safety data sheets, disclaim the implied warranty of merchantability.

19. Wolverine's breach of implied warranty of merchantability claim (Count X) is or may be barred, in whole or in part, because Wolverine did not provide 3M reasonable notice of the alleged breach.

20. Wolverine's breach of implied warranty of merchantability claim (Count X) is or may be barred, in whole or in part, by applicable statutes of limitations.

21. Wolverine's breach of implied warranty of fitness for a particular purpose claim (Count XI) is or may be barred, in whole or in part, because Wolverine did not rely on 3M to select a product suitable for a particular purpose.

22. Wolverine's breach of implied warranty of fitness for a particular purpose claim (Count XI) is or may be barred, in whole or in part, because 3M was not made aware that Wolverine was relying on it to select a product suitable for a particular purpose.

23. Wolverine's breach of implied warranty of fitness for a particular purpose claim (Count XI) is or may be barred, in whole or in part, because the contracts between the parties and/or other applicable documents, including material safety data sheets, disclaim the implied warranty of fitness for a particular purpose.

24. Wolverine's breach of implied warranty of fitness for a particular purpose claim (Count XI) is or may be barred, in whole or in part, because Wolverine did not provide reasonable notice of the alleged breach.

25. Wolverine's breach of implied warranty of fitness for a particular purpose claim (Count XI) is or may be barred, in whole or in part, by applicable statutes of limitations.

26.     Wolverine's negligence claim (Count XII) is or may be barred, in whole or in part, because it is preempted by Michigan's product liability statute.

27.     Wolverine's negligence claim (Count XII) is or may be barred, in whole or in part, because there are contracts between the parties that govern their relationship.

28.     Wolverine's negligence claim (Count XII) is or may be barred, in whole or in part, by applicable statutes of limitations.

29.     Wolverine's CERCLA and NREPA claims (Counts XIII-XVIII) are or may be barred, in whole or in part, because PFAS compounds are not "hazardous substances" regulated by CERCLA, and Wolverine has incurred no response costs arising from any other substance provided by 3M.

30.     Wolverine's CERCLA and NREPA claims (Counts XIII-XVIII) are or may be barred, in whole or in part, because 3M did not arrange for the disposal of hazardous substances.

31.     Wolverine's CERCLA and NREPA claims (Counts XIII-XVIII) are or may be barred, in whole or in part, because and to the extent that Wolverine's past and future response costs are due to any substances not provided by 3M or would have been incurred regardless of the presence of PFAS at any site at issue.

32.     Wolverine cannot pursue a cost recovery action pursuant to CERCLA and NREPA because Wolverine is subject to a Section 106 unilateral order from the Environmental Protection Agency.

33.     Wolverine's request for consequential damages is or may be barred, in whole or in part, because the contracts between the parties and/or other applicable documents, including material safety data sheets, disclaim consequential damages.

34.     Wolverine's request for attorneys' fees is or may be barred, in whole or in part, because there is no statute, court rule, or contract that entitles it to recover attorneys' fees.

35.     Wolverine's claims are or may be barred, in whole or in part, because 3M did not owe a legal duty for Wolverine, or, if it owed such a duty, did not breach or fail to discharge the duty.

36.     Wolverine's claims are or may be barred, in whole or in part, because 3M is not responsible or liable for any acts or omissions undertaken by, or at the direction of, any governmental authority or agency.

37.     Wolverine's claims are or may be barred, in whole or in part, because 3M did not discharge, release, emit, or dispose of PFAS or related compounds that allegedly contaminated the groundwater in or around the subject facilities or disposal sites.

38.     Wolverine's claims are or may be barred, in whole or in part, because 3M never owned, operated, or otherwise controlled the facilities, disposal sites, and other purported sources of PFAS or related compounds.

39.     Wolverine's claims are or may be barred, in whole or in part, by various provisions, including, but not limited to, provisions concerning disclaimer of warranties, limitations of liability, exculpation of liability, and alternative dispute resolution, that are contained in contracts between 3M and Wolverine and/or other applicable documents, including material safety data sheets.

40.     Wolverine's claims are or may be barred, in whole or in part, by the voluntary payment doctrine.

41.     Wolverine's claims are or may be barred, in whole or in part, because 3M is not liable for alleged contamination where chemical compounds not attributable to 3M or any

105

product sold by 3M exceed state or federal action levels or standards, requiring cleanup regardless of the presence of PFAS purportedly attributable to 3M.

