UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHIGAN DEPARTMENT OF
ENVIRONMENTAL QUALITY,

      Plaintiff,

v.

WOLVERINE WORLD WIDE, INC.,

      Defendant.

and

PLAINFIELD CHARTER TOWNSHIP and
ALGOMA TOWNSHIP,

      Intervening Plaintiffs,

v.

WOLVERINE WORLD WIDE, INC.,

      Defendant.

_____/

WOLVERINE WORLD WIDE, INC.,

      Third-Party Plaintiff,

v.

3M Corporation,

      Third-Party Defendant.

_____/

No. 1:18-cv-00039

HON. JANET T. NEFF

**<u>DEFENDANT'S MOTION FOR RESOLUTION OF DISPUTE</u>**

Defendant Wolverine World Wide, Inc., ("**Wolverine**") moves under Paragraph 18.8 of the February 19, 2020, Consent Decree ("**CD**") [ECF No. 151] to resolve a dispute between Wolverine and Plaintiff Michigan Department of Environment, Great Lakes and Energy[1] ("**EGLE**") related to the Area R-1 Completion Report submitted by Wolverine under Paragraph 7.12(a)(vii) of the CD (the "**Area 19 Completion Report**").[2]

## INTRODUCTION

The Court should direct EGLE to approve the Area 19 Completion Report. Under Paragraph 7.12(a)(vii) of the CD, the only requirement for the Area 19 Completion Report is that it "demonstrate[] that [Wolverine] has completed the Response Activities Required by Paragraph 7.9(b)[(ii)]." Under Paragraph 7.9(b)(ii) of the CD, Wolverine agreed to install groundwater wells in Area 19 in accordance with the Area 19 Statement of Work ("**SOW**")[3] and Area 19 Response Activity Plan ("**RAP**")[4] and to conduct one sampling event at each of these monitoring wells in order to define the vertical and horizontal extent of PFAS Compounds contamination in Area 19.

Wolverine completed this agreed-upon work, but EGLE is now demanding that Wolverine undertake additional activities that would have been required under MCL 324.20114 if EGLE had prevailed on its claims against Wolverine rather than entering into the CD. As described in the Area 19 Completion Report, Wolverine installed groundwater wells in Area 19 in accordance with the EGLE-approved SOW and the EGLE-approved RAP, and it conducted one sampling event at each of the monitoring wells it installed in Area 19. Those facts are

---

[1] Previously the Michigan Department of Environmental Quality
[2] Attached as **Exhibit A.**
[3] Attached as **Exhibit B.**
[4] Attached as **Exhibit C**.

indisputable. Accordingly, the vertical and horizontal extent of PFAS Compounds in Area 19 has been defined as agreed and the Area 19 Completion Report must be approved.

BACKGROUND

**I.    Wolverine has conducted extensive work to implement the CD.**

The CD was entered in compromise of disputed claims and for settlement purposes. It sets out a comprehensive agreement among the parties for response activities to investigate and address PFAS Compounds in groundwater in the North Kent Study Area.

For example, the CD required Wolverine to do the following:[5]

- Fund the extension of municipal water in the North Kent Study Area (CD ¶ 6.1(c));

- Sample residential drinking water wells for PFAS Compounds (CD ¶ 7.6);

- Capture groundwater at Wolverine's former Rockford tannery before it migrates to the Rogue River (CD ¶ 7.7);

- Install a surface cap at the House Street property to reduce and control potential migration of PFAS Compounds from the property (CD ¶ 7.8);

- Install a vast network of groundwater wells to monitor PFAS Compounds in the North Kent Study Area (CD ¶ 7.9); and

- Conduct a study of the potential for groundwater to discharge to surface water in certain areas in the North Kent Study Area (CD ¶ 7.10).

Wolverine has fulfilled these CD obligations. As agreed upon in the CD, Wolverine has funded the design and construction of over 20 miles of municipal drinking water lines and

---

[5] This work is summarized in more detail in the EGLE-approved submissions and interactive map available here: https://www.michigan.gov/pfasresponse/investigations/sites-aoi/kent-county/house-street-disposal-area

connected nearly 900 homes to the water system. Wolverine also collected 12,055 residential well drinking water samples from over 1,500 wells. In addition, Wolverine designed and constructed a groundwater capture and treatment system at the Tannery site that includes approximately 2,000 linear feet of collection trenches and has already successfully treated over six million gallons of groundwater.

At its House Street property, Wolverine capped over 27 acres as set forth in the CD and has already implemented interim monitoring as required for this site. Wolverine completed the required groundwater investigations and sampling in Areas 5, 6, 11, and 12 in 2024. That work included installing 294 monitoring wells and collecting over 1,900 groundwater samples as set out in EGLE-approved scopes of work and response activity plans for those areas. Wolverine also completed the Groundwater-Surface Water Interface Investigation as outlined in the EGLE-approved scope of work and response activity plan for that work.