42.      Wolverine's claims may be barred, in whole or in part, because Wolverine's damages, if any, alleged in the Third-Party Complaint are the result of independent, unforeseeable, superseding, and/or intervening causes.

43.      Wolverine's claims are or may be barred, in whole or in part, because 3M did not owe Wolverine a duty to warn of possible dangers not known at the time of the alleged sale of the products to Wolverine.

44.      Wolverine's claims are or may be barred, in whole or in part, because the products sold by 3M to Wolverine were not defective at the time of sale.

45.      Wolverine's claims are or may be barred, in whole or in part, because Wolverine failed to take reasonable steps to mitigate its damages.

46.      Wolverine's claims for equitable relief are or may be barred, in whole or in part, because Wolverine has an adequate remedy at law.

47.      Wolverine's claims are or may be barred, in whole or in part, because, at all times relevant, the state of the medical, industrial, and scientific arts was that there was no generally accepted or recognized knowledge of any unsafe, inherently dangerous, hazardous, or defective nature of products containing PFAS or related compounds, so that there was no duty by 3M to know of such character or nature or to warn Wolverine or others.

48.      Wolverine's claims are or may be barred, in whole or in part, because 3M used proper methods in designing, testing, and manufacturing its products in conformity with (i) federal and state regulations, standards, specifications, and laws in effect; (ii) available knowledge and research of the scientific and industrial communities; (iii) generally recognized

and prevailing industry standards; and (iv) state of the art in existence at the time the design was prepared and the products were manufactured and tested.

49.     Wolverine's claims are or may be barred, in whole or in part, because damages of which Wolverine complains were caused by unforeseeable and/or improper use of products containing PFAS or related compounds and as a result of failure to exercise reasonable care or caution for which 3M is not legally liable or responsible.

50.     Wolverine does not have a right to a jury trial on some or all of its claims.

51.     Wolverine's claims are or may be barred, in whole or in part, because federal, state, and/or local authorities authorized, ratified, or were aware of and acquiesced in actions by 3M or Wolverine that are the subject of Wolverine's claims.

**WHEREFORE**, 3M respectfully requests that the Court dismiss the Third-Party Complaint with prejudice, and respectfully requests that the Court award 3M its reasonable attorneys' fees and costs incurred to defend this action.

## COUNTERCLAIM

3M Company ("3M") for its Counterclaim against Wolverine World Wide, Inc. ("Wolverine") states as follows:

### PARTIES

1.      3M is a Delaware corporation with its principal place of business in St. Paul, Minnesota.

2.      Wolverine is a Delaware corporation with its principal place of business in Rockford, Michigan. Wolverine is a publicly traded company whose stock is traded on the New York Stock Exchange.

### JURISDICTION AND VENUE

3.      This Court has supplemental jurisdiction over this Counterclaim under 28 U.S.C. § 1367(a) because the Counterclaim is closely related to, and forms a part of the same case and controversy as, the federal law claims asserted by Wolverine.

4.      Venue is proper in the Western district of Michigan pursuant to 28 U.S.C. § 1391(b)(1) and (2)  because Wolverine is resident in the district and a substantial portion of the events giving rise to the Counterclaim occurred in the district.

### BACKGROUND

5.      Wolverine is a leading designer, marketer, and licensor of a broad range of footwear and apparel. Wolverine markets its footwear and apparel worldwide in approximately 200 countries and territories. Substantially all of the units of footwear sourced by Wolverine now are procured from third-party manufacturers in the Asia Pacific region. Wolverine's 2018 revenue exceeded $2 billion.   Wolverine's proxy statement for the 2019 meeting of shareholders reports that Blake Krueger (Wolverine's Chairman, CEO and President) received compensation of $10.2

million, $12.0 million and $8.9 million for 2016, 2017 and 2018, respectively. 2018 compensation for other Wolverine senior officers was reported as $2.0 million for Michael Jeppesen (a Group President), $2.6 million for Michael Stornant (CFO), $1.8 million for Richard Woodworth (a Group President), and $2.0 million for James Zwiers (Executive Vice President).

6.      From the early 1900s through approximately 2009, Wolverine also operated a leather tannery in Rockford, Michigan (the "Tannery").