In sum, Wolverine's work in the six years since this Court entered the CD has included collection, analysis, and interpretation of over 14,000 water and 1,200 soil samples and drilling over 41,000 ft as part of the investigations.

## II.    Wolverine's work in the North Kent Study Area included work in "Area 19."

Wolverine's obligations in the portion of the North Kent Study Area referred to as "Area R-1" or "Area 19" are a small fraction of the overall work already performed under the CD. The Area 19 obligations are set out in Paragraph 7.9(b)(ii) of the CD, which provides in full as follows:

> In Area R-1 (19) (depicted in Appendix Q—Map of Groundwater Investigation Area R-1 (19)) of the Filter Areas, Defendant will install groundwater monitoring wells in accordance with Appendix R— Statement of Work for R-1 (19) Groundwater Monitoring and the Response Activity Plan in Paragraph 7.4(a). Defendant shall conduct one sampling event in accordance with Appendix R—

3

> Statement of Work for R-1 (19) Groundwater Monitoring and the Response Activity Plan in Paragraph 7.4(a) at each monitoring well it installs in Area R-1 (19). Following the one (1) sampling event, Defendant shall have no further obligations for sampling, maintenance, or abandonment of that monitoring well. Once the vertical and horizontal extent of the PFAS Compounds contamination in Area R-1 (19) of the Filter Areas is defined, Defendant shall have no further obligation for groundwater investigations in Area R-1(19) of the Filter Areas. MDEQ may conduct future sampling events at the monitoring wells and will be responsible for maintaining and abandoning of the monitoring wells installed hereunder.

The EGLE-approved SOW and EGLE-approved RAP reinforce the scope of Wolverine's obligations in Area 19. The SOW provides the location of the groundwater monitoring wells for Area 19, and the RAP provides additional detail for the location and plan for sampling of those wells.[6]

Wolverine completed the installation of monitoring wells in Area 19 and one round of sampling at each well on September 15, 2023. After completing that work, Wolverine submit the Area 19 Completion Report in accordance with Paragraph 7.12(a)(vii) of the CD. The work outlined in the SOW and RAP, and Wolverine's completion of that work, is summarized in Table 5.1.1 of the submitted Completion Report.

EGLE issued a Disapproval of the Area 19 Completion Report on November 25, 2025. Following EGLE's disapproval, Wolverine initiated informal dispute resolution under Paragraph 18.5 of the CD. EGLE and Wolverine were unable to resolve their dispute through that process, and on January 5, 2026, Wolverine submitted a Request for Review to Mike Neller, Director, Remediation and Redevelopment Division, EGLE, under Paragraph 18.5 of the CD.[7]

---

[6] CD Appendix R, pp. 1–4; RAP, p. 13.
[7] Attached as **Exhibit D.**

On January 26, 2026, EGLE issued a Statement of Decision in response to Wolverine's Request for Review.[8] EGLE concluded that in its view Wolverine was required to not only perform the work under Paragraph 7.9(b)(ii) of the CD as set out in the SOW and RAP but also to "define the vertical and horizontal extent of PFAS Compounds contamination in Area R-1 (19) *and comply with Section 20114 of Part 201*." (emphasis added.)

After EGLE issues a Statement of Decision, Paragraph 18.8 of the CD allows Wolverine to "file[] with this Court a motion for resolution of the dispute."[9] The motion must set forth the following: "the matter in dispute, the efforts made by [EGLE and Wolverine] to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of the Consent Decree."

## DISCUSSION

The CD reflects a compromise. As this Court knows, the CD resolved complex and multi-faceted litigation that could have ebbed and flowed on this Court's docket for decades. [ECF No. 150.] Like any compromise in the context of broader principles and priorities, each party made concessions.

The keystone compromise in the CD was agreement among the parties on the extension of municipal water in the Municipal Water Areas. The focus on providing that expedient and expansive relief to affected homeowners in those areas explains, in part, the more precisely tailored and limited activities performed in areas like Area 19 where there was less evidence connecting Wolverine's activities to the presence of PFAS Compounds in groundwater. Those and other factors that were litigated in the underlying lawsuit were all put to bed when the Court entered the CD six years ago.

---

[8] Attached as **Exhibit E**.
[9] This Motion is timely filed by agreement reflected in the attached communication among counsel.  **Exhibit F**.