7.      A fundamental part of Wolverine's tanning operations at the Tannery involved Wolverine placing leather in a mill (a large, washing-machine-like drum) and mixing it with various chemicals. During the course of the tanning process, leather was mixed in the mill with different chemicals at different steps in the process. After each step in the process, chemicals remaining in the mill along with particles of skin or hide were drained from the mill, and Wolverine was responsible for disposal of this waste.

8.      Beginning in the late 1950s until 2009, Wolverine used Scotchgard™ in its processing of certain leathers at the Tannery. Scotchgard™ was used by Wolverine as a leather protector to allow it to be the first company to offer products made with pigskin leather that was resistant to water, oil, and stains. Wolverine generated very substantial revenue for decades selling products made with pigskin leather that was resistant to water, oil, and stains. In the absence of such treatments, on information and belief, Wolverine could not have generated such revenues and generated a market for its products. To this day, Wolverine has not found a replacement leather treatment that offers all of the same properties as Scotchgard™ without use of one or more fluorochemicals.

9.      Wolverine generated substantial waste from the tanning process at the Tannery. On information and belief, for example, in 1965, the Tannery generated approximately one million

gallons per day of liquid waste, and, in or about 1979, the Tannery operations were generating approximately 20,000 lbs. per day of dry solid wastes.

10. Wolverine's operations, including those at the Tannery, are subject to various federal, state and local laws and regulations relating to the protection of the environment, including those governing the discharge of pollutants into the air, soil and water, the management and disposal of hazardous materials and wastes, employee exposure to hazards in the workplace, and investigation and remediation of contamination resulting from releases of hazardous materials. Wolverine acknowledges that these environmental and workplace safety laws and regulations create risks related to the company's business that could adversely affect the company's business. Wolverine portrays itself as actively seeking out environmentally sustainable business practices. It claims to be committed to inspiring its global communities through environmental education and awareness. Wolverine states that "As a company entrusted with the reputation of our family of brands, we hold ourselves to the highest standards of human and environmental health and safety."

11. On information and belief, the waste generated by Wolverine at the Tannery included, among other things, arsenic, chromium, mercury, selenium, lead, and zinc, all of which are hazardous substances as that term is defined under CERCLA, 42 U.S.C. § 9601(14).

12. On information and belief, Wolverine was responsible for establishing and implementing its waste management and disposal practices. Over the years, in addition to its own employees (who included chemists, engineers, and other persons with scientific expertise), Wolverine retained and relied upon numerous consultants and technical experts to advise it and provide services related to building, maintaining, operating, and modifying its wastewater treatment plant, characterizing wastes generated by Wolverine at the Tannery, characterizing

110

chemicals used by Wolverine for reporting to various federal, state, or local authorities, testing Wolverine's waste streams, and testing chemicals used by Wolverine in the Tannery.

13.     On information and belief, Wolverine's employees responsible for the company's waste management and disposal practices, disregarded the Material Safety Data Sheets supplied by 3M in connection with Wolverine's purchase of Scotchgard$^{TM}$.

14.     On information and belief, until approximately 1935, most of the waste from Wolverine's Tannery operations was filtered only through a screen and discharged directly into the Rogue River.  Beginning in or about 1936 and continuing until approximately 1955, Wolverine utilized the City of Rockford's wastewater treatment facility to dispose of much of its Tannery waste. The City of Rockford's treated wastewater was discharged into the Rogue River. Sludge from the City's wastewater treatment plant was placed into landfills. By 1955, the City of Rockford's wastewater treatment plant could no longer handle the volume of waste being generated by the Tannery, and Wolverine constructed its own wastewater treatment facility.

15.     On information and belief, Wolverine is unable to document where it disposed of all of the waste from the Tannery during the period from when it began operations at the Tannery through 1955.

16.     On information and belief, after Wolverine constructed its own wastewater treatment facility, it began using a type of treatment termed filtration and clarification, the purpose of which is to reduce the amount of solid in the wastewater stream and by allowing them to settle into a sludge. Wolverine discharged the treated wastewater into the Rogue River. Wolverine disposed of the sludge from the Tannery in landfills.