In interpreting the CD, the Court should construe it as a contract. *See Lorain NAACP v. Lorain Bd. Of Educ.*, 979 F.2d 1141, 1148 (6th Cir. 1992) A consent decree reflects a compromise and settlement, so it must be interpreted within its four corners based on the language used and not based on what one party or the other views as its general purpose. *Id.* In short, interpretation of a consent decree follows the general rules of contract interpretation. *Id.*

**I.    The matter in dispute involves EGLE's attempt to unwind the compromise embodied in the CD.**

In rejecting Wolverine's Area 19 Completion Report, EGLE asserts that Wolverine somehow still has more to do. As support, EGLE relies on the following sentence in Paragraph 7.9(b)(ii) of the CD: "Once the vertical and horizontal extent of the PFAS Compounds contamination in Area R-1 (19) of the Filter Areas is defined, Defendant shall have no further obligation for groundwater investigations in Area R-1(19) of the Filter Areas."

But EGLE misreads that provision. EGLE ignores the fact that the work Wolverine already performed satisfies its obligation to define the vertical and horizontal extent of PFAS Compounds in Area 19. In addition, EGLE's interpretation is unsupported as matter of law and common sense. At the end of the day, EGLE's argument is merely an attempt to re-trade the compromise embodied in the CD.

**A.    *The work Wolverine performed satisfies the agreed-on scope of work to define the vertical and horizontal extent of PFAS Compounds in Area 19.***

Wolverine completed its obligation to define the vertical and horizontal extent of the PFAS Compounds in Area 19 to the degree required by the CD. As discussed above, the CD, SOW, and RAP all call for installation of specified wells, one round of sampling of those installed wells, and evaluation of results with EGLE. That work was performed to satisfy the stated objectives in the CD, including the objective to "define the nature and extent of PFAS

6

Compounds in groundwater in the Filter areas *as required by this Consent Decree*." CD ¶ 7.1(f) (emphasis added). The means by which those objectives would be accomplished were extensively negotiated and ultimately documented in detail in the CD, SOW, and RAP. The purpose of that extensive, early negotiation was to agree in advance on the work to be performed to accomplish the stated goals in the CD.

Wolverine has now completed that extensively negotiated work. The groundwater investigation work done to date in Area 19 included sampling at over thirty groundwater monitoring wells and dozens of drinking water wells. In satisfies the performance objectives identified in the CD, including the objective to define the nature and extent of PFAS Compounds as required by the CD.

### B. EGLE's interpretation contorts the plain language of the CD, which cannot possibly require additional future activities to be undertaken while also requiring a completion report to summarize the <u>completion</u> of all required activities.

There is no room in paragraph 7.12(a)(vii) of the CD for EGLE's interpretation that the Completion Report is both a summary of activities completed and somehow also a mechanism for proposing future response activity. The Completion Report is a summary of the completion of all required activities. By definition any future activities can be performed only after the Completion Report is submitted. Accordingly, its approval cannot possibly be contingent on completion of additional future work that has not yet been proposed or approved.

For that reason, there is no requirement in the CD to post a financial assurance mechanism for Area 19. The purpose of a financial assurance mechanism is to provide security for long-term (*i.e.*, future) response activity obligations. CD ¶ 4.9. If Wolverine had a long-term obligation to delineate and perform additional response activities under the CD, it would follow that Wolverine would be required to post a financial assurance mechanism to secure performance

of that future work. A financial assurance mechanism is required for every other completion report. (CD ¶ 7.12(a)(i)(C), (a)(ii)(C), (a)(iii)(C), (a)(iv)(C), (a)(v)(C), (a)(vi)(C). But no financial assurance is required for Area 19. (CD ¶ 7.12(a)(vii). Where an item in a contract is listed in every instance but one, the omission is significant. *Zedan v. SGL No 1 Ltd.*, 527 F. Supp. 3d 937, 942 (E.D. Mich. 2021) ("Michigan courts deem it significant when parties include a material term in one section of a contract and omit it from a second section of the contract.") Here, financial assurance is not required for Area 19 because no long-term response activities, such as further delineation work, are required.

For Area 19, the only requirement is to demonstrate that Wolverine completed the work it agreed to perform under Paragraph 7.9(b)(ii) of the CD. Having done that, the Completion Report must be approved.

EGLE's contrary position results in an irreconcilable contradiction. Taken as a whole, Paragraph 7.9(b)(ii) cannot simultaneously limit Wolverine's obligation to installation of wells and a single sampling of those wells while also imposing an open-ended mandate to delineate all PFAS contamination in Area 19. Standard principles of interpretation require that these clauses be read in concert, where the specific, negotiated single sampling requirement clarifies the scope of the general, passive-voice delineation language. *See, e.g.*, *Lorain NAACP v. Lorain Bd. Of Educ.*, 979 F.2d 1141 (6th Cir. 1992) (holding that specific limitations in consent decrees cannot be overridden by general policy goals).

That is why the sentence in Paragraph 7.9(b)(ii) of the CD that refers to delineation finds itself between two sentences that specifically refer to specific wells that will be installed in Area 19. The entire Paragraph must be read as referring to the same, specifically identified wells that

will be installed and sampled in Area 19. Once those wells are sampled, delineation has been accomplished.