17.     On information and belief, the City of Rockford, from on or about 1936 to on or about 1955, and Wolverine, from 1956 until 1970, primarily disposed of sludge from their

respective wastewater treatment facilities, at a parcel of land owned by Wolverine on House Street in Plainfield Township, Michigan (the "House Street" site). The City of Rockford also disposed of some sludge from its wastewater treatment facility at other local landfills. Wolverine also disposed of sludge from the Tannery at Wolven/Jewell, the Northeast Gravel Company, and at other sites in or around Kent County, Michigan (together with the "House Street" site, the "Sites").

18.     On information and belief, the Sites used to dispose of sludge from the Tannery were not lined to prevent groundwater contamination.

19.     On information and belief, Wolverine dumped some of its sludge at the House Street site into naturally occurring ravines, but to be able to accommodate the volume of sludge Wolverine was disposing of at the House Street site, it also constructed seepage pits and trenches in which it could dump the sludge.

20.     On information and belief, in 1964, Wolverine retained geologist Edwin M. Burt to undertake a geologic and hydrologic study of the House Street site. The purpose was to identify which areas of the site had the most permeable soils for construction of seepage pits and trenches that would allow rapid infiltration of the liquid component of the sludge. Per Wolverine's request, Mr. Burt identified the areas that were most permeable, and also recommended that best results would be obtained by stripping off surface soils and constructing the trenches and seepage pits in the underlying sands. Wolverine constructed its trenches and seepage pits in accordance with Mr. Burt's recommendations.

21.     On information and belief, Wolverine knew that disposal of sludge from the Tannery at the Sites would result in groundwater contamination.  For example, as early as 1964, Wolverine evaluated whether ground water contaminated by the sludge disposed of at the House Street site would flow towards wells of persons residing in the vicinity of the House Street site.

112

As another example, in 1979, Wolverine conducted a study at the Northeast Gravel Company site, which it had used as its primary site for disposal of Tannery sludge since closing the House Street site in 1970. The study found tannery residue, including chromium, had impacted groundwater at the site

22.     In 1966, after Plainfield Township had changed the zoning of House Street site such that it could no longer be used as a dump, Wolverine sued Plainfield Township seeking authorization to continue the House Street site for waste disposal. Wolverine's lawsuit was resolved by a consent judgment ordering Wolverine to, *inter alia,* "see that water supplies and/or lakes or other waters not owned by the company will not be contaminated by any use made of said dump."

23.     Nevertheless, Wolverine did not undertake any investigations of groundwater contamination at the House Street site until 2017, after being contacted by MDEQ about groundwater contamination found at the Belmont Armory (located near the House Street site). To the contrary, Wolverine actually took steps to prevent testing of groundwater under the House Street site, including by attempting to contractually restrict a potential purchaser of the site from undertaking environmental studies, tests or evaluations at the site before or after the sale.

24.     In January 2018, the Michigan Department of Environmental Quality ("MDEQ") filed a complaint for declaratory and injunctive relief against Wolverine. Plainfield Charter Township and Algoma Township (the "Townships") have intervened as plaintiffs in that lawsuit.

25.     MDEQ and the Townships allege that Wolverine's manufacturing processes and waste management and disposal activities associated with its Tannery operation caused the release of per- and polyfluoroalkyl substances ("PFAS") into the environment and that the PFAS released

by Wolverine have migrated into the environment, including surface water, soils, and groundwater at the Sites.

26.     MDEQ and the Townships seek a declaration that Wolverine's past and/or present handling, storage, treatment, transportation, and/or disposal of wastes from the Tannery at properties owned by Wolverine, as well as properties owned by others, presents, or may present, an imminent and substantial endangerment to human health and to the environment. MDEQ and the Townships request, among other things, that Wolverine be ordered to abate the public nuisance caused by its discharge of injurious substances into groundwater and surface waters of the State and to pay the State's past and future response activity costs incurred by the State in connection with releases of hazardous substances into the environment.

## COUNT I
## CONTRACTUAL INDEMNITY

27.     3M incorporates by reference paragraphs 1 - 26 as though fully set forth herein.

28.     In September 1999, 3M and Wolverine entered into a trademark license agreement with respect to the Scotchgard Trademark (the "Trademark License Agreement"). A copy of the Trademark License Agreement is attached as Exhibit A. The Trademark License Agreement makes Wolverine a licensee of the Scotchgard Trademark for use in connection with leather materials that Wolverine has properly treated with Scotchgard$^{TM}$.