Otherwise, the requirement to delineate would swallow the entire Consent Decree. There would be no reason to consistently refer to sampling and hand-off of particular wells, and there would be no reason to painstakingly negotiate the details in the SOW and RAP if at the end of the day Wolverine was required to perform additional response activities as if it were a liable party under Part 201. It would be impossible for the completion report, which was due in February 2025, to show completion of activities that were to be proposed in the first instance in the completion report itself. EGLE's interpretation is simply unworkable as a practical matter.

### C.  EGLE's demand is an attempt to unilaterally rewrite the CD.

EGLE's insistence that more is now required is an attempt to re-trade the CD. The Statement of Decision's command that Wolverine "comply with Section 20114 of Part 201" swallows the compromise that the Court lauded when it approved the Consent Decree. Section 20114 of Part 201, MCL 324.20114, applies to parties who are liable under Part 201. Wolverine contested Part 201 liability in the underlying lawsuit, particularly with respect to Area 19 where there is no direct evidence connecting historic Wolverine activities with the presence of PFAS Compounds in groundwater. Imposing a requirement to perform additional response activity in Area 19 would nullify the specific, negotiated limitations in the judicially approved CD and associated SOW and RAP for Area 19. It would be contrary to the fundamental compromise embodied in the extensively negotiated CD and would completely reopen the lawsuit that the CD comprehensively resolved.

It is also exactly the kind of scope-creep that the CD contemplated and prohibited. Paragraph 7.14(a) of the CD states that while EGLE may require modifications to a RAP, it

"may not require a modification to a portion of a Response Activity Plan that was contained in a statement of work attached to this Consent Decree." The Area 19 SOW was attached to the CD as Appendix R and explicitly limited the sampling in conformance with Paragraph 7.9(b)(ii). EGLE's attempt to arbitrarily impose an open-ended delineation requirement is therefore an impermissible modification of the specific, negotiated, and limited obligations contained in the CD and its associated SOW for Area 19.

EGLE's reliance on its Notice of Approval with Conditions of the RAP is also misplaced. While EGLE's notice states its "anticipat[ion] that after this first round of drilling, additional monitoring wells will be needed", and that "Wolverine must define the vertical and horizontal extent of the PFAS Compounds contamination within Area 19", these statements do not—and cannot—impose new obligations on Wolverine. EGLE's Notice of Approval is not a legally binding modification to the Consent Decree. At most, it reflects EGLE's own interpretation and future intentions. But EGLE cannot use the submission and approval process under a judicially approved consent decree to unilaterally alter the specifically negotiated terms of the governing document. Otherwise, the CD itself would be a meaningless document subject to unilateral change by EGLE every time Wolverine made a required submission.

In sum, the plain language of the governing documents, supported by their negotiation history, establishes a defined and limited scope of sampling work that was extensively negotiated to provide certainty. The parties dedicated time and effort to negotiating the details in advance so they could avoid exactly this undefined end point. Such extensive negotiation and agreement on the front end would not have been necessary if Wolverine was now required to comply with the entire suite of liable-party obligations under MCL 324.20114.

Instead, the CD, SOW, and RAP embody a compromise. They make clear that Wolverine's obligations in Area 19 ended when it documented completion of the specifically negotiated work in the Area 19 Completion Report.

**II.    Wolverine has attempted in good faith to resolve this dispute informally, but EGLE has refused to engage in discussions or participate in mediation.**

Wolverine attempted to resolve this dispute through informal negotiations, but its offers to meet to discuss a reasonable path forward were declined by EGLE. EGLE also rejected mediation, insisting that despite Wolverine's willingness to meet to discuss a possible compromise, any dispute or any possible resolution to the dispute involving Area 19 relates purely to the interpretation of the CD and not to any technical issues associated with any of Wolverine's submissions. For example, EGLE has steadfastly refused to engage in any discussion with Wolverine about the technical sufficiency of the delineation work performed by Wolverine in Area 19 to date or the extent of the work it believes is necessary to fill gaps in that work.

**CONCLUSION**

For the foregoing reasons, Wolverine respectfully requests that this Court find that Wolverine has completed the work required under Paragraph 7.9(b)(ii) of the CD and enter an Order directing EGLE to approve Wolverine's Area 19 Completion Report.

Dated: February 20, 2026

Respectfully submitted,

/s/ *Scott M. Watson*
Scott M. Watson (P70185)
BARNES & THORNBURG LLP
171 Monroe Ave NW, Ste 1000
Grand Rapids, Michigan 49503
scott.watson@btlaw.com
(616) 742-3991

John V. Byl
WARNER NORCROSS + JUDD LLP
150 Ottawa Ave NW, Ste 1500
Grand Rapids, Michigan 49503
jbyl@wnj.com
(616) 752-2000

*Attorneys for Defendant Wolverine World Wide, Inc.*