29.     The Trademark License Agreement provides that it constitutes the entire agreement between the parties respecting the Scotchgard Trademark and supersedes and cancels all previous negotiations, agreements, commitments, and writings in respect to the Scotchgard Trademark.

30.     Pursuant to the Trademark License Agreement, Wolverine has agreed to indemnify and hold harmless 3M from and against any and all claims, demands, losses, suits, liabilities, or expenses (including court costs and reasonable attorneys' fees) for property damage resulting from

or arising out of the negligence or intentional or unintentional wrongful acts of Wolverine during or in connection with the use of 3M products.

31.    In December 2018, Wolverine filed its Third-Party Complaint against 3M. In the Third-Party Complaint, Wolverine alleges that the Scotchgard™ it purchased from 3M for treatment of leather materials at the Tannery was the source of the PFAS that MDEQ alleges Wolverine released into the environment at and around the Sites. Wolverine further alleges that its disposal of waste from use of Scotchgard™ has caused physical harm to its properties and the groundwater underneath its properties.

32.    If Wolverine is found liable on the claims brought against it by MDEQ and the Townships, Wolverine seeks to impose on 3M some or all of the costs and expenses it is required to pay as a result of such property damage. The costs and expenses Wolverine seeks to impose on 3M relate to property damage resulting from Wolverine's negligence or intentional or unintentional wrongful acts in connection with its disposal of waste from its use of Scotchgard™ in its leather manufacturing process.

33.    If any such costs or expenses are imposed on 3M as a result of Wolverine's Third-Party Complaint, 3M is entitled to indemnification from Wolverine for those costs and expenses pursuant to the indemnification provision of the Trademark License Agreement.

34.    3M is also entitled to indemnification for all costs, fees and expenses it incurs in defending this lawsuit pursuant to the indemnification provision of the Trademark License Agreement.

**WHEREFORE,** 3M respectfully requests that the Court enter judgment in its favor and against Wolverine requiring Wolverine to indemnify 3M for any and all amounts (including,

without limitation, costs, attorneys' fees and expenses) imposed on or incurred by 3M in connection with Wolverine's Third-Party Complaint.

## COUNT II
### (COMMON LAW INDEMNITY)

35.     3M incorporates paragraphs 1 - 26 as though fully set forth herein.

36.     On information and belief, Wolverine was actively involved with deposit, storage, disposal, and placement of Tannery wastes at the Sites.

37.     3M had no active involvement in the deposit, storage, disposal, and placement of Tannery wastes at the Sites.

38.     Should 3M be found liable to any of the relief sought in Wolverine's Third-Party Complaint, it is just and reasonable that Wolverine bear ultimate responsibility and be required to indemnify 3M.

**WHEREFORE,** 3M respectfully requests that the Court enter judgment in its favor and against Wolverine requiring Wolverine to indemnify 3M for any and all costs and expenses imposed on 3M pursuant to Wolverine's Third-Party Complaint.

## COUNT III
### (CERCLA §113(f) – CONTRIBUTION)

39.     3M incorporates paragraphs 1 - 26 as though fully set forth herein.

40.     If the allegations of the Third-Party Complaint are true, each of the Sites is a "facility" within the meaning of CERCLA § 101(9), 42, U.S.C. § 9601(9).

41.     If the allegations of the Third-Party Complaint are true, there was a "release" of "hazardous substances" within the meaning of CERCLA §§ 101(14) and (22), 42 U.S.C. §§ 9601(14) and (22) at the Sites.

42.     Wolverine is a "person" within the meaning of CERCLA § 101(21), 42 U.S.C. § 9601(21).

43.     3M is a "person" within the meaning of CERCLA § 101(21), 42 U.S.C. § 9601(21).

44.     On information and belief, Wolverine, as the "owner or operator" of the Sites within the meaning of CERCLA § 101(20)(A), 42 U.S.C. § 9601(20)(A) and/or the person who arranged for the disposal of allegedly "hazardous substances," is a "covered person" within the meaning of CERCLA § 107(a)(2) and (3), 42 U.S.C. § 9607(a)(2) and (3).

45.     Should 3M be found liable for any of the relief sought in Wolverine's Third-Party Complaint, 3M is entitled to contribution from Wolverine pursuant to CERCLA § 113(f), 42 U.S.C. § 9613(f).

**WHEREFORE,** 3M respectfully requests that, if it is found liable on the Third-Party Complaint, 3M be awarded contribution from Wolverine pursuant to CERCLA § 113(f), 42 U.S.C. § 9613(f).

## <u>COUNT IV</u>
### <u>(CONTRIBUTION UNDER PART 201)</u>

46.     3M incorporates paragraphs 1 - 26 as though fully set forth herein.

47.     If the allegations of the Third-Party Complaint are true, each Site is a "facility" within the meaning of Part 201 of NREPA, Mich. Comp. Laws § 324.20101(1)(s).

48.     If the allegations of the Third-Party Complaint are true, there was an actual or threatened "release" of "hazardous substances" at the Sites within the meaning of Part 201, Mich. Comp. Laws §§ 324.20101(1)(x) and (pp).

49.     On information and belief, Wolverine is a liable person under Part 201, Michigan Comp. Laws § 324.20126 because it "owned" or "operated" a "facility" at the time of disposal of

an allegedly hazardous substance and/or was responsible for an activity causing a release or threat of release of an allegedly hazardous substance.

50.    Should 3M be found liable for any of the relief sought in Wolverine's Third-Party Complaint, 3M is entitled to contribution from Wolverine pursuant to Part 201 of NREPA, Mich. Comp. Laws § 324.20129(3).

**WHEREFORE,** 3M respectfully requests that, if it is found liable on the Third-Party Complaint, 3M be awarded contribution from Wolverine pursuant to Part 201 of NREPA, Mich. Comp. Laws § 324.20129(3).

## COUNT V
## CERCLA COST RECOVERY

1.    3M incorporates paragraphs 1 - 26 as though fully set forth herein.

2.    In the Third Party Complaint, Wolverine has alleged cost recovery causes of action against 3M under CERCLA and NREPA.  3M has asserted in its affirmative defenses that Wolverine cannot pursue a cost recovery action pursuant to CERCLA and NREPA because Wolverine is subject to a Section 106 unilateral order from the Environmental Protection Agency. If 3M's affirmative defense to Wolverine's cost recovery actions is not sustained, then 3M alleges, in the alternative, this CERCLA cost recovery claim

3.    If the allegations of the Third-Party Complaint are true, each of the Sites is a "facility" within the meaning of CERCLA § 101(9), 42, U.S.C. § 9601(9).

4.    If the allegations of the Third-Party Complaint are true, there was a "release" of "hazardous substances" within the meaning of CERCLA §§ 101(14) and (22), 42 U.S.C. §§ 9601(14) and (22) at the Sites.

5.     Wolverine is a "person" within the meaning of CERCLA § 101(21), 42 U.S.C. § 9601(21).

6.     3M is a "person" within the meaning of CERCLA § 101(21), 42 U.S.C. § 9601(21).

7.     On information and belief, Wolverine, as the "owner or operator" of the Sites within the meaning of CERCLA § 101(20)(A), 42 U.S.C. § 9601(20)(A) and/or the person who arranged for the disposal of  allegedly "hazardous substances," is a "covered person" within the meaning of CERCLA § 107(a)(2) and (3), 42 U.S.C. § 9607(a)(2) and (3).

8.     Should 3M be found liable for any of the relief sought in Wolverine's Third-Party Complaint, Wolverine is liable, pursuant to CERCLA § 107(a)(2) and (3)(B), 42 U.S.C. 9607(a)(2) and (3)(B), to 3M for any necessary costs of response imposed on 3M.

**WHEREFORE,** 3M respectfully requests that the Court enter judgment in its favor and against Wolverine finding Wolverine liable to 3M for any necessary costs of response imposed on 3M.

DATED: June 20, 2019                    Respectfully submitted,


By /s/ Daniel L. Ring

Joseph M. Infante (P68719)
Robert L. DeJong (P12639)
MILLER, CANFILED, PADDOCK AND
STONE, P.L.C.
99 Monroe Avenue NW, Suite 1200
Grand Rapids, MI 49503
(616) 454-8656

Timothy S. Bishop
Michael A. Olsen
Daniel L. Ring
Richard Bulger
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL  60606
(312) 782-0600

*Counsel for Defendant 3M Company*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 20th day of June 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel registered with CM/ECF.

/s/  Daniel L. Ring
Daniel L. Ring

